Richard C. Eymann, WSBA #7470
EYMANN ALLISON HUNTER JONES P.S.
2208 W. Second Avenue
Spokane, Washington 99201
Telephone:  (509) 747-0101
Facsimile:    (509) 458-5977
E-mail:       eymann@eahjlaw.com




Hugh P. Lambert
Emily C. Jeffcott
Cayce C. Peterson
THE LAMBERT FIRM, PLC
701 Magazine Street
New Orleans, Louisiana 70130
Telephone:  (504) 581-1750
Facsimile:    (504) 529-2931
E-mail:       hlambert@thelambertfirm.com
              ejeffcott@thelambertfirm.com
              cpeterson@thelambertfirm.com

*Attorneys for Relators*

1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA *EX REL.* GARY BRUNSON, DONNA BUSCHE, AND WALTER TAMOSAITIS, PH.D. | CIVIL ACTION NUMBER: CV-13-5013-EFS. <br><br> DISTRICT JUDGE: HONORABLE EDWARD F. SHEA |
| RELATORS, | **AMENDED COMPLAINT** <br> **FILED UNDER SEAL** |
| VS. <br> BECHTEL NATIONAL INC., BECHTEL CORPORATION, URS CORPORATION, AND URS ENERGY & CONSTRUCTION, INC. | DEMAND FOR JURY TRIAL |
| DEFENDANTS. | |

1

## TABLE OF CONTENTS

2    ACRONYMS ..................................................................................9

3    I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS ............12

4    II.    PARTIES ............................................................................13

5         A.    Relators ..................................................................13

6         B.    Defendants ..............................................................15

7    III.    JURISDICTION AND VENUE ..................................................18

8    IV.    FACTUAL ALLEGATIONS ......................................................19

9         A.    Background: A Century of Hanford ............................19

10              1.    Beginnings: A Nuclear Facility at Hanford ..............................19

11              2.    Storing the Chemical Nuclear Waste Left Behind from

12                   Plutonium Production ...........................................20

13              3.    Immobilizing the Mixed Waste Through Vitrification ............22

14                   a)    Vitrification of Chemical Nuclear Waste Has Been

15                        Successfully Achieved Worldwide ..........................22

16                   b)    Vitrification at Hanford ...........................................24

17              4.    BNFL is Terminated as the WTP Contractor ..........................27

18              5.    Bechtel Purposefully Underbids and Secures the WTP

19                   Contract ...........................................................29

20              6.    Bechtel's Contract to Design and Construct the Hanford Waste

21                   Treatment Plant ....................................................30

7.    *Payment Under the WTP Contract* ..........................................39

B.    **Testing in Response to Issues Raised by the 2006 External Flowsheet Review Team Violated Requirements** ....................**41**

1.    *Inadequate Mixing in Vessels (M3)* ........................................45

a)    Background on Mixing Wastes with Varying Rheologies .................................................................45

b)    Defendants Knowledge of Mixing Issues ................47

c)    To Resolve Mixing Issues and Close M3, Defendants Had to Verify the Vessel Design ..........50

d)    Defendants Failed to Evaluate Adverse Conditions and Cut Corners During M3 Testing, Resulting in Quality Indeterminate Data .......................................52

e)    Defendants Misrepresented the Quality Indeterminate Testing Data to Obtain TSG Approval for the Closure of M3 ...............................64

(i)    Unsupported Scale Up of Test Results ..........65

(ii)    The unverified assumption that Newtonian fluids may be used to predict the behavior of non-Newtonian fluids. ....................................68

(iii)    Untested Heel Removal Strategy ...................69

2.    *Undemonstrated Leaching Process (M12)* ..............................76

3.    Plugging in Process Piping (M1) ...............................................80

4.    Process Operating Limits Not Completely Defined &
      Gelation/Precipitation During Leaching (M6/P4) .................83

5.    Mixing Vessel Erosion (M2)......................................................86

C.    Government Dollars Spent on Lobbying....................................90

D.    False Claim for Accelerated Payment ......................................100

E.    Failure to Comply with DOE-STD-3009 and NQA-1 in
      Developing the QRA Probabilistic Tool ..................................103

      1.    Defendants Falsely Asserted that the QRA Would Not Be Used
            to Remove Safety Controls .....................................................108

      2.    Defendants Misrepresented to DOE Compliance with
            NQA-1......................................................................................116

F.    Failure to Comply with Safety Requirements in Designing
      and Fabricating the PVV/PVP System.....................................117

G.    Procurements that Failed to Meet Basic Safety
      Requirements.............................................................................120

H.    Welds That Failed to Meet Requirements ...............................184

I.    Fire safety System failed to meet requirements ....................188

      1.    Defendants Failed to Meet Requirements for the WTP Fire
            Safety Sprinkler Systems.......................................................188

2.   *Defendants Failed to Meet Requirements for the WTP Fire Service Water Protection System* ............................................ 190

3.   *Defendants Failed to Meet Requirements for the LAW Annex Roof Assembly* ..................................................... 192

4.   *Defendants Failed to Meet Requirements for the WTP Fire Perimeter Barriers* ................................................ 193

J.   **Modifications To Cathodic Protection System Without Design Basis** ................................................................. 194

K.   **Government Dollars Spent To Develop A Tool For Private Gain** ....................................................................... 197

1.   *Defendants Misrepresented to DOE the Utility of CFD Modeling* ............................................................... 200

2.   *Defendants Misrepresented to DOE the Results of CFD Analysis* ............................................................... 205

3.   *Defendants Failed to Implement Quality Assurance Requirements in CFD Testing* ............................................ 206

L.   **Failure To Implement Safety Requirements** ........................... 207

1.   *The PT PDSA Failed to Identify Known Safety Hazards in the Ultrafiltration Process System* ............................................ 209

2.   *The PT PDSA Failed to Identify Safety Functions and Changes to the PVV/PVP System* ....................................... 211

3.     *The PDSA Safety Classifications Related to the PT Facility Fire Barrier Design Were Not Based on Required Hazard Analyses* .................................................................213

4.     *Defendants Failed to Account for Known Volcanic Ashfall Hazards in Designing Safety Class and Safety Significant SSCs* ...............................................................214

M.    **A Noncompliant Quality Assurance System**...........................215

N.    **False Claim For Money For Descoped Work**..........................219

O.    **False Claim for Milestone Award: Lab Construction Substantially Complete** .............................................222

P.    **False Certification of Tri-Party Agreement Milestone M-062-49** ...........................................................................223

Q.    **Manipulation of Performance Metrics** ...................................227

1.     *Defendants Moved Scope and Budget to the Future to Alter SPI Indexes*..............................................................229

2.     *Defendants Authorized and Performed Work Without a Budget To Delay Reporting of Costs and Schedule* ...........................230

3.     *Defendants Manipulated the PMB and Misused Funds from Management Reserve* ......................................................231

4.     *Defendants Broke EVMS Scheduling Ties and Modified Rules of Credit to Maintain Performance* ..........................................232

V.     DAMAGES ................................................................................................237

VI.    JURY REQUEST ......................................................................................237

VII.   PRAYER FOR RELIEF.............................................................................237

**ACRONYMS**

| | |
|---|---|
| ACWP | Actual Cost of Work Performed |
| ACWS | Actual Cost of Work Scheduled |
| AWA | Advanced Work Authorization |
| BCP | Baseline Cost Proposal |
| BCWP | Budgeted Cost of Work Performed |
| BCWS | Budgeted Cost of Work Scheduled |
| BHRG | British Hydraulic Research Group |
| BOC | Bubble of Concern |
| BOF | Balance of Facilities |
| CD-4 | Critical Decision-4 |
| CFD | Computational Fluid Dynamics |
| CPI | Cost Performance Index |
| CSER | Preliminary Criticality Safety Evaluation Report |
| DNFSB | Defense Nuclear Facilities Safety Board |
| DOE | United States Department of Energy |
| DOE-HQ | United States Department of Energy Headquarters |
| E&NS | Environmental & Nuclear Safety Group |
| EFRT | External Flowsheet Review Team |
| EPA | United States Environmental Protection Agency |
| EPCC | Engineering, Procurement, Construction, and Commission |

| | | |
|---|---|---|
| 1 | EVMS | Earned Value Management System |
| 2 | FSW | Fire Service Water Protection System |
| 3 | HEPA | High Efficiency Particulate Air filter |
| 4 | HLW | High-Level Waste |
| 5 | HPAV | Hydrogen in Piping and Ancillary Vessels |
| 6 | LAB | Laboratory |
| 7 | LAW | Low-Activity Waste |
| 8 | MAR | Materials At Risk |
| 9 | MOU | Memorandum of Understanding |
| 10 | MR | Management Reserve |
| 11 | NCR | Non-Conformance Report |
| 12 | NFPA | National Fire Protection Association |
| 13 | NQA-1 | Nuclear Quality Assurance-1 |
| 14 | ORP | United States Department of Energy Office of River Protection |
| 15 | PDSA | Preliminary Documented Safety Analysis |
| 16 | PEMP | Performance Evaluation Measurement Plan |
| 17 | PIER | Project Issues Evaluation Report |
| 18 | PJM | Pulse Jet Mixer |
| 19 | PMB | Performance Measurement Baseline |
| 20 | PNNL | Pacific Northwest National Laboratory |
| 21 | PT | Pretreatment |

| | |
|---|---|
| PVP | Process Vessel Vent Process |
| PVV | Process Vessel Vent Exhaust |
| QRA | Quantitative Risk Assessment |
| R&T | Research & Technology Group |
| SDDR | Supplier Deviation Disposition Request |
| SPI | Schedule Performance Index |
| SRD | Safety Requirements Document |
| SRNL | Savannah River National Laboratory |
| SSC | Structures, Systems, and Components |
| SRD | Safety Requirements Document |
| TSG | Technology Steering Group |
| UPS | Uninterruptible Power Supply |
| WSU | Washington State University |
| WTP | Hanford Waste Treatment and Immobilization Plant |
| ZOI | Zone of Influence |

## I.     INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.     This is an action to recover damages, civil penalties, and other relief from Bechtel Corporation, Bechtel National Inc., URS Corporation, and URS Energy & Construction, Inc. for causing great harm to the United States by perpetuating a conspiracy by and between themselves to defraud the United States of billions of dollars in supposed design, testing and development of the Hanford Waste Treatment & Immobilization Plant ("WTP").  The WTP is intended to treat and ultimately vitrify 55 million gallons of high-level radioactive and chemical wastes, referred to as mixed waste, currently stored in 177 underground storage tanks at the Hanford Site, a one-time nuclear production complex that is in the process of being decommissioned.  The Hanford Site is located on the Columbia River in the mid-south area of Washington state.

2.     Since 2000, Defendants have perpetrated a massive fraud on the United States.  Beginning with the initial contracting process, Bechtel underbid to obtain the WTP Contract, knowing fully that the WTP could not be designed, constructed, and commissioned at the submitted bid price and intending at that time to obtain additional funds through the subsequent misuse of the "change order" process.

3.     Defendants then designed and constructed the WTP in a manner they knew failed to conform to contractual requirements in myriad

ways, most of which constitute systemic failures of Defendants' design, procurement, and construction processes. To limit the public impact of these failures, Defendants used taxpayer funds to hire lobbyists to secure future appropriations and silence critics. Defendants likewise falsely claimed achievement of incentive fees and milestone awards, submitting to DOE false statements and manipulated statistics.

4.    Defendants, focused squarely on the bottom-line, manipulated and deceived the United States in an effort to increase profits. Defendants fraudulenty obtained from the United States over a billion dollars in taxpayer funds, and the amount to repair Defendants' defective design and construction of the WTP exceeds billions of dollars.

II.    **PARTIES**

    A.    <u>RELATORS</u>

5.    Gary Brunson was the Department of Energy ("DOE") Office of River Protection ("ORP") Engineering Director responsible for the WTP until his involuntary retirement in January of 2013. Relator Brunson has direct and independent knowledge of the information underlying his claims as set forth in the Original and Amended Complaints in this Court, and he voluntarily provided all such information to the United States before the filing of the Original and Amended Complaint in this Court. Even if certain allegations or transactions described herein have been

publically disclosed, the information possessed by Relator Brunson and provided to the United States materially adds to publically disclosed allegations and transactions, if any.  He, therefore, is an "original source" as that term is used in the False Claims Act, 31 U.S.C. § 3730 (e)(4)(B).

6.      Donna Busche is the WTP Environmental and Safety Manager and designated as key personnel in the WTP Contract.  Relator Busche is employed by URS.  Relator Busche has direct and independent knowledge of the information underlying her claims as set forth in the Original and Amended Complaints in this Court, and she voluntarily provided all such information to the United States before the filing of the Original and Amended Complaint in this Court.  Even if certain allegations or transactions described herein have been publically disclosed, the information possessed by Relator Busche and provided to the United States materially adds to publically disclosed allegations and transactions, if any.  She, therefore, is an "original source" as that term is used in the False Claims Act, 31 U.S.C. § 3730 (e)(4)(B).

7.      Walter Tamosaitis, Ph.D. was the WTP Research & Technology Manager and Deputy Chief Process Engineer prior to his forced departure from the WTP in June of 2010.  Relator Tamosaitis has direct and independent knowledge of the information underlying his claims as set forth in the Original and Amended Complaints in this Court, and he

voluntarily provided all such information to the United States before the filing of the Original and Amended Complaint in this Court.   Even if certain allegations or transactions described herein have been publically disclosed, the information possessed by Relator Tamosaitis and provided to the United States materially adds to publically disclosed allegations and transactions, if any.  He, therefore, is an "original source" as that term is used in the False Claims Act, 31 U.S.C. § 3730 (e)(4)(B).

## B.   Defendants

8.    Defendant Bechtel Corporation is a foreign corporation doing business in Washington and the United States.   Defendant Bechtel Corporation is the owner and operator of a worldwide vertically integrated business providing engineering, procurement, and construction services to civil infrastructure, communications, transportation, mining and metals, oil and gas, chemicals, power, and government industries in the United States. Bechtel Corporation conducts such businesses in Washington and the United States through a number of subsidiaries including Defendant Bechtel National Inc.  Bechtel Corporation is the alter ego of Bechtel National Inc., or in the alternative, Bechtel Corporation is using subsidiary Bechtel National Inc. as its agent, or Bechtel Corporation and Bechtel National Inc. are one single integrated enterprise.   Defendant Bechtel Corporation is incorporated under the laws of the state of Nevada, with its

home office at 50 Beale Street, San Francisco, California 94105.  Defendant Bechtel Corporation may be served with process through its registered agent for service, C T Corporation, at 818 West Seventh Street, Los Angeles, California 90017.

9.    Defendant Bechtel National Inc. is a foreign corporation doing business in Washington and the United States.  Defendant Bechtel National Inc. is a wholly owned subsidiary of Bechtel Corporation.  Defendant Bechtel National Inc. is a contractor for ORP at the Hanford Nuclear Site, and is charged with the design, construction, commissioning, and startup of the Waste Treatment Plant at the Site.  Defendant Bechtel National Inc. is a subsidiary of Bechtel Corporation, and Bechtel Corporation is the alter ego of Bechtel National Inc. or in the alternative, Bechtel Corporation is using Bechtel National Inc. as its agent with respect to engineering, construction and technical services provided to the United States, or Bechtel Corporation and Bechtel National Inc. are one single integrated enterprise.  Defendant Bechtel National Inc. is incorporated under the laws of the state of Nevada with its home office at 50 Beale Street, San Francisco, California 94105.  Defendant Bechtel National Inc. may be served with process through its registered agent, The Corporation Company, at 555 Capitol Mall, Ste. 1000, Sacramento, California 95814.

10. Bechtel Corporation and Bechtel National Inc. are collectively referred to herein as "Bechtel."

11. Defendant URS Corporation is a foreign corporation doing business in Washington and the United States. Defendant URS Corporation is the owner and operator of a worldwide vertically integrated business providing engineering, construction and technical services for public agencies and private sector companies around the world. URS Corporation conducts such businesses in Washington and the United States through a number of subsidiaries including Defendant URS Energy & Construction, Inc. URS Corporation is the alter ego of URS Energy & Construction, Inc., or in the alternative, URS Corporation is using subsidiary URS Energy & Construction, Inc. as its agent, or URS Corporation and URS Energy & Construction, Inc. are one single integrated enterprise. Defendant URS Corporation is incorporated under the laws of the state of Delaware with its home office at 600 Montgomery Street, 26th Floor, San Francisco, California 94111. Defendant URS Corporation may be served with process through its registered agent, C T Corporation System, at 818 W. Seventh Street, Los Angeles, California 90017.

12. Defendant URS Energy & Construction, Inc. is a foreign corporation doing business in Washington and the United States. Defendant URS Energy & Construction, Inc. is a subsidiary of URS

Corporation, and URS Corporation is the alter ego of URS Energy & Construction, Inc. or in the alternative, URS Corporation is using URS Energy & Construction, Inc. as its agent with respect to engineering, construction and technical services provided to the United States, or URS Corporation and URS Energy & Construction, Inc. are one single integrated enterprise. Defendant URS Energy & Construction Inc. is incorporated under the laws of the state of Ohio with its home office at 720 E. Park Blvd, Boise, Idaho 83712. Defendant URS Energy & Construction, Inc. may be served with process through its registered agent, C T Corporation System, at 111 W. Jefferson Street, Boise, Idaho 83702.

13.    URS Corporation and URS Energy & Construction, Inc. are collectively referred to herein as "URS."

**III.    JURISDICTION AND VENUE**

14.    This action arises under the United States False Claims Act, 31 U.S.C. § 3729 *et seq.*

15.    This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

16.    There was not, prior to filing the Original or Amended Complaints in this case, any "public disclosure" of the false claims identified herein as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A).    However, even if a "public disclosure" has occurred,

Relators' claims are not barred pursuant to 31 U.S.C. § 3730(e)(4)(B) because Relators are "original sources" of the information underlying and becoming Relators' false claims identified herein. Venue is proper with respect to all parties in the United States District Court for the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because all Defendants transact business in this District and because Relators, during all times material to this matter, were employed in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     BACKGROUND: A CENTURY OF HANFORD

17.     Nuclear operations began at the Hanford Site in approximately 1943 and continued until 1987 when its last reactor ceased operation.  In addition, the Hanford Site was likewise used as a repository for mixed chemical and nuclear wastes generated both on-site and nationwide.  To remediate the Hanford Site, DOE agreed to design, build, and commission the WTP and treat the mixed waste by 2040—a deadline that will not be met because of Defendants' fraud.

#### 1.     Beginnings: A Nuclear Facility at Hanford

18.     The Hanford Site was established as part of the Manhattan Project and was home to the first full-scale plutonium reactor in the

world—the B Reactor.  The bomb dropped on Nagasaki, Japan contained plutonium manufactured at Hanford.

19.   Over 45 years, a total of 9 plutonium production reactors and six large processing facilities were built at the Hanford Site, producing the plutonium for the majority of weapons in the U.S. nuclear stockpile.  The weapons production reactors have been in the decommissioning process since the Cold War.

## 2.   *Storing the Chemical Nuclear Waste Left Behind from Plutonium Production*

20.   The decades of plutonium manufacturing produced 55 million gallons of high-level radioactive and chemical wastes, referred to as "mixed" waste.  Over time, 177 large tanks, ranging in capacity from 55,000 gallons to more than 1,000,000 gallons, were constructed to house the waste.  One hundred and forty-nine of these tanks are single shell and were built at Hanford between 1943 and 1964.  The remaining 28 were built between 1968 and 1986 with double shells.  At present, all of the tanks are beyond their design life.

21.   Collectively referred to as the "Tank Farm," the 177 tanks have failed to maintain structural integrity, resulting in many confirmed leaks. It is estimated that 67 of the 147 single shell tanks are leaking and at least one of these double shell tanks is leaking.  The environmental hazards

posed by the leaking Tank Farm are extreme.  The radioactive and chemical wastes are toxic to the environment and deadly to humans.

22.    Seeking to correct and prevent further damage from the mixed waste contaminating the Hanford Site, the United States Environmental Protection Agency ("EPA"), DOE, and the State of Washington Department of Ecology signed a comprehensive cleanup and compliance agreement in 1989.  The agreement, known as the "Tri-Party Agreement," eventually became a Consent Decree following litigation.  The Tri-Party Consent Decree mandates that the Hanford site, including the Tank Farm, be brought into compliance with existing federal and state laws that govern the management and cleanup of hazardous waste sites by specified dates. The Tri-Party Agreement includes numerous mandatory milestones that DOE must achieve in order to remain compliant with the legally binding agreement.  One such category of milestones pertains to the immobilization of mixed waste from the Tank Farm.  To accomplish this, DOE decided to vitrify the waste, just as has been done at other nuclear waste treatment facilities across the world.

### 3. *Immobilizing the Mixed Waste Through Vitrification*

23.   Vitrification has been recognized as the solution to managing radioactive wastes for roughly 60 years and is the preferred method of immobilizing radioactive waste for disposal.

24.   Since the 1970s, facilities across the world have constructed melters to vitrify radioactive wastes and the melter technologies employed by these various facilities are recognized as mature and standard.

### a)   <u>Vitrification of Chemical Nuclear Waste Has Been Successfully Achieved Worldwide</u>

25.   Vitrification facilities have been built at La Hague in France, Kalpakkam in India, Lanzhou in China, Mayak in Russia, Sellafield in the United Kingdom, Rokkasho in Japan, Tarapur in India, Tokai in Japan, Trombay in India, the Savannah River Site in South Carolina, and also the West Valley Demonstration Project in New York.

26.   To date, vitrification facilities across the world have produced tens of thousands of metric tons of vitrified nuclear waste.

27.   One of the largest radioactive waste vitrification plants in the world is the Defense Waste Processing Facility located at the Savannah River Site in South Carolina.  Construction of this facility took 13 years, beginning in late 1983 and becoming operational in March 1996.  Until

1989, Bechtel was the design/construction contractor for this facility.  By 2019, the facility will have produced 6,000 canisters of vitrified waste that are each ten feet tall and two feet in diameter, weighing over 5,000 pounds.

28.    Another United States facility, the West Valley Demonstration Project, located in West Valley, New York, which had accumulated approximately 2 million gallons of radioactive sludge including 600,000 gallons of high-level waste, took approximately 9 years to build (1986-1995).  The facility began vitrification of high level wastes in 1996 and completed vitrification of all wastes in 2002, producing over 9 million pounds of glass.  URS was the prime operator of this facility.

29.    France is recognized as the forefather of nuclear waste vitrification.  The vitrification facility at La Hague, France is the oldest of the vitrification plants.    In 1952, France launched a research and development program to study vitrification of nuclear waste, and by 1957, France had commissioned a laboratory scaled vitrification unit.  Shortly thereafter, France had commissioned the first vitrification pilot unit.  This first facility was called "PIVER" and operated successfully from 1969-1973, producing 12 tons of glass containing radioactive waste.  PIVER resumed operation in 1979 and continued vitrification of nuclear waste until it was decommissioned around 1990.  France developed a second vitrification facility in parallel to PIVER called the "Atelier de Vitrification de

Marcoule" or "AVM".  The AVM started active operation in June 1978 and operated until 1997, producing 2,731 glass canisters corresponding to 2,189 cubic meters of fission products and 977 tons of glass.   France has continued to open other vitrification facilities, which as of 2010 have produced a combined 17,200 canisters of vitrified nuclear waste.

30.    England, utilizing the melter technology developed in France, began construction of the Sellafield Waste Vitrification Plant in 1983.  This facility, located in Cambria, England, opened eight years later, on February 26, 1991.  Many aspects of the Hanford WTP are based on and attributable to the Sellafield design.

31.    Defendants have past experience in the design, construction, and operation of DOE vitrification facilities.   Bechtel was a major participant in the design and construction Defense Waste Processing Facility located at the Savannah River Site.  URS is the current operator of this facility.  URS was also the operator of the West Valley Plant in New York.

### b)    Vitrification at Hanford

32.    The WTP is targeted to be the world's largest vitrification facility capable of handling mixed waste.  According to the baseline plan for the WTP, the Pretreatment ("PT") facility will receive mixed waste from the Tank Farm through an underground piping system and then separate

the waste into two streams, low-activity waste ("LAW"), which is mainly liquid with a moderate danger level, and high-level waste ("HLW"), which is concentrated with highly radioactive particles, including plutonium, uranium, and cesium.

33.   This separation process will primarily take place in a hot cell located on the main level of the PT facility.  The hot cell will contain ultra-filtration equipment (also referred to as cross-flow filtration) that will filter the mixed waste, removing radioactive particles and concentrating them in a HLW feed.  This cross-flow technology is an established process utilized at other vitrification facilities, including the West Valley Demonstration Project in New York.  Following initial filtration, the waste will then pass through cesium-ion exchange columns, which will remove the soluble, highly radioactive cesium and add those particles to the HLW feed.

34.   For final processing, the low-activity liquid will proceed to the LAW facility and the high-level liquid and solids will continue to the HLW facility.

35.   The LAW facility, which will have two melters located in a single gallery, will employ standard melter technology to vitrify the wastes.  Glass-forming materials, like silica, will be added to the waste to achieve a 20% waste to 80% glass ratio.

25

36.   The LAW mixture of waste and molten glass will then be poured into stainless steel cylindrical containers that are seven feet tall and four feet in diameter.   Once full, the seven-ton canisters containing the LAW glass mixture will undergo mechanical lidding and decontamination and will be transported to the integrated disposal facility on the Hanford site for storage.

37.   The HLW facility, which will house two 40-ton melters, will immobilize the most dangerous waste at Hanford by applying standard melter technology.   High-level waste requires a 70% glass to 30% waste ratio for safe storage.   When the 15 feet tall, two feet in diameter, four ton canisters are full of the HLW glass mixture, the lids will be welded shut and the canisters will be immersed in a solution that dissolves a thin layer of the canister's surface to ensure that any harmful radioactive contamination is removed.   The decontaminated canisters will then be placed inside shielded containers before being transported to a national geological suppository for permanent disposal.

38.   To ensure the safety of the public and the environment, the PT, HLW, and LAW facilities are required to maintain safety systems and redundant safety systems.   Any system, service, or component in these facilities deemed to be important to safety is held to a higher standard of quality.   This ensures the utmost protection in case of an event caused by

malfunction in the design (referred to as design basis event) or a natural disaster caused by volcanic ash, earthquake, flooding, etc.

39.     The crisis at the nuclear facility in Fukushima demonstrates the basis for a higher standard for safety systems, services, and components.

40.     Although the WTP is unique in its size, the vast majority of the WTP design is based on standard technologies employed by other vitrification and treatment facilities that are applicable regardless of the size of a facility.  For example, using pulse jet mixers in the vessels and sealing off wastes in black cells have been successfully employed at Sellafield, and aspects of the PT facility are based on the Sellafield design. While Bechtel may not apply certain technologies in the exact same manner as other facilities, the fundamentals of these technologies are unchanging.

### 4.     *BNFL is Terminated as the WTP Contractor*

41.     In 1994, DOE decided to privatize the clean-up of contaminated nuclear sites, including the development of the Hanford WTP.   The privatization program was intended to reduce costs by allowing contractors to procure financing from commercial markets.

42.     On September 25, 1996, upon an initial estimate that building the plant would cost $3.2 billion, BNFL Inc. was awarded the contract to design, build, and operate the vitrification facility to treat and immobilize radioactive liquid wastes stored in the 177 underground tanks at Hanford.

43.    On September 25, 1996, the same day BNFL Inc. was awarded the contract, Bechtel announced through a press release that it would be joining the BNFL team to provide detailed design, procurement, and construction services.

44.    Chris Judd, Bechtel's program manager for the privatization effort, said that during the project's initial 16 month "Proof of Concept" phase, Bechtel and other subcontractors would develop a conceptual design and prepare permit applications, scope and pricing documents, regulatory framework development, and a safety program for the waste treatment facility.

45.    In 1998, BNFL Inc., while working directly with Bechtel, more than doubled the cost estimate it made two years earlier, claiming that the facility would cost $6.9 billion.

46.    Despite the cost increases, the project moved forward in a series typical for large and complex construction projects; activities were to be serially executed, including: design development, safety documentation development, procurements, construction, acceptance testing, and commissioning.

47.    In 2000, BNFL Inc., with Bechtel knowledge, once again more than doubled the cost estimate it made two years earlier and claimed the

facility would cost over $15 billion.  In response to the price hike, DOE cancelled its contract with BNFL Inc.

### 5.   *Bechtel Purposefully Underbids and Secures the WTP Contract*

48.   Following BNFL's increased cost proposal, ORP publicly issued a request for proposals to complete the WTP, deciding to pursue a cost-plus-incentive fee contract instead of continuing the BNFL privatization strategy

49.   In the proposal requests provided to potential bidders, DOE modified the scope of work, omitting from contractual duties the requirement to treat 10% of the wastes—work originally included in BNFL's contract.  Instead, DOE planned for vitrification to be performed by the operator of the WTP following the completion of the WTP.  DOE believed this modification reduced the original scope of work by approximately 10%.

50.   Mike Lawrence, a former ORP site manager, asserted that the WTP could not be completed for less than $6.5 billion.

51.   Also during this timeframe, Relator Busche recalled a Tank Farm meeting where attendees laughed at the notion that the WTP could be built for less than $6 billion.

52.    However, despite being a core member of the BNFL team to construct the WTP, Bechtel submitted a bid to complete the WTP for $4.3 billion—approximately $11 billion less than BNFL's price—an objectively false estimate of the cost to complete the WTP.  Bechtel knew, or should have known, that it could not complete the scope of work for $4.3 billion. Bechtel purposefully underbid to secure the contract for the WTP, intending to fraudulently inflate the cost of the WTP through a subsequent manipulation of the "change order" process.  This process, formally known at the WTP as the "baseline change request" process, allows a government contractor to request an increase in costs where the scope of the work has been modified.

53.    DOE accepted Bechtel's bid, resulting in Contract No. DE-AC27-01RV14136 ("WTP Contract").  Bechtel proceeded to abuse the change order process to inflate the cost of the WTP from its originally proposed $4.3 billion to an amount unknown but one exceeding $12 billion.

### 6.    *Bechtel's Contract to Design and Construct the Hanford Waste Treatment Plant*

54.    After winning the WTP Contract, Bechtel formally named URS as its prime subcontractor, dividing scope of work and sharing contractor responsibilities.

55.    The deliverables identified in the WTP Contract are rooted in the functional requirements found in the WTP Contract.  The requirements include, among others:

a.        Have a forty (40)-year operating life for the operating facilities (PT, HLW, LAW), Analytical Laboratory ("LAB"), and Balance of Facilities ("BOF") exclusive of ancillary facilities.

b.        Separately receive and store LAW and HLW streams from the Tank Farm in appropriately designed vessels.

c.        Implement the processes for solids washing, caustic leaching, and oxidative leaching of the HLW stream and immobilize the HLW feed and radionuclides separated from the LAW feed.

d.        Comply with applicable Federal, State, and local requirements, including environmental permits and other regulatory approvals and authorizations as compiled by Relator Busche's department, the Environmental & Nuclear Safety group.

e.        Coordinate and obtain approval of Environmental & Nuclear Safety Management regarding compliance with contractual and NQA-1 Standards as implemented through the Safety Requirements Document ("SRD"), the Preliminary Documented Safety Analysis ("PDSA"), and the Preliminary Criticality Safety Evaluation Report ("CSER").

56.    The WTP Contract requires that functional requirements be flowed down and incorporated into the design of the WTP as depicted in Figure 1, WTP Design Development.

57.    Figure 1, WTP Design Development (next page) shows the flowdown of requirements, beginning with the contract.    Each level provides progressively more detailed design requirements, and changes occurring at any level must be implemented in all subsequent levels as shown below.    If a change is contemplated at one level that does not comply with requirements at a higher level, then the upper level requirements must be modified prior to approving the design change.



**Figure 1, WTP Design Development**

58.   In executing the WTP Contract, Defendants have adopted a "close-coupling" approach, allowing Defendants to break the project up into parts so that portions of the project could proceed faster than others.

59.   As a result, the WTP is being designed and built in five facility segments—PT facility, LAW facility, HLW facility, LAB, and the balance of facilities—which makes each part a discrete and smaller project.  As the design and safety documentation of each segment are completed, the WTP Contract permits procurement and construction to proceed on that portion of the design.

60.   As the WTP prime contractor, Bechtel is responsible for all aspects of the project including the initial startup.   By having this contractually enumerated responsibility, Bechtel is the design authority and the design agent.

61.   The design authority is the organization responsible for establishing and approving the design basis as defined by the contract, safety documents, applicable laws, codes, and standards.

62.   In this role, the organization is responsible for design control and the ultimate technical adequacy of the design process.   These responsibilities are applicable whether the process is conducted fully in-house, partially contracted to outside organizations, or fully contracted to outside organizations.

63.   The design authority may delegate design work, but not its responsibilities to comply with contractual requirements including nuclear safety standards.

64.   The design agent is the organization responsible for development of the design, including the analysis and calculations to support the design, and for establishing engineering deliverables for design implementation.   The design agent determines how and when a design will be done, and the design agent performs design activities at the direction of and under the responsibility of the design authority.

65.   Interaction between the design authority and design agent must be identified and procedurally controlled in order to maintain the integrity of the two separate and distinct functions.   Interface controls between the design authority and the design agent are necessary, particularly where the design agent is within the same organization as the design authority.  The level of control necessary is dependent on the size of the organization—the larger the organization, the greater the need for procedural controls.  In large matrixed organizations, such as Bechtel and URS, interaction between groups performing design functions and groups performing design implementation—whether in house or outsourced—should be handled formally through change order specifications,

authorized requisitions, and formal work order control—i.e., the design authority treats these matrixed organizations as outside vendors.

66.    By being both the design authority and design agent, Bechtel determines what needs to be done (design authority) and how and when it will be done (design agent).

67.    The WTP Contract identifies Bechtel as the design authority and design agent, providing that Bechtel:

> shall have authority and responsibility to ensure that: (i) the design of the WTP facilities comply with all requirements in the contract, and design requirements identified in approved deliverables and work products specified in C.6 through C.9 of this contract. (ii) The planned operation of the WTP can achieve the capacity requirements specified in section C.6, Standard 5, Commissioning. (iii) The Contractor shall identify, quantify, and manage process and facility equipment sizing, technical operation performance, environmental permitting and the safety authorization basis to achieve the Contract Specified requirement of the WTP.

68.    To fulfill its responsibility as design authority and agent, Bechtel has established various EPCC project departments.    The main project departments are Research & Technology; Design Engineering;

Construction, Procurement & Acceptance; Environmental & Nuclear Safety; Operations; Project Controls; and Project Management.

a. The Research & Technology ("R&T") group frequently performs a design agent function and is responsible for demonstrating the performance of selected designs and resolving technical issues. The WTP Contract requires testing by R&T to (1) characterize the LAW and HLW feeds; (2) validate the capability of PT to meet contract requirements, operating requirements, operating limits, and plant throughput requirements; (3) determine the appropriate operating conditions for the LAW and HLW melters; (4) demonstrate that immobilized LAW and HLW glasses meet contract requirements; (5) design and provide operational processes for oxidative leaching; and, among other things, (6) confirm vessel mixing. R&T is also required to develop and use analytical modes to predict and evaluate WTP performance.

b. The Design Engineering group performs a design authority function and is responsible for the design of the Hanford WTP, including the basis of design. Separate sub-groups within the design engineering group focus on specific areas of the plant: Pretreatment, LAW vitrification, HLW vitrification, the laboratory, and the support systems. The WTP Contract establishes numerous

requirements for the development of the WTP design and the design itself.

c.        The Construction, Procurement & Acceptance group performs a design agent function and is charged with procuring all required materials; constructing or managing the construction of the required systems, components, equipment, etc., inspecting and testing, and "ensur[ing] that work performed under the Contract conforms to the Contract."

d.        The Environmental & Nuclear Safety group ("E&NS") is responsible for establishing and maintaining regulatory permits and the safety documents (SRD, PDSA, CSER), evaluating the WTP design and design changes, and project procedures for compliance with environmental and safety regulations and regulatory requirements and notifying the project management group when designs or project procedures are noncompliant.

e.        The Project Management group includes top managers from the all departments who are responsible for establishing and maintaining the appropriate organization structure to coordinate the functions, duties, and responsibilities of design authority and design agent functions.

38

1         f.     The Project Controls group is responsible for

2    maintaining cost and schedule performance records and overall

3    project status and reporting that data to Project Management.

4         g.     The Operations group is responsible for the

5    transition from construction to commissioning, and ultimately, the

6    transition from an EPCC project to the operations contractor.

7    ### 7.    *Payment Under the WTP Contract*

8    69.    The WTP Contract is a cost-plus award-fee Contract.  Under

9    this type of contract, DOE reimburses the contractor for costs expended

10   and pays the contractor for meeting defined incentives and milestones.

11   70.    The budget for the WTP is $690 million, from which ORP

12   receives a portion of its funding.

13   71.    Bechtel, on behalf of Bechtel and URS, submits bi-monthly

14   invoices to ORP for payment from the $690 million of allotted funds.

15   72.    In all of Bechtel's billings, it must include supporting

16   documentation with each invoice.  Supporting documentation includes a

17   summary of charges, payroll schedule, overhead schedule, general and

18   administrative schedule, other direct cost schedule, payroll details,

19   subcontractor invoices with supporting documents and any other

20   specialized schedules required by a specific project within the contract.  A

21

proper invoice must also include the description, quantity, unit of measure, unit price, and extended price of supplies delivered or services performed.

73.    From the $690 million annual budget for the WTP, Defendants have three primary sources of revenue.

74.    First, Defendants earn a baseline fee as the contractor for the WTP project.    This fee is earned for basic operations regardless of fulfillment of milestone, incentive or other performance based awards.

75.    Second, Defendants earn revenue on labor expended under the WTP Contract: Defendants add 20-40% of hourly cost to every hour of labor billed to the United States.

76.    Third, Defendants earn revenue from incentive fees, including awards for completing activity and facility milestones and bi-annual awards for Project Management and Cost Incentives.

77.    Except for the bi-annual awards, when Defendants believe an incentive fee activity has been met, they notify the ORP Contracting Officer in writing.    The Contracting Officer then: 1) makes a determination on whether the requirements of the Contract have been met based primarily on Defendants' representations; 2) makes a determination on whether the fee is earned; and 3) notifies Defendants of its determinations within 30 calendar days after receipt by the ORP Contracting Officer of Bechtel's

40

notification.   If the ORP Contracting Officer determines a fee has been earned, then Defendants includes it on its next bi-monthly invoice.

78.   The WTP Contract requires Bechtel to maintain precise and complete conformance with the WTP Authorization Basis absent express, written approval from ORP.   As depicted in Figure 1 (page 33), the Authorization Basis describes the safety and environmental requirements for the WTP and is the benchmark against which a proposed change to the WTP is evaluated for safety and regulatory implications.

79.   This duty to conform to the Contract and Authorization Basis is non-delegable. If Bechtel chooses to hire subcontractors to perform any part of its contract with the United States, the WTP Contract requires Bechtel to "flowdown" those quality requirements to subcontractors.

80.   Bechtel nonetheless remains obligated to the United States to provide an end item which conforms in all respects to the requirements of the contract.

**B.   TESTING IN RESPONSE TO ISSUES RAISED BY THE 2006 EXTERNAL FLOWSHEET REVIEW TEAM VIOLATED REQUIREMENTS**

81.   In 2005, Defendants made a commitment to then Secretary of Energy, Samuel Bodman, to issue reports addressing concerns of increased costs and schedule delays caused by technical issues in the design and

1    construction of the WTP.  The first study analyzed these technical issues,

2    and the second study evaluated and determined cost and schedule

3    estimates, relying on the data gathered in the first study.

4        82.    Relator Tamosaitis was the Project Manager for the first study,

5    titled "External Flowsheet Review."  The main consulting team for this

6    study, known as the External Flowsheet Review Team ("EFRT"), was

7    comprised of three sub-teams and over 51 consultants.

8        83.    The EFRT evaluated the ability of the WTP, as designed, to

9    meet contractually defined throughput rates—in others words, the EFRT

10   primarily looked at whether the WTP would be able to process the mixed

11   waste within the time period allotted and at the rates defined in the WTP

12   Contract.  This required determining: (1) the major issues that would

13   prevent operations as a whole; (2) the major issues that would prevent the

14   WTP from achieving the necessary process rates; and (3) the potential

15   issues that could affect operations or process rates.

16       84.    In a February 2006 report, the EFRT identified 28 technical

17   issues that it believed had to be addressed to achieve operationality.  The

18   EFRT classified 17 of the issues as *major*, identified as M1 – M17, and 11 as

19   *potential*, similarly identified as P1 – P11.  The numbering scheme on these

20   issues bore no significance.

21

42

85.     For each issue, after multiple prompts from DOE-Headquarters ("DOE-HQ") and ORP, Bechtel subsequently developed an Issue Response Plan, which described the planned measures necessary for resolution and the criteria required for formal closure of the issue.

86.     The Issue Response Plans were reviewed and accepted by ORP, Bechtel technical and project management, and a lead EFRT member.

87.     The Technology Steering Group ("TSG"), an eight-member team comprised of four ORP officials and four WTP Project Managers determined whether to close EFRT issues based on a review of information submitted by Defendants.

88.     During the TSG's tenure, the WTP Project Manager for ORP changed multiple times, and included John Eschenberg, Guy Girard, and lastly Dale Knutson in May of 2010.

89.     The WTP Project Manager for Defendants also frequently changed, and included Bill Elkins, Ted Feigenbaum, and Frank Russo in December of 2009.

90.     The remaining six members included: Relator Gary Brunson (ORP), Don Alexander (ORP), Langdon Holton (ORP contractor), Richard Edwards (URS), Craig Myler (Bechtel), and Greg Ashley (Bechtel).

91.     Pursuant to the Tri-Party Consent Decree, all EFRT issues were to be resolved by December 31, 2010.

43

92.    To incentivize timely closure, ORP tied the resolution of the EFRT issues to 80% of the 2010-A cost incentive award.  Only if Bechtel closed M3—what ORP believed was the only remaining unresolved EFRT issue—by June 30, 2010 would Bechtel receive 80% of the award.   In addition, ORP tied closure of a specific issue, M12, to a milestone award of $ 3.875 million.

93.    Notably, during normal operations and in working to resolve EFRT issues, Defendants engineers outnumbered ORP engineers by at least 100:1.  Indeed, Defendants oftentimes had a combined contracting force of over 1,000 engineers against the less than 20 ORP engineers.   As such, DOE-HQ and ORP relied on Defendants to ensure that all testing met applicable requirements.   If occasions arose where ORP employees disagreed with Defendants' employees, members of Defendants' management team would approach DOE-HQ or other ORP employees and misrepresent facts to manipulate them into moving forward despite the disagreement by lower ORP employees.   DOE-HQ and ORP relied on Defendants, believing that Defendants, as government contractors, possessed greater understanding of how to design, procure, and construct the WTP.

94.    As detailed below, Defendants abused their status, exploiting ORP management and intimidating those who disagreed in order to push

ahead with noncompliant EFRT testing and obtain fraudulent closure of EFRT issues.   As a result, Defendants received payment and obtained incentive and milestone fee awards for testing that they knew, or should have known, failed to meet contractual requirements.

### 1.   Inadequate Mixing in Vessels (M3)

95.   In 2006, the EFRT identified vessel mixing, known as M3, as a major issue.   Specifically, EFRT raised concerns about the mixing of Newtonian and non-Newtonian fluids in the vessels.

### a)   Background on Mixing Wastes with Varying Rheologies

96.   The waste to be treated by the Hanford WTP is not a homogeneous liquid.  The Hanford waste is slurry: a mixture of Newtonian and non-Newtonian liquids and insoluble solid particles of wide ranging sizes and densities.   Both the solid particles and liquids have unique physical and chemical properties that affect the speed at which the solid particles settle in the pipes and vessels.  These characteristics also affect the ability to raise or move the solids after they have settled.

97.   The characteristics of the liquids and solids contained in the waste, including solubility, are functions of their content, chemical constituents, viscosity, shear stress, particle size distribution and density, among other characteristics.   Due to the treatment process, these

characteristics of the slurry will significantly change as the waste is processed to support vitrification.

98.   The viscosity of Newtonian fluids—common examples include water or oil—is constant and only affected by temperature while the viscosity of non-Newtonian fluids, such as ketchup, is dependent on some mechanical variable, such as shear stress (movement), time, and temperature.

99.   Added to the complications of dealing with non-Newtonian fluids is the fact that the waste slurries contain many solid particles of various shapes, sizes and composition.

100.   The slurries must be adequately mixed on a constant basis to ensure appropriate sampling results, release of hydrogen, and to prevent solids from accumulating on the bottom of tanks and pipes.

101.   Any accumulation of solids can trap explosive hydrogen gas or cause an unsafe accumulation of fissile material (e.g. plutonium), which could lead to a "criticality," such as explosion or other potentially disastrous situation.

102.   These complications and difficult issues are not wholly new or unique to Hanford, have been resolved successfully at other vitrification and nuclear processing facilities, and were known to Bechtel prior to the WTP Contract.

b)   **Defendants Knowledge of Mixing Issues**

103.   Prior to becoming the prime WTP contractor in 2000, Bechtel was a prime subcontractor to BNFL.  Indeed, in a press release regarding its partnership with BNFL at the WTP, Bechtel touted that it was charged with the design of the WTP.  In this position, Bechtel participated in, or knew of, the original WTP mixing system—a design Bechtel falsely asserts it had no involvement with and no ability to change.

104.   In early to mid 2000, BNFL produced several reports providing rheological data for much of the tank waste to be treated by the WTP.  This data was based on testing performed by Pacific Northwest National Laboratory ("PNNL").

105.   The WTP Contract, executed later that year, references the Interface Control Document, which included rheology characteristics of the waste to be treated, indicating Defendants' knowledge of the non-Newtonian characteristics of the waste slurries, as well as the wide ranging particle sizes contained therein.

106.   As early as January 2001, Defendants performed computational fluid dynamics ("CFD") testing on vessel mixing performance.  The CFD testing showed failure of mixing in most vessels due to the rheological properties of the waste slurry previously identified in the 2000 PNNL testing.

107.   Despite this knowledge, Defendants waited until the following year before reporting the inadequacy of the mixing design.

108.   In 2002, Defendants requested an increase in the target cost and cost performance fee due to the need for additional mixing testing for the fluidic devices, called pulse jet mixers ("PJM").

109.   PJMs are used to mix fluids in selected process vessels located in pretreatment and high level waste facilities' black cells.   The PJM concept was based on previous applications at the Sellafield site in the United Kingdom.   The PJM itself is a long cylindrical vessel that draws in fluid by a vacuum and then pressurizes to eject the fluid, much like a turkey baster draws in and expels fluid.

110.   In June 2003, Defendants authorized work on an integrated strategy for scaled testing to validate PJM mixing of non-Newtonian fluids in WTP vessels.   This integrated strategy employed non-Newtonian simulants in only part-scale PJM-equipped vessel configurations to empirically determine and validate the PJM design.

111.   Despite realizing the need for this type of testing at the time of signing the contract with DOE, Defendants considered the new testing a change in contract scope and requested an equitable adjustment to the contract.

112.   DOE denied Defendants' request.

48

113.  By November 2003, Defendants determined that design changes to the PJMs could optimize their performance, including changes to PJM vessel configuration, nozzle design, and air supply.

114.  Notably, during this time, Defendants also began to evaluate other mixing options, such as acidifying the slurries—the mixing process most commonly used in other nuclear waste treatment plants—but decided that this option would be too costly.

115.  In 2004, Defendants determined that the PJM could not mix the slurry "as-is" and that changes to the rheology of the incoming slurry and air sparging were required to achieve the necessary mixing.

116.  In 2005, PNNL issued two reports assessing previous testing on PJM and sparger design.  In the first report, PNNL noted that maintaining accurate rheology characteristics in selecting simulants to test was critical to accurately assess mixing performance.  In the second report, PNNL concluded that the testing at issue could not be directly applied to WTP mixing because the testing was not prototypic, in other words, the testing did not accurately simulate the conditions under which the PJM would operate once in effect at the Hanford Site, and so could not be applied to predict the efficacy of WTP mixing.

c)      **To Resolve Mixing Issues and Close M3,**
**Defendants Had to Verify the Vessel Design**

117.  Following the EFRT's conclusions in 2006, the TSG approved an Issue Response Plan, providing that formal closure of M3, the unresolved major issue regarding mixing and PJM design, required Defendants to meet established criteria, including:

a.      Conducting computational fluid dynamics analysis and validation/benchmarking for PJM mixing;

b.      Specification of testing simulant compositions and characteristics based on engineering definition of waste feeds to be simulated;

c.      Procuring and executing testing activities based on technical test plans, and ensuring that the technical testing activities comply with testing requirements and achieve testing objectives; and

d.      Assessment of the PJM vessel design against the mixing requirements.

118.  As such, resolving M3 meant that Defendants would have to provide the technical basis proving the efficacy of the pulsed jet mixers, including vessel-operating mode, mixing requirements, safety requirements, feed limits, and physical design.

119.   The WTP Contract required that all testing of the mixing design be conducted in accordance with NQA-1.

120.   Testing standards imposed by NQA-1 mandate that pedigree— or the strict adherence to requirements with documentation supporting such—be maintained before, during, and after the testing sequence. Likewise, NQA-1 standards mandate the testing include safety requirements as provided for in the WTP Safety Basis.  Environmental & Nuclear Safety ("E&NS") is charged with developing and maintaining the WTP Safety Basis, and Design Engineering is charged with incorporating all safety requirements into the design of the WTP.

121.   As depicted in Figure 2, WTP procedures require that Design Engineering obtain from E&NS the parameters necessary to ensure safety in the design and compliance with the WTP Safety Basis.  Design Engineering then develops the testing requirements and provides them to R&T for execution.  Ultimately, the design, upon finalization, is distributed to other WTP groups, like Construction, Procurement and Acceptance. Quality Assurance oversees these groups, supervising compliance with quality assurance requirements, including NQA-1.



Figure 2

122. Incorporation of the WTP Safety Basis in design verification testing is key to NQA-1 compliance and ensures that all nuclear safety requirements, functional requirements and other design requirements for environmental conditions are integrated into the design as required by the WTP Contract.

     **d)**     <u>**Defendants Failed to Evaluate Adverse Conditions and Cut Corners During M3 Testing, Resulting in Quality Indeterminate Data**</u>

123. In conducting M3 testing, Defendants (1) failed to conduct testing in accordance with all required and relevant NQA-1 standards and (2) failed to utilize a simulant that represented the true rheological characteristics of the waste.

124.   Defendants began M3 testing in 2006, and in March 2007, the testing was evaluated under the British Hydraulic Research Group ("BHRG") Methodology which predicted inadequacies and marginal performance of vessel mixing with accumulation of high solid concentrations, again, due to the rheological properties of the waste slurry previously identified in the 2000 PNNL testing.

125.   This testing by Defendants was not performed in accordance with NQA-1 standards.  The testing failed to implement NQA-1 standards pertinent to and required for compliance with safety requirements; for example, the testing failed to account for hazards identified in the Safety Basis.  Indeed, the Engineering Group provided R&T the testing objectives without the necessary consultation of E&NS to ensure that such objectives incorporated nuclear safety.  The failure to account for nuclear safety in the design and execution of the testing resulted in quality indeterminate data— data that cannot be used to confirm vessel design as it lacks pedigree for nuclear safety, precision. and accuracy.

126.   Despite these problems, Defendants' April 2007 progress report found that M3 was well thought out and likely to be successful.

127. A month after the "successful" EFRT progress report, Defendants requested additional funds from the United States to increase

1  PJM nozzle size and pulse jet velocity in several of the vessels.  Defendants

2  had not tested the design changes prior to requesting the additional funds.

3  128.  ORP approved the request, but the design changes were never

4  implemented and the money was spent elsewhere.

5  129.  In June 2007, Defendants issued Revision 2 of the M3 Issue

6  Response Plan and requested additional funds for M3 testing.  Defendants'

7  justification was the poor results from Defendants' CFD testing and testing

8  by British Hydraulic, both of which were due to the rheological properties

9  of the waste slurry identified 7 years earlier by PNNL in 2000.

10  130.  After receiving additional funds to increase PJM nozzle size

11  and PJM velocity, Defendants decided to test whether increasing nozzle

12  size and velocity would provide significant improvement.

13  131.   In late 2007 due to problems with procurements, PNNL was

14  unable to conduct M3 Phase 1 scaled testing.  Defendants instructed PNNL

15  to test using an ad hoc test stand not built to NQA-1 standards; however,

16  procurement delays prevented PNNL from testing.

17  132.  In early 2008, Defendants requested an equitable adjustment to

18  remove the requirement to increase PJM nozzle size and PJM velocity,

19  justifying the request by claiming that the requirement was too expensive

20  despite having already been paid by the United States to add both features.

21

54

133. Likewise, in March of 2008, Defendants reduced the mixing requirements they originally defined for themselves as design authority. Defendants instructed PNNL to begin parametric testing using the lowered criteria, an ad hoc test stand, and five-part water simulants unrepresentative of the rheological properties of the slurry, a necessary component of conducting adequate testing.

134. This testing failed to conform to NQA-1 requirements, including but not limited to:

a.     The ad-hoc test platform was procured and fabricated at a commercial quality level.  Consequently, parameters of the platform affecting quality lacked the required traceability to ensure pedigreed test data.

b.     Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as excel and DAS.

c.     Defendants failed to consider adverse conditions as provided for in the WTP safety basis document in developing and conducting the tests.

d.     Defendants and PNNL failed to perform compliance audits.

e.          Defendants failed to maintain proper document control.

f.          Defendants refused to allow PNNL to apply NQA-1 to sensitivity data and its related application.

135.   Defendants misrepresented the nature of the testing and its results to the DNFSB and ORP.  As noted by Perry Meyer of PNNL in an email following a presentation by Defendants to DNFSB:

- I was very uncomfortable with the presentation and even more uncomfortable being present in the room while it was given. I interrupted the client twice to present factual clarifications and once to illustrate a major technical issue with a proposed approach. I did not interrupt a fourth time and regret not doing so. I am profoundly uncomfortable with this type of relationship with the client.

- The presentation was generally misleading concerning the nature and extent of the design inadequacy. While on a point by point basis I can see how many of the individual points could be viewed as literally correct (with some creative latitude), the points clearly concealed the nature and extent of the issues, and in aggregate work

56

together to potentially mislead the DNFSB.

•    The presentation was generally misleading concerning the plan in place to close the issue, with such items as an known unattainable schedule, etc.

•    Previous work by PNNL documented in letter reports was misrepresented with major findings avoided altogether.

•    In general, there was omission or minimization of negative findings and an exaggeration of positive findings.

•    There was a general exaggeration of test results and conditions - phrases such as "testing with very large particles", etc. where used which gave the impression that the results are less than meaningful to the primary design, or that the issues are associated with a very small fraction of the waste. The fact that the results are generally applicable well below d95 was avoided, and on two occasions the smallest particles used in testing were omitted (no mention of 80micron particles from previous testing or 40 micron particles from current testing).

•    There were a number of important factual misstatements,

1     some of which I believed to be known to the presenter.

2     One example is the statement referencing our March 08

3     report that off-bottom suspension is not an issue (once in

4     the presentation it says the problem is much less than

5     expected and in another place it implies the design has

6     been showed to be adequate regarding off-bottom

7     suspension). We had informed Phil Keuhlen verbally that

8     the result in the report was in error, and have provided

9     him with an updated result which demonstrates a much

10    more serious problem.  So while referencing the report his

11    statement may be technically factual, the clear impression

12    given to the DNFSB is that it IS factual and that it is a

13    closed issue.

14        136. Originally, PNNL issued conclusions concerning vessel mixing

15   in a draft report; however, because PNNL's conclusions showed significant

16   issues with vessel mixing, Defendants instructed PNNL to remove vessel

17   assessments from its report.  Defendants instead issued their own report

18   analyzing the data and ranking the vessels—conclusions PNNL disagreed

19   with.  PNNL balked, but ultimately succumbed to Defendants' pressure

20   and limited the report to "examples" of the implications from the test data.

21

137.   After numerous delays, proposed changes to M3 closure criteria and arguments over appropriate testing, the Phase 1 test report on M3 was issued by PNNL in May 2009.

138.   Because Phase 1 testing proved to be non-confirmatory, Phase 2 testing of a cohesive simulant (non-Newtonian) was replaced with re-testing non-cohesive simulants—again using simulants that failed to represent the rheological characteristics of the waste to be treated.

139.   Phase 2 testing was contracted to Energy*Solutions* Federal EPC, Inc., with majority of testing conducted by Mid Columbia Engineering. The Phase 2 program did not meet NQA-1 requirements, with violations including but not limited to:

> a.      The test platform was procured and fabricated at a commercial quality level.  Consequently, parameters of the platform affecting quality lacked the required traceability to ensure pedigreed test data.  Defendants' attempts to validate the quality level of the non-NQA-1 testing parameter were conducted post-testing and failed to address all of the contractually required quality parameters.

> b.      Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as excel and DAS.

c.      Defendants failed to flowdown quality requirements and/or failed to ensure that quality requirements were flowed down to sub-tier contractors, resulting in work by unqualified contractors.

d.      Defendants failed to account for hazards identified in the Safety Basis in developing and conducting the tests.

e.      Defendants failed to correct known issues with software being used to analyze M3 testing data and failed to issue corrective actions or track such issues.

f.      Defendants failed to train M3 testing personnel.

g.      Defendants permitted testing not compliant with requirements to move forward and informally changed or deleted test procedures without regard to overall effect or to achieve legitimate results.

140.   In or about June 2009, Relator Tamosaitis asked his supervisor, Richard Edwards, to assign the M3 program to R&T so it could be completed with the assistance and support of PNNL.

141.   Edwards told Relator Tamosaitis that this would not be done due to costs, paper work, and the NQA-1 requirements associated with doing test programs under R&T and through PNNL.

142.   In September of 2009, Defendants decided their M3 closure strategy needed to be re-planned to add significant new resources to the M3 team. Relator Tamosaitis was designated the program lead at the request of DOE.

143.   In November 2009, the Defense Nuclear Facilities Safety Board ("DNFSB"), an independent body responsible for nuclear safety oversight authority of DOE and its activities as related to the WTP, issued a report regarding the status of Defendants' efforts in bringing M3 to closure.

144.   The DNFSB identified potential safety concerns with WTP mixing, including (1) the potential for a credible inadvertent criticality scenario; (2) retention of flammable gasses trapped in the sediment layer in an amount beyond that assumed in the safety basis; and (3) degradation in level-detection performance, which could result in an excessive number of pulse jet mixer overblows that could lead to the structural failure of vessel components.

145.   In this report, the DNFSB also found that Defendants' issue response plan for M3 had "undergone multiple revisions driven by technical challenges" and that one reason for the difficulty in addressing the issue was "that the mixing and transport systems were designed for average rather than bounding values of particle density in the Hanford waste inventory."

146.   Despite knowing the rheological properties of the slurry waste since the 2000 PNNL report, and despite knowing that "pulse jet mixers lack the required power to sufficiently suspend and transport a significant fraction of the most rapidly settling particles through the plant," Defendants planned to close M3 using scaled-down experiments and CFD testing that had previously proven unsuccessful.

147.   In January of 2010, Defendants knew that mixing would not be resolved using a simulant that accurately represented the WTP waste stream.  As a result, Defendants selected simulants that did not bound to the conditions in which the waste would be treated—namely, how treatment would affect the rheological and chemical properties of the slurry waste.

148.   In other words, the characteristics of the simulants selected by Defendants to represent the mixed waste failed to encompass all of the characteristics of the Tank Farm mixed waste  to be treated by the WTP.

149.   During this time, Frank Russo arrived and replaced Ted Feigenbaum as Bechtel Project Director for the WTP.  Russo, with input from Greg Ashley, determined that the plan proposed by Relator Tamosaitis would increase costs and highlight design shortfalls.

150.   In or about March of 2010, ORP decided to tie 80% of the performance incentive fee to completion of the EFRT issues, namely, completion of M3, by June 30, 2010.

151.   In addition to the incentive fee, Frank Russo was motivated to close M3 in order to obtain an additional $50 million in funding from the United States.

152.   Following his arrival, Russo continued to promise ORP and DOE confirmation of the mixing design and closure of M3, minimizing technical issues.

153.   In an email between Russo and Ines Triay, assistant Secretary of DOE Environmental Management, Triay asked whether Russo was able to convince others that mixing could be achieved.  Russo responded:

It was like herding cats.  Scientists that were diametrically opposed at the beginning of the meeting were in lock step harmony when we told them the science is ending.  They all hated it … **I told them and the entire room that their job now is to give me/Guy and then you [Triay] a well developed and balanced business case that talks to tank by tank capability** … Tomorrow I will remind ORP and my folks and will do the same Thursday.  **Guy will keep ORP and DOE consultants in line, I will help and I will send anyone on my team home if**

1    **they demonstrate an unwillingness or inability to fulfill my**

2    **direction** … Re the non Newtonian tanks…no new tests. The

3    recommended position which the majority already agrees is

4    non-Newtonian tanks is acceptable as is.

5    154.   Triay later learned that lower ORP officials were not persuaded

6    by Russo's statements.    ORP officials wanted validation from an

7    independent laboratory such as Savannah River National Laboratory

8    ("SRNL").

9        **e)**    **Defendants Misrepresented the Quality**

10    **Indeterminate Testing Data to Obtain TSG**

11    **Approval for the Closure of M3**

12    155.   Because Defendants knew they could not confirm the design

13    and close M3 without significant cost and delay, Defendants devised three

14    manipulations to convince ORP-TSG Members and DOE that M3 could be

15    closed:

16        a.    Knowingly use an unsupported scale-up factor to

17    falsely confirm clearing of vessel-bottoms;

18        b.    Knowingly use the unverified assumption that the

19    behavior of Newtonian slurries bounds non-Newtonian slurries in

20    order to falsely confirm the designs of the non-Newtonian vessels;

21    and

64

c.          Rely on—as a "back up"—a process to remove particle build up, known as "heel removal," that Defendants knew had not been tested, researched, or previously used in a plant similar to the WTP.

156.   Defendants devised these strategies to falsely convince DOE that the mixing design—with minimal modifications—would be able to mix the waste.

**(i)      Unsupported Scale Up of Test Results**

157.   Where appropriate, testing and test results may be scaled-up to predict the behavior of the same test performed at a larger scale.

158.   To confirm the mixing design, close M3, and avoid costs and time for additional testing, Defendants applied a scale-up factor it knew to be unsupported.

159.   In November 2009, Defendants issued a report, stating that a scale-up factor of 0.22 was appropriate, misrepresenting the data obtained under M3 testing performed by PNNL and the testing performed under the BHRG method.

160.   ORP rejected this assertion, stating "[n]o defensible technical basis has been provided for DOE to assess the proposed scaling method or the scaling exponent."  By using this scale-up factor, Defendants asserted

1   that computational fluid dynamics ("CFD") could be used to confirm the

2   design and that additional testing would not be necessary.

3       161.   Defendants' own mixing consultant recognized the deficiency

4   in the scaling analysis, noting it lacked references to predicate information

5   and the statistical analysis of the data had an error band.   Jon Berkoe, a

6   Bechtel CFD analyst, responded, stating that such concerns were essentially

7   just details which took away from the actual mixing issue.

8       162.   Following meetings with ORP concerning scaling, Defendants

9   decided to use CFD—a technology they admitted was unable to handle

10   multiple rheological parameters—noting that "[t]here are opportunities to

11   use CFD for establishing confidence in the scaling method" but that

12   "Langdon [ORP] wants overwhelming evidence that the scaling method is

13   predictive."

14       163.   To support CFD and scale-up, Defendants performed testing at

15   Washington State University ("WSU").   This testing was not performed to

16   NQA-1 standards, and as noted by then-PNNL scientist Perry Meyer,

17   Ph.D., with whom Relator Tamosaitis agreed the testing "in no way

18   represent[ed] real waste behavior."

19       164.   Defendants nonetheless calculated a scale-up exponent of 0.18,

20   telling DOE that scale up was established through the WSU testing.

21

66

165. This scale-up 0.18 exponent could not be supported experimentally, and was recognized by PNNL scientists, Defendants' consulting experts, and Relator Tamosaitis to be incorrect, based on an unreliable methodology, and used only to falsely confirm the design.

166. As stated by Bechtel's mixing consultant, David Dickey, Ph.D., "[t]he use of 0.18 factor for scale-up would be considered by me to be criminally negligent with respect to the design of a nuclear waste processing plant." Similarly, then-PNNL scientist, Perry Meyer, Ph.D., assailed the use of a 0.18 exponent, stating "[t]he mixing system backbone of a $15B nuclear solids processing plant is being designed based on a 50-year-old air jet test. This is madness."

167. Despite this issue, Defendants told ORP that the 0.18 exponent was acceptable. Knowing that ORP wanted an independent laboratory to verify findings, Defendants pressured SRNL into issuing a report concurring with Defendants' results. Indeed, William "Bill" Wilmarth, Ph.D., a manager of SRNL associated with the report, subsequently admitted that SRNL succumbed to the pressure because he "still need[ed] my knees and fingers."

168. Ultimately, Defendants used the exponent to confirm full-scale bottom clearing in vessels—a requirement for M3 closure—which was

1    presented to DOE and the DNFSB as an experimentally supported scale-up

2    factor.

3                    **(ii)    The    unverified    assumption    that**

4                         **Newtonian    fluids    may    be    used    to**

5                         **predict the behavior of non-Newtonian**

6                         **fluids.**

7        169.   Knowing that CFD could not confirm non-Newtonian testing

8    results and that the prior testing failed to account for the waste's full range

9    of rheology characteristics, Defendants devised a theory that non-

10    Newtonian wastes would behave in the same manner as that of Newtonian

11    wastes.    Through this theory, Defendants declared that the results of

12    Newtonian testing would be applied to non-Newtonian wastes.

13        170.   Defendants knew that the possibility of its theory being correct

14    was remote, if at all possible.   Nonetheless, Defendants authored a report,

15    using unsupported assumptions and calculations.   Defendants presented

16    this report to ORP in support of M3 closure, asserting that Newtonian test

17    results and CFD analysis could be applied to the non-Newtonian tanks and

18    testing of the non-Newtonian vessels was unnecessary.

19        171.   Defendants asserted this theory until then Secretary of Energy

20    Dr. Steven Chu—the former director of the Lawrence Livermore National

21    Laboratory and Nobel Prize winning Physicist—flatly rejected the theory

1    as impossible during a tour of the WTP in 2012.  The report was cancelled

2    shortly thereafter.

3                    **(iii)    <u>Untested Heel Removal Strategy</u>**

4        172.   In a further stretch to resolve mixing issues, Defendants

5    proposed to ORP a previously unconsidered strategy called heel removal,

6    which Bechtel knew the SRNL had recognized as a poor idea.

7        173.   Heel removal is the process of removing settled waste particles

8    that have accumulated on the bottom of a vessel.  This process is used in

9    lieu of trying to continuously keep the particles in suspension and off the

10   bottom of the vessel.

11       174.   In a meeting on April 14, 2010, Russo told Greg Ashley and

12   other Bechtel and ORP employees, including Relator Brunson, something

13   to the effect that the failure to close M3 could shut down the project, and

14   the senators from Washington State were "our friends" and losing the $50

15   million would cost them political clout. Russo inquired of the group as to

16   whether M3 could be closed by June 30, 2010, to which Relator Brunson

17   replied that closure was dependent on the quality of the objective evidence

18   presented.  Russo snapped back "everyone in this room's reputation is on

19   the line."

20

21

175.   Following this meeting, Russo continued to intimidate those that did not agree with his implementation of the new heel removal strategy without additional testing.

176.   Frank Russo summarized his unilateral plan to close M3 using heel removal in an email dated April 22, 2010:

> Bechtel is confident that the heel removal will close this issue, because there is no concern that it won't work.  This is proven technology.  While we are backing up the heel removal with testing, we believe that it will take months to agree on test simulant and test process.  **Any change in non-Newtonian arrays will challenge all previous non-Newtonian testing**.  So add another series of non-Newtonian tests.  If not heel removal, I continue to believe that we will lose many more months than are available. No way would I commit to July of 2010.  This is very sad news as I am at a loss for a solution other than heel removal.

177.   Lower ORP officials, including Relator Brunson, did not agree that heel removal was a proven solution.

178.   To ensure closure of M3, Russo pressured PNNL and SRNL to endorse Defendants' mixing solutions.  Dae Chung of DOE recognized PNNL's lack of approval as a serious concern and repeatedly inquired of

1  Frank Russo regarding whether PNNL would approve M3 closure, stating

2  "[h]ave you made the case for M3 with sufficient endorsement from

3  PNNL?"

4  179.   Russo responded, "PNNL is not on the team.  I have met with

5  Knudson [sic] on this obvious absence and I have a meeting scheduled

6  with Mike Kluse [PNNL] today to ensure that PNNL understands that **we**

7  **now need to benefit of the 10 years of study and $200 million of**

8  **intellectual investment that we have made with this local national lab**."

9  180.   In another email dated May 24, 2010, Russo similarly stated

10  "PNNL is running to the hills after 200 million to Battelle and PNNL for

11  research," and that he needed to "calibrate" the head of Battelle leadership.

12  181.   PNNL refused to approve Defendants' approach despite

13  Russo's insistence.

14  182.   As a result, Defendants exerted extreme pressure to obtain

15  SRNL approval.

16  183.   Russo noted in an email to Shirley Olinger, then-ORP site

17  manager for the WTP, that he had the support of SRNL, stating that Paul

18  Deason, the director at SRNL, had previously reported to Russo on another

19  project.  In a separate email to Greg Ashley, Russo demanded to "put Rich

20  or Russ on a plane to SRNL to help them get in alignment."

21

71

184.  SRNL issued a report stating that no additional testing was needed.  William Wilmarth, Ph.D. of SRNL subsequently admitted that additional testing was needed but that he agreed with Russo again because "[he] still need[ed] [his] knees and fingers."

185.  As a member of the TSG, Relator Brunson refused to approve closure of M3, especially the non-Newtonian vessels, without execution of testing.

186.  When Relator Brunson rejected Frank Russo's proposed solution of the untested heel removal and additional non-Newtonian testing with heavy particles, Dae Chung (DOE), in a meeting on May 6, 2010 in which both ORP and Defendants' engineers were present, told all those in the meeting, including Relator Brunson, that they should be fired for failing to close M3.

187.  In this same meeting, Greg Ashley informed Chung that Bechtel would sign as the design authority in order to close the non-Newtonian vessels, to which Chung replied, "the fact that the design authority would sign meant a great deal to him."  DOE at all levels relied on Defendants for design input and solutions.

188.  Brunson stated that he could not concur and discussion ensued about removing him as a signatory for the TSG.

189.  On May 25, 2010, Olinger approached Relator Brunson in his office to discuss, among other things, changing the M3 closure criteria to eliminate ORP sign off.  Relator Brunson did not respond.

190.  Defendants declared M3 closed on June 30, 2010 for fee purposes without PNNL approval, without resolution of the non-Newtonian vessels, and using non-NQA-1 testing.  Although the TSG approved closure of Newtonian vessels, Defendants justified the closure to DOE by (1) using a scale-up exponent for bottom clearing that was falsely stated as conservative and incorrect; (2) relying on an unproven assumption that Newtonian analysis would apply to the non-Newtonian vessels; and (3) incorporating an unproven method of removing settled particles through heel removal that Defendants represented would work.

191.  On June 30, 2010, having deemed M3 closed and resolution of the mixing issue a success, Russo proudly emailed WTP employees "Now on to the next phase … let's get it designed and built and into operation." However, in Defendants' August 2010 monthly status report to ORP, Defendants claimed the WTP to be approximately 82% engineered and 53% constructed.

192.  The next day, in an email to Defendants' management, Russo noted that he had argued to Dale Knutson and Shirley Olinger that, if M3

was not closed, federal funding, including the $50 million "accelerated" funds, would be in "major peril":

> I already made the argument to Dale and Shirley that they would be absolutely crazy to not accept that we are finished with M-3. **Congress is just looking for a reason to put Hanford money in other States .... our $50 million is still in play. Declare failure and high probability that the $50 mil goes away. $50 mil goes away ...... 12.263 and 2019 are in major peril ..... major peril** … This all said, I repeat, they are DOE ……. and they often do things that make no basic sense.

193.   Also on July 1, 2010, Robert French, Defendants' M3 closure manager, emailed the M3 technical group, stating that the words "M3 testing" should no longer be used in any communications going forward.

194.   By August of 2010, the non-Newtonian mixing issues were still open, and on August 13, 2010, Dale Knutson told Relator Brunson that he wanted closure by August 20, 2010.

195.   Following significant ORP pressure, the non-Newtonian mixing issue was formally concurred on by the TSG (with one ORP member dissenting) and closed by Bechtel on August 20, 2010.

196.   Despite Defendants' declaration that M3 was "closed," Defendants' contract was subsequently amended to include resolution of

the still existent mixing problems, including large scale integrated testing as recommended by the TSG.  Defendants received additional funds to conduct this testing.

197.  As a result of M3 testing, Defendants made substantial design modifications to vessels, pulse jet mixers, venting systems, and other SSCs.

198.  Despite the clear existence of mixing issues after June 30, 2010, Defendants pressured PNNL and other WTP employees to support closure of M3.  Bechtel Defendants falsely certified closure of M3 and thereby obtained incentive fee payment of approximately $3.8 million and $45 million in accelerated funding.

199.  Further, per the WTP Contract, Defendants knew that testing, such as with M3, was required to comply with NQA-1 standards.  In order to save time and costs, Defendants knowingly failed to implement NQA-1 standards, resulting in testing data that lacks pedigree, cannot be used to verify the design, and is otherwise quality indeterminate.  Defendants falsely certified that M3 testing complied with NQA-1 and likewise submitted false statements and records in order to obtain payment for costs associated with M3.

200.  Defendants have claimed over $150 million in costs associated with M3; further, the cost the United States will incur to retest and reevaluate design modifications, and if necessary, undo modifications to

SSCs constructed and installed in reliance on quality indeterminate testing will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.   Indeed, Defendants acts caused DOE to falsely claim and certify achievement of milestones associated with the Tri-Party Consent Decree.

### 2.   *Undemonstrated Leaching Process (M12)*

201.   With respect to the design and construction of the ultrafiltration and leaching systems, the EFRT raised concerns in M12 regarding the limited WTP project experience and lack of confirmatory testing data.

202.   More specifically, the EFRT was concerned that the PT facility would not achieve its required throughput, as testing data indicated significantly lower rates of ultrafiltration and leaching, leading to a throughput rate less than contractually mandated.   Furthermore, the EFRT questioned the adequacy of the mixing system to blend the leaching/washing solutions with the bulk of the wastes.

203.   With   M12,   the   EFRT   recommended   a   combined ultrafiltration/leaching system test of all leaching, washing and filtration scenarios at sufficient scale to demonstrate the effectiveness of the design and the adequacy of the mixing system.

204.   The closure of M12 required completion of the following criteria:

a.          Develop and validate initial single component simulants for boehmite, gibbsite, chrome, phosphate, sodium, sulfate and filtration that can be used in laboratory and integrated demonstration;

b.          Test laboratory scale systems to obtain actual waste sample data, validate simulant composition, and provide additional laboratory scale simulant studies to expand operating basis; and

c.          Perform integrated demonstration to confirm ultrafiltration process system design and sludge treatment process.

205.   The testing performed under M12 failed to comply with NQA-1 requirements, including but not limited to:

a.          The test platform was procured and fabricated at a commercial quality level.  Consequently, parameters of the platform affecting quality lacked the required traceability to ensure pedigreed test data.

b.          Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as Microsoft Excel and DAS.

c.          Defendants failed to account for hazards identified in the Safety Basis in developing and conducting the tests.

d.          Defendants     and     PNNL     failed     to     perform

compliance audits.

e.          Defendants failed to maintain proper document

control.

206.   Further, Defendants performed scaled testing using simulants Defendants knew to be insufficient and noncompliant with contractual requirements.  The simulants did not bound the conditions in which the waste would be treated, including the effects to the rheological and chemical properties of the slurry waste.

207.   Defendants selected the suspect simulants to save money, maintain schedule, and ensure the testing confirmed the design basis.

208.   Relator Tamosaitis believed the simulant used in M12 testing was not representative of actual slurry waste.

209.   Defendants' management told Relator Tamosaitis that testing done outside of R&T did not need to comply with NQA-1 requirements.

210.   Contrary to the false representations made by Defendants' management, all testing is required to comply with NQA-1 requirements.

211.   Moreover, in a conversation between Relator Busche and Suzanne Heaston, WTP communications manager for Bechtel, on or about January 11, 2013, Heaston confirmed that M12 testing failed to comply with NQA-1 requirements. Relator Busche and Heaston were discussing Relator

Busche's inability to use entrainment coefficient data from M12 testing due to noncompliance with NQA-1.   Heaston noted that Defendants had decided to forego NQA-1 compliance in M12 testing to save money.

212.   Despite failing to comply with NQA-1 requirements, Defendants falsely certified closure of M12 and thereby obtained a milestone fee payment of approximately $3.4 million.

213.   Further, per the WTP Contract, Defendants knew that testing, such as with M12, was required to comply with NQA-1 standards.   In order to save time and costs, Defendants knowingly failed to implement NQA-1 standards, resulting in testing data that lacks pedigree, cannot be used to verify the design, and is otherwise quality indeterminate. Defendants falsely certified that M12 testing complied with NQA-1 and likewise submitted false statements and records in order to obtain payment for costs associated with M12.

214.   Defendants have claimed over $110 million in costs associated with M12; further, the cost the United States will incur to retest and reevaluate design modifications, and if necessary, undo modifications SSCs constructed and installed in reliance on quality indeterminate testing will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.   Indeed,

Defendants acts caused DOE to falsely claim and certify achievement of milestones associated with the Tri-Party Consent Decree.

### 3.   *Plugging in Process Piping (M1)*

215.   Another issue identified by the EFRT was the plugging of pipes transporting the slurry waste.

216.   Slurry mobility is key to process throughput, and is thus one of the most important attributes for functional WTP operations.  At the time of the EFRT's analysis, a large amount of 2, 3, and 4-inch piping had already been installed between the various WTP unit operations in construction.  The EFRT concluded that "any line containing both solids and liquids can be expected to plug and should be designed to prevent plugging for both rapidly settling and hindered-settling slurries."

217.   The EFRT determined that Defendants had not "consistently" designed the WTP to avoid the risk of line plugging, and although EFRT could not "quantify how severely process line plugging would affect Plant throughput," the EFRT anticipated that "some piping could plug within days to a few weeks."

218.   To resolve this issue, known as M1, Defendants assigned Scott Saunders to lead the M1 team, with closure of the issue permitted after the performance of the following activites:

1        a.        Issuance of a report documenting the design basis

2    for particulate size and density with support from Hanford waste

3    characteristic experts.

4        b.        Issuance of an interim Design Guide that specifies

5    minimum slurry flow velocity, pipe flushing velocity, and preferred

6    piping configuration.

7        c.        Evaluation of the WTP piping against the interim

8    Design Guide to identify necessary modifications.

9        d.        Issuance of a final Design Guide upon confirmation

10   of final particulate characterization and R&T test results.

11   219.  In closing M1, Defendants confirmed this Design Guide by

12   using simulants Defendants knew did not represent the rheological

13   properties and chemical characteristics of the waste.

14   220.  Defendants    utilized    a    five-part,    water-based    simulant

15   containing particles of limited size and density.  Despite knowing the

16   simulants to be inadequate representations of actual waste, Defendants

17   selected the simulants to save money, maintain schedule, and ensure the

18   testing confirmed the design basis.

19   221.  Further, the testing conducted to close M1 failed to conform to

20   NQA-1  requirements,  including  but  not  limited  to  the  following

21   deficiencies:

a.          Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as Microsoft Excel and DAS.

b.          Defendants failed to account for hazards identified in the Safety Basis in developing and conducting the tests.

c.          Defendants and PNNL failed to perform compliance audits.

d.          Defendants failed to maintain proper document control.

222.  Defendants likewise refused to issue findings from Adam Poloski of PNNL that disagreed with Defendants' analysis, and Defendants misrepresented and omitted data from related testing to confirm a minimally modified piping design, including pressuring engineers to misreport test results in issuing the interim Design Guide.

223.  Defendants confirmed the interim Design Guide and issued a final Design Guide based on the noncompliant testing.

224.  Despite failing to comply with contractual requirements for simulants and NQA-1 requirements for testing, Defendants falsely certified closure of M1.

225.  Further, per the WTP Contract, Defendants knew that testing, such as with M1, was required to comply with NQA-1 standards.  In order

to save time and costs, Defendants knowingly failed to implement NQA-1 standards, resulting in testing data that lacks pedigree, cannot be used to verify the design, and is otherwise quality indeterminate.   Defendants falsely certified that M1 testing complied with NQA-1 and likewise submitted false statements and records in order to obtain payment for costs associated with M1.

226.   Defendants have claimed over $14 million in costs associated with M1; further, the cost the United States will incur to retest and reevaluate design modifications, and if necessary, undo modifications to SSCs constructed and installed in reliance on the quality indeterminate testing will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.   Indeed, Defendants acts caused DOE to falsely claim and certify achievement of milestones associated with the Tri-Party Consent Decree.

### 4.   *Process Operating Limits Not Completely Defined & Gelation/Precipitation During Leaching (M6/P4)*

227.   The EFRT concluded that many of the process operating limits of the WTP unit operations had not yet been determined.   Process operating limits are those upper and lower thresholds for things such as temperature, flowrate, pH, pressure, viscosity and other important factors that affect the performance of each process operation.

228.   The EFRT determined that WTP needed to prepare documentation that described the operating behavior of the WTP as a function of feed characteristics, system operating strategies and the above process operating limits.

229.   The EFRT determined that some of the feeds to the leaching operation would contain significant amounts of aluminum and other materials that could precipitate, and if conditions proved unfavorable, there existed the possibility that the aluminum could gel.

230.   The EFRT recommended the performance of additional testing to expand the understanding of plant process capability and to define practical process operating limits for each unit operation.

231.   The EFRT also recommended that Defendants conduct scale-up testing of the leaching processes to ensure problematic gels/precipitates do not form and post-filtration precipitation does not occur.

232.   To obtain closure of M6/P4, Defendants were required to complete over ten activities in two distinct phases, including: "the evaluation and identification of the potential causes of chemical line plugging and gelation/precipitation in process lines" using R&T testing to "evaluate process chemistry associated with potential line plugging.

233. Defendants performed testing using simulants Defendants knew to be non-representative and noncompliant with contractual

requirements, and Defendants misrepresented and omitted data from related testing to confirm a minimally modified piping design.

234. Despite knowing the simulants to be inadequate rheological and chemical representation of actual waste, Defendants selected the simulants to save money, maintain schedule, and ensure the testing confirmed the design basis.

235. Further, the testing failed to conform to NQA-1 requirements, including but not limited to the following deficiencies:

a.      Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as Microsoft Excel and DAS.

b.      Defendants failed to account for hazards identified in the Safety Basis in developing and conducting the tests.

c.      Defendants and PNNL failed to perform compliance audits.

d.      Defendants failed to maintain proper document control.

236. Despite failing to comply with NQA-1 requirements, Defendants falsely certified closure of M6/P4.

237. Further, per the WTP Contract, Defendants knew that testing, such as M6/P4 testing, was required to comply with NQA-1 standards. In

order to save time and costs, Defendants knowingly failed to implement NQA-1 standards, resulting in testing data that lacks pedigree, cannot be used to verify the design, and is otherwise quality indeterminate. Defendants falsely certified that M6/P4 testing complied with NQA-1 and likewise submitted false statements and records in order to obtain payment for costs associated with M6/P4.

238. Defendants have claimed over $15 million in costs associated with M6/P4; further, the cost the United States will incur to retest and reevaluate design modifications, and if necessary, undo modifications to SSCs constructed and installed in reliance on the quality indeterminate testing will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree. Indeed, Defendants acts caused DOE to falsely claim and certify achievement of milestones associated with the Tri-Party Consent Decree.

### 5. *Mixing Vessel Erosion (M2)*

239. Prior to EFRT review, Defendants concluded that the design for the PJM vessels possessed a 40-year life span based on its calculation of erosion wear rates. The EFRT questioned the reliability of this conclusion. The EFRT explained that "[t]he only certainty about the solids-containing fluids in the [pulse jet mixing] vessels is that they will contain particles having a wide range of sizes, variable densities, and hardness factors, at

both low and high concentrations."  As fluids containing solid particles are forcibly mixed by pulse jet mixers, the solids will hit the surface of the vessel, causing an erosive kind of stress.   The EFRT determined that this kind of stress causes vessel erosion and must be considered in assessing the feasibility of the 40-year design life.

240.  The EFRT concluded that Defendants' analysis required verification by direct measurement to address three concerns.

241.  First, the EFRT found that Defendants' erosion analysis for the vessels had been based "on fluids with a single set of waste properties and compared to literature reports of tests with fluids with a limited range of particle characteristics."  Specifically, Defendants' erosion analysis relied on assumptions for particle size distributions, particle hardness, and density derived from samples taken from the initial tanks to be processed. These initial samples, however, did not include all the waste types produced at the Hanford Site, and therefore, the samples could not be considered representative of the nuclear and chemical waste to be treated.

242.  Second, the EFRT found that the literature reports relied upon in the erosion analysis were "focused on erosion caused by pipe flow (i.e. flow parallel to the metal surface) rather than particle impingement" and involved "tests with fluids with a limited range of particle characteristics."

243.   Third, the EFRT found that Defendants' calculations of erosive wear rates did not account for the potential positive correlation between erosion wear and particle size as referenced in the literature.  Based on the equations and parameters applied by Defendants, "erosive wear rates caused by a small amount of large particles may be as much as 150 times those calculated for the median particle size."

244.   Because of the unreliability caused by these concerns, the EFRT concluded that the erosive wear rates calculated by Defendants needed to be "experimentally verified under conditions representative for WTP applications (e.g., appropriate [particle size distributions], angles of impingement, concentrations, hardness, and velocities, in both dilute and concentrated suspensions)."   The EFRT specifically noted that this issue needed to be resolved prior to beginning operations because resolving the erosion problems during operations could result in lengthy interruptions and other strategic problems.

245.  To resolve M2, Defendants assigned Garth Duncan, then-Deputy for Analysis and Engineering, to lead the team tasked with developing the M2 Issue Response Plan and closing the issue out.   On February 7, 2008, the Issue Response Plan for M2 was formally issued, requiring that:

a.          Reports be issued by independent external reviewers regarding the adequacy of the methodology used in the WTP erosion wear analysis; and

b.          An evaluation of the particle characteristics determined in EFRT activity M1 be completed to ensure there is no inconsistency between the slurry characterizations used for line plugging and vessel mixing and those used for vessel erosion.

246. To obtain closure of M2, Defendants used simulants Defendants knew did not represent the rheological properties and chemical characteristics of the waste.

247. Defendants utilized a five-part, water-based simulant containing particles of limited size and density. Defendants used charcteristcs derived from the M1 analysis—an analysis Defendants manipulated, including pressuring engineers to change data—to verify the design.

248. Further, the testing failed to conform to NQA-1 requirements, including but not limited to the following deficiencies:

a.          Defendants failed to flowdown software quality requirements, including those applicable to programs used for calculations and data tracking such as Microsoft Excel and DAS.

b.      Defendants failed to account for hazards identified in the Safety Basis in developing and conducting the tests.

249.  Further, per the WTP Contract, Defendants knew that testing, such as M2 testing, was required to comply with NQA-1 standards.  In order to save time and costs, Defendants knowingly failed to implement NQA-1 standards, resulting in testing data that lacks pedigree, cannot be used to verify the design, and is otherwise quality indeterminate. Defendants falsely certified that M2 testing complied with NQA-1 and likewise submitted false statements and records in order to obtain payment for costs associated with M2.

250.  Defendants have claimed over $6 million in costs associated with M2; further, the cost the United States will incur to retest and reevaluate design modifications, and if necessary, undo modifications to SSCs constructed and installed in reliance on the quality indeterminate testing will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.  Indeed, Defendants acts caused DOE to falsely claim and certify achievement of milestones associated with the Tri-Party Consent Decree.

C.   GOVERNMENT DOLLARS SPENT ON LOBBYING

251.  The WTP Contract prohibits Bechtel from using funds to influence Congress:

90

The Contractor agrees that none of the funds obligated on this award shall be expended, directly or indirectly, to influence Congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 United States Code (U.S.C.) 1913.  This restriction is in addition to those prescribed elsewhere in statute and regulation.

252.   Defendants ignored this contract restriction, using WTP funds in soliciting Congressional support, influencing budget appropriations, and increasing funding for the WTP project at Hanford.

253.   E-mail communications between Defendants employees, Congressional staffers, Senators, Representatives, and lobbyists illustrate systemic violations of the WTP Contract.

254.   In 2009, Defendants engaged in lobbying efforts to downplay concerns raised by the DNFSB, including concerns with hydrogen in piping and ancillary vessels ("HPAV"), materials at risk ("MAR") due to WTP issues, and waste stream properties.

255.   Similarly, following a January 2010 report issued by the DNFSB about significant safety issues in the design and construction of the WTP, Defendants and certain high level ORP officials began planning how best to minimize the impact of the letter to prevent it from negatively affecting

future federal budget allocations for the WTP. Much focus was placed on the House Armed Services Committee, a standing committee responsible for funding and oversight of the Department of Defense and substantial portions of DOE.

256.   In an email chain dated January 8, 2010, a suggestion was made to Frank Russo, Bechtel Project Director for WTP, Daniel E. Kennedy Jr., Bechtel registered lobbyist, and Suzanne Heaston, Bechtel WTP communications manager, to contact Douglas Clapp, the Democratic Majority clerk for the Senate Appropriations Subcommittee on Energy and Water Development, to take pre-emptive action against the Board's report.

257.   Shirley Olinger, ORP site manager for the WTP, Theodore "Erik" Olds, ORP communications director, Greg Ashley, Bechtel management, and others were subsequently requested for their input.

258.   It was recommended that Olinger, who had already planned to be in Washington D.C., meet with congressmen, especially those on appropriations committees, to deflect negative attention.

259.   Olinger agreed to meet with more "critical" members of congress, and further recommended that "[Defendants] get to the right members on the hill before this is taken out of context."

260. Olds likewise agreed, stating "I'm really interested in closing with House and Senate Appropriations given the rumors about the 2011 budget."

261. A few days later, Defendants' employees began enacting their crisis management strategy, attempting to influence the mental impressions of certain congressional and professional staffers in Washington, D.C. by arranging one-on-one meetings and providing Bechtel's response to DNFSB's report.

262. On Monday, January 11, 2010, Heaston sent Daniel Kennedy, a Bechtel registered lobbyist, a letter to provide to "selected congressional and professional staff," to "determine their 'anxiety' level about the issue" and requested that Kennedy, "assist in making appointments with those who would like one-on-one meetings with Olinger and/or Guy Girard, and Ashley."

263. After circulating the letter to professional staff on both the House and Senate Armed Services Committees and certain staff of the Energy and Water Appropriation subcommittees, Kennedy spoke with Daryl Owen and Adam Ingols, both lobbyists with the government relations and strategy consulting firm Daryl Owen Associates, Inc.

264. Kennedy updated Owen and Ingols on the status of neutralizing the effect of the DNFSB letter on federal lawmakers, and requested Owen's interpretation of Douglas Clapp's reaction to the letter.

265. The following day, January 12, 2010, Kennedy reported that he had spoken with Madelyn R. Creedon, then-counsel to the staff of the Senate Committee for Armed Services, who seemed supportive of Defendants' response to the DNFSB report and would not need to be personally visited by Olinger, Girard, or Ashley.

266. Kennedy also placed calls to Carrie Desmond at Senator Murray's office and Jessica Gleason at Congressman Hastings office to gauge their reactions and the status of their support for the WTP project at the Hanford Site.

267. Defendants' employees also provided talking points and other information to Clapp prior to a meeting he had with the DNFSB regarding the efficacy of the pulse-jet mixers installed at Hanford.

268. In an e-mail from Owen to Russo, Kennedy, and Ingols on January 25, 2010, Owen stressed the importance of Clapp's support stating, "Doug is about the best, and often only, friend this project has.  Our ability to stick to a funding level of $690m, much less accelerate funding, rests almost exclusively on his good will.  Perhaps we can get together on a conference call to discuss."

269.   That same day, Kennedy, Owen, Ingols, and Russo decided to meet the very next day to continue their crisis management strategy.

270.   On January 26, 2010, the day of Russo's meeting with lobbyists, Ashley emailed Russo, requesting that Russo "DO NOT FORWARD" the email.  This email stated:

> Frank, assume you are getting on a plane soon.  Just spoke with Dan Kennedy and Jay Farrar.  We will pull together the notes (previously prepared) on M3 and structural.   Jay and Dan suggest that these be given to Doug as hard copy (hand carried).  As these were previously given to DOE, Jay considers them public.   Let's discuss tonight.   There are some major concerns/sensitivities in this area, as you might have detected.

271. Following these meetings, Bechtel employees, including lobbyist Kennedy, Russo, Ashley, and Heaston, developed a power point for Frank to use when lobbying on the "Hill".  This power point included misrepresentations, such as "Plant Design 78% complete" and that Defendants had "better than planned" cost and schedule performance in 2009, and that "27 of 28" EFRT issues had been resolved.

272. As the year progressed, Defendants' employees began to explicitly lobby professional staff for an additional $50 million beyond the $690 million requested for the WTP project for fiscal year 2011.

273.   In an e-mail from Kennedy dated February 28, 2010, Kennedy described meetings between Russo and Senator Murray's and Congressman Doc Hastings' staff where he was accompanied by Olinger and Olds, among others.

274.   Kennedy reported that in these meeting, despite the fact that professional committee staff were focused on the $50 million in additional funds requested for 2011, he believed some headway was made in terms of addressing concerns, and later sent attachments to the committee professional staff detailing why Defendants needed an extra $50 million for 2011, how those funds would be used, and the value of spending contingency dollars earlier than originally planned.

275.   As the deadline for determining federal appropriations for fiscal year 2011 approached, Defendants attempted to influence the language of the forthcoming House Armed Services Committee appropriations bill, continuing to employ lobbyists to advance their goals.

276.   In an e-mail chain dated May 6, 2010, Jay Ferrar wrote to Kennedy, Russo, Heaston, Daryl Owen and Adam Ingols, suggesting they influence Madelyn R. Creedon's drafting of the appropriations bill to prevent decreasing or stalling the WTP project funding, stating:

I think an option here is for Madelyn to put language in the Bill calling for a quarterly report to the Committee's [sic] of

jurisdiction on the progress being made to address the Board's concerns. Word it broadly to preclude anything that portends stopping the project, but tightly enough the DOE knows it's serious and will be held accountable.

277.   Kennedy voiced his assent to this plan in a subsequent reply e-mail, writing to Russo, "I think this approach is worth pursuing - may give Madelyn just enough to satisfy her concerns, but just short of delaying activities on the project. This way she wouldn't be ignoring the DNFSB's concerns."

278.   Kennedy went on to suggest drafting the language of the bill themselves, "[i]f we don't suggest a path forward for Madelyn - she may find one on her own. Suggest we draft some language that you think you could live with - and then discuss."

279.   Owen further urged Clapp, the Democratic Majority clerk for the Senate Appropriations Subcommittee on Energy and Water Development, to contact Madelyn Creedon to discuss the appropriations bill and to open up conversation between the two policymakers and supporters of Bechtel's handling of the WTP project at Hanford. Owen noted that his "sense is she'll be pretty candid with Doug and he with her. Why don't we give that a bit 'o time to take place and calibrate from there."

280.   Kennedy noted in a subsequent email that he had spoken with a staffer from Senator Murray's office, and that "[the staffer] doesn't feel that Doug [Clapp] is concern[ed] about providing the $50M additional funds requested …"

281.   In addition to appropriations, Defendants used lobbyists to minimize the significance of reports issued by the DNFSB and concerns raised by Congress.

282.   For example, following the letter sent by Relator Tamosaitis to the DNFSB after his removal from the WTP project, Suzanne Heaston called a meeting with Kennedy, Ashley, and Jason Bohne, the Public Affairs Manager for Bechtel, "to discuss strategic communications to address the Walt T. letter."

283.   In addition, on July 27, 2010, Owen forwarded Russo a conversation between himself and Clapp in which Owen described Relator Tamosaitis and the DNSFB's response to Relator Tamosaitis's letter:

I thought the [Walt Tamosaitis] looked like an asshole for the way he responded to being fired and DNFSB looked like an asshole for opening an investigation.  BNI does not want to join the parade of assholes, but they do want to make sure you have anything you may want/need.  I'll talk with Frank about the

98

10th, or if you suddenly cease to not care you can raise it with him.

284.  In that same email chain, Owen noted to Russo that he had "talked to [Inez Triay] about Poneman and Doc.  She understands.  Typically frenetic.  Not sure she should be spending $5B annually."

285.  Defendants' lobbying efforts continued in 2011, and according to Relator Busche, WTP lobbying practices are likely still ongoing as of present date.

286.  For example, Relator Busche received email communications requesting that she and other of Defendants' employees provide talking points for Russo when on the "Hill" visiting congressional representatives.

287.  Defendants' management and employees, who are paid through taxpayer funds, have engaged in a prolonged and consistent pattern of lobbying on behalf of the WTP in contravention of the WTP Contract.

288.  Each time Daryl Owen Associates, Inc. submitted an invoice to Bechtel, which Bechtel then submitted for reimbursement under the WTP Contract, Bechtel was required to certify compliance with the Byrd Amendment.  Each such certification was false and constituted a false claim.

289.  Government dollars were used to pay for lobbying performed

by Daniel Kennedy, Suzanne Heaston, Greg Ashley, and Frank Russo, and taxpayer dollars were used to pay the hours spent by Defendants' employees to prepare materials used in lobbying efforts; for example, Relator Busche's time spent on generating "talking points" for Russo's lobbying efforts with congressional representatives.

290.   Each time Defendants submitted, under the WTP Contract, a request for reimbursement for Daniel Kennedy's, Suzanne Heaston's, Greg Ashley's, Frank Russo's salaries, other employees of Defendants who prepared materials for lobbying, or expenses, including travel, related to the illegal lobbying, Bechtel was required to certify compliance with the WTP contractual provision prohibiting such activities.   Each such certification was false to the extent that federal monies were used to pay for lobbying efforts during the relevant period.

### D.   FALSE CLAIM FOR ACCELERATED PAYMENT

291.   For the 2011 congressional year, Defendants sought an additional $50 million in congressional funding.

292.   Defendants claimed to DOE and Congress that the money was going to be used to "accelerate" the design and construction of the WTP. Specifically, Defendants convinced DOE that the "increase in funding will accelerate completion of the design and engineering that will directly support the completion of WTP engineering.   Increased funding will

support procurements for the accelerated incorporation of procured components into the final design."

293.   The money was not intended to be used to accelerate the design and construction of the WTP.

294.   In a February 28, 2010 email, Daniel Kennedy, a Bechtel registered lobbyist, stated that "[l]ast week Frank Russo provided WTP program updates to the professional staff of the two authorizing (House and Senate Armed Services Cmtes) and two appropriations (House and Senate Energy & Water Approps) committee…."   In this same email, Kennedy noted:

> Meetings were very timely as both the authorization and appropriations process are going to begin very early this year (due to pending elections).  Without exception – all professional staff were focused on the $50M additional funds in the FY11 request for WTP.  All indicated they needed more justification for why these funds were needed – and how they would be expended.   No indications that the funds would not be provided – but clearly the concerns are there – we promised to provide supporting information soon ….

295.   Following these meetings, Michael Rocha, Bechtel Manager of Project Controls at the WTP, emailed Frank Russo, describing "what work

is in jeopardy if we are not allowed to carryover funds from FY10 to FY11 as planned, and we do not receive the additional $50m of BA [Budget Authority] in FY11 as currently planned." A chart describing the work was attached to the email.

296.   Rocha admitted to Russo that "[a]s we discussed, not much of this work is 'accelerated,' the driver for the additional funding needed through FY11 is the 'skim' from DOE of $17m in FY09, and the $15m planned for in FY's 10 and 11."

297.   Rocha then identified activities that would "add up to more than we want to show."

298.   Rocha further noted that "key to note is that in reality if we did not receive the additional $50m, or carryover was taken from us, most of these activities would still likely happen as they are critical/near critical path."

299.   Thus, Defendants misrepresented to Congress the basis for receiving acceleration, falsely claiming that to accomplish certain activities required accelerated funds when in fact these activities would be accomplished even if the $50 million had not been allocated to the WTP.

300.   Days after this email, on March 5, 2010, Kennedy sent a note to committee staff "as a follow-up to last week's meetings," which stated:

[W]e promised you some more information on why this year's

request includes $50 million more than the anticipated $690 million, how those funds would be used, and the value of spending those contingency dollars earlier than originally planned.  The first attachment contains a point paper and chart providing that information.

301.  The chart included contains the same information—albeit reorganized—that Rocha provided to Russo.

302.  In a later email, Rocha admitted that the additional funds could be used to "recover the 4 months of schedule we slipped;" not to accelerate "the design and engineering that will directly support completion of WTP engineering."

303.  Defendants knowingly made a claim for $50 million from the United States to "accelerate" aspects of the WTP design and construction. This claim was false; Defendants did not intend to use the funds for acceleration.  Based on Defendants' false claim of "acceleration," Bechtel received approximately $45 million.

E.  FAILURE TO COMPLY WITH DOE-STD-3009 AND NQA-1 IN DEVELOPING THE QRA PROBABILISTIC TOOL

304.  In 2002, the Nuclear Regulatory Comission issued information notices regarding two hydrogen explosions in overseas nuclear power plant piping systems.  From these accidents, the nuclear industry

determined that hydrogen could accumulate in piping and ancillary vessels ("HPAV") and cause explosions both during accidents and, in certain cases, normal operations.

305.   As a result, ORP directed Defendants to consider those hazards associated with HPAV and provide controls to prevent them.

306.   To evaluate hazards and select safety controls, the WTP Contract mandates the application of DOE-STD-3009, the safe-harbor provisions for compliance with 10 C.F.R. 830.

307.   DOE-STD-3009 requires the application of a conservative and deterministic analysis in evaluating hazards—analysis that looks to the worst-case scenarios physically possible.  This ensures that nuclear facilities are designed and operated to a rigorous standard in order to prevent injury from the occurrence of those once in a lifetime events—e.g. the Fukushima nuclear disaster.

308.   DOE-STD-3009 addresses the inapplicability of a probabilistic method, stating:

> The hazard analysis distinguishes when accident analysis is required as a function of potential offsite consequence. Guidance for hazard and accident analysis is not based on probabilistic risk assessment (PRA).

309.   The basic identification of hazards inherent in the process

provides a broad, initial basis for identification of safety programs needed (e.g., radiation protection, hazardous chemical protection). The hazard analysis then moves beyond basic hazard identification to evaluation of the expected consequences and estimation of the likelihood of accidents, an activity that in no way connotes a probabilistic or quantitative risk assessment.

310.  Despite ORP's clear direction to identify, address, and manage HPAV hazards, Defendants failed to take timely action.  ORP found that Defendants' inaction "creat[ed] uncertainty in plant wide design," and that "numerous design elements w[ould] have to be revisited resulting in additional and avoidable costs."

311.  Following ORP's reprimand, Defendants devloped an HPAV control strategy known as the the Bubble of Concern ("BOC") concept. Applying a deterministic analysis, the BOC determined which HPAV events might exceed strain criteria—e.g. cause a given pipe segment to breach.

312. In 2006, while developing the BOC concept, Defendants rebaselined the WTP budget, obtaining DOE approval for approximately an additional $4 billion.  In requesting additional funding, Defendants intimated to DOE that the cost to implement HPAV controls could not be ascertained due to strategy uncertainty.  As a result, DOE agreed to accept

a $150 million risk for the implementation of future HPAV controls following the 2006 rebaseline.

313.   ORP approved by letter the BOC concept in April of 2006, but formal addition into the Authorization Basis did not occur until May 2007.

314.   In the letter approving the addition to the Authorization Basis, Shirley Olinger, then-ORP manager, stated that the delay between initial approval and formal Authorization Basis acceptance was due to a detailed review process resulting in modifications to the BOC concept.

315.   This ORP review process included analysis from an ORP Design Oversight Team, which concluded that Defendants' BOC approach in resolving the HPAV issues was comprehensive and thorough.   The Team's conclusions were drawn from document review, independent analysis, and question and answer sessions with Defendants' staff.   In responding to ORP questions, Defendants explained the BOC concept as one utilizing a deterministic analysis.

316.   Defendants continued to propose additions to the WTP Authorization Basis to further address and control HPAV hazards.   These additions were also approved with modification by Olinger and were added to the Authorization Basis in June of 2008.

317.   Later that year, based on new data concerning waste characteristics, ORP requested a reevaluation of material at risk used in the

1  WTP design and accident analysis.  A joint WTP and Tank Farm report was

2  issued on January 16, 2009, noting that overly conservative assumptions

3  concerning waste characterization, including hydrogen generation, had led

4  to an unnecessarily complex design.

5    318.  The following month, an HPAV Assessment Team chartered by

6  ORP—but led by Defendants—recommended modifying the hydrogen

7  generation rate, separating risks associated with nuclear safety from those

8  of plant availability, and using a quantitative risk assessment ("QRA") to

9  evaluate risks to plant availability.

10    319.  The QRA tool uses probability analysis to assess risk; namely,

11  determining the likelihood of events and the relative importance of hazards

12  in all pipe routes.  Under the QRA, if an event or hazard is determined to

13  be improbable, controls to protect the pipe routes are deemed operationally

14  unnecessary.

15    320.  Under DOE-STD-3009, probabilistic analysis used to remove

16  safety controls in nuclear safety evaluations is not permitted; a

17  deterministic approach is required to ensure protection against all possible

18  hazards.

19    321.  Recognizing a potential cost savings of $60 million, Defendants,

20  in early 2009, began developing the QRA for the primary purpose of

21  reducing or removing controls—regardless of their safety application and

in violation of DOE-STD-3009.

322.   In September of 2009, DOE issued a formal letter, stating there lacked sufficient documentation to support the removal of safety controls and that the current strategy (QRA) lacked an articulate path forward.

323.   To maintain funding, to continue developing the QRA, and to ultimately remove HPAV safety controls using the QRA, Defendants misrepresented and omitted material facts to DOE, including that:

a.        The QRA would not be used to remove safety controls; and

b.        The QRA tool meets NQA-1 requirements.

324.   As a result of Defendants misrepresentations, taxpayers have spent millions on a tool under false pretense.

**1.     *Defendants Falsely Asserted that the QRA Would Not Be Used to Remove Safety Controls***

325.   Defendants perpetrated a scheme to receive federal funding to develop the QRA, misrepresenting the QRA as a tool solely to be used "to determine the potential combustion loads (severity and frequency) for each pipe route susceptible to deflagrations or detonations for ASME code compliance."  Defendants intended to eliminate HPAV controls by using the QRA to redefine the hazards analysis and downgrade safety classifications, knowing that "ASME code compliance" would not meet

1    DOE-STD-3009 rigors.

2        326.   Recognizing that reducing hazards would require a DOE-STD-

3    3009 hazards analysis, Defendants initially had a subcontractor draft a

4    White Paper claiming that the QRA complied with DOE-STD-3009.

5        327.   However, Defendants soon thereafter reversed their position,

6    agreeing with a White Paper presented to the DNFSB, which focused on

7    the use of the QRA rather than its compliance with DOE-STD-3009, and

8    stated the "QRA is not planned to be used as the fundamental basis to

9    establish and evaluate DBAs [design basis accidents] for the 10 CFR 830

10   safety basis per the DOE-STD-3009 safe harbor method."

11       328.   Defendants requested additional funds from DOE to develop

12   the QRA, falsely asserting that it would be used to assess ASME code

13   compliance, reduce complexity and would specifically not be used to assess

14   and remove safety controls required by DOE-STD-3009.

15       329.   In fact, Defendants intended to use the QRA to remove safety

16   controls and knew that the QRA—if used merely for assessing ASME code

17   compliance—would not reduce operational complexity.

18       330.   In February of 2010, DOE approved criteria for use of QRA for

19   the PT Facility as a design tool for ASME load assessments.  The approved

20   criteria stipulated:

21            a.       The QRA must assess HPAV using bounding waste

properties;

      b.        The QRA must apply an ignition probability of one and assume that a design basis event—no matter how improbable—will occur;

      c.        The QRA must not exclude limiting events based on probability;

      d.        The QRA may exclude structurally insignificant events;

      e.        The QRA must have complete model documentation prior to implementation.

331.  By definition, DOE's criteria imposed deterministic constraints on the QRA.

332.  Defendants knowingly ignored DOE's criteria.

333.  In August of 2010, Defendants proposed a closure plan to finalize the HPAV engineering design methods and criteria.  The plan did not address DOE-STD-3009 but affirmatively sought to apply the QRA to ensure the safety and reliability of the WTP design.

334.  Concerned with possible misalignment in the QRA's intended purpose, Dr. Steve Krahn, DOE Deputy Assistant Secretary for Safety and Security Program of Environmental Management, responded within a week requesting clarification as to the relationship between the QRA and

DOE-STD-3009, noting:

> It is my understanding, developed in several conversations with your staff and your contractor, Bechtel National Incorporated, that the Waste Treatment Plant (WTP) Quantitative Risk Analysis (QRA) is not used in the DOE-STD-3009 safety analysis process for either the unmitigated event consequence (which assumes piping system failure) nor in the mitigated analyses that rely upon secondary confinement (C5 cells and HVAC with HEPA filtration). Instead, the WTP QRA supports implementation of the design code, (ASME B31.3) for unconventional loads that may be imposed by combustion events within piping systems. Its use for that purpose is governed by the project's Safety Requirements Document (SRD).
>
> …
>
> However, questions have been raised occasionally regarding the relationship of the QRA to STD-DOE-3009, and this has not been clearly discussed and documented in DOE-ORP and project technical documents.  DOE-ORP should clearly define and document the role of the QRA relative to STD-3009 and provide this information to EM for review.

335.   Defendants confirmed that the QRA was not to be used in the DOE-STD-3009 hazards analysis:

The WTP QRA is not used in any manner as part of the DOE-STD-3009 safety accident analysis process to support dose estimation for either unmitigated event analysis or mitigated event analysis phase.   Instead the QRA supports the implementation of the design code, ASME B31.3, for the loads that may be imposed by hydrogen combustion events with piping systems, and is governed by Volume II of the project's Safety Requirements Document (SRD).

336.   Further, in testimony before the DNFSB in October of 2010, Relator Busche testified that, as manager of WTP Environmental and Nuclear Safety, she could not use the QRA for safety analysis until its assumptions and inputs were assessed for compliance with DOE-STD-3009.

337.   In a subsequent meeting between Defendants and the DOE Technical Authority Board, Defendants explained the selection of safety controls would not be based on the QRA's probabilistic methodology:

Once we get analysis of pipe failure, then use for SC [safety class] and SS [safety significant] control selection is based on unmitigated consequences.   Use of QRA is to develop stress

analysis for piping design.  The design analysis is not part of the safety analysis.  Safety Analysis looks at consequences of failure.  Probability of detonation (PRC DDT) in pipe is not an input to functional classification of pipe, only determines the frequency of loading.  Probability of ignition is assumed to be 1.

338.   This explanation misrepresented Defendants' ongoing intention to use the QRA to reduce or remove HPAV controls.

339.   Based on Defendants' false representation, DOE and ORP both concluded that this application of the QRA comported with DOE-STD-3009 because it would not be used for safety classification.

340.   Subsequently, Relator Busche and Hans Vogel, then-ORP Environmental Health and Safety Lead, separately issued memos stating that the QRA could not be used in safety analysis, namely, to remove or reduce HPAV controls.

341.    Defendants ignored DOE and Relator Busche's directives and continued to develop the QRA to remove controls.

342.   On or about May 2, 2013, Relator Busche met with Defendants and DOE about the QRA.  During that meeting, Defendants told DOE that, at a previous engagement, Relator Busche had used a probabilistic analysis similar to that used in the QRA to comply with DOE-STD-3009 and that the QRA could therefore be used at the WTP.

343.  Defendants made this false assertion in order to convince DOE that the QRA could be used to remove safety controls without violating DOE-STD-3009.  Relator Busche has never used a tool similar to the QRA to remove DOE-STD-3009 safety controls.

344.  Relying on this misrepresentation, Greg Jones, an ORP engineer, supported Defendants' use of the QRA until Relator Busche explained that Defendants' assertion was false and that the QRA could not be used to comply with DOE-STD-3009.  In response to Relator Busche, Mike Wentink, one of Defendants' lead engineers, stated in the meeting something to the effect that if the QRA was not going to serve its purpose and remove safety controls, "then we have wasted a lot of money."

345.  Faced with clear instruction that the QRA could not be used to assess DOE-STD-3009 controls, Defendants, lead by attorney Jean Dunkirk of Bechtel's General Counsel's office, announced that the QRA could be used to remove safety controls because DOE-STD-3009 did not apply to the WTP during the design and construction phase.  Defendants asserted that DOE-STD-3009 did not apply to WTP design and construction and would only apply on commissioning.  This position ignores that the selection of safety controls must be made during the design process.  Otherwise, the WTP would need to be retrofitted to include such controls.

346.   Perhaps realizing this, Ward Sproat, the Manager of Design, Operations, and Integration admitted to Relator Busche and others, including ORP personnel, in a subsequent meeting on or about May 7, 2013, that DOE-STD-3009 did apply to the WTP and that the QRA's probabilistic analysis could not be used to remove safety controls.

347.   However, out of the presence of DOE, Defendants changed their position yet again.  On June 6, 2013, Russell Daniel, WTP Technical Director, confronted Relator Busche regarding the QRA.   Daniel told Relator Busche that she needed to approve the use of the QRA to remove controls.  Relator Busche told Daniel that she could not approve its use because she had not been relieved of the federal requirements.   Daniel implored that approval was necessary because Defendants were "breaking new ground."  Relator Busche also reminded Daniel that quality assurance procedures did not permit her to use the QRA to which Daniel replied that Defendants would "figure that out."

348.   Defendants have made misrepresentations to DOE in order to obtain DOE approval for the QRA.   Despite requirements that a deterministic method be applied when assessing safety controls, Defendants continue to develop the QRA tool at the cost of the taxpayer, misrepresenting Defendants' intended purpose for the QRA, the

applicability of DOE-STD-3009, and its use at other waste treatment facilities.

## 2. *Defendants Misrepresented to DOE Compliance with NQA-1*

349. In addition to misrepresenting their intention to use the QRA to remove DOE-STD-3009 controls, Defendants failed to comply with NQA-1 in collecting the data to be analyzed by the QRA and developing the QRA software. Thus, regardless of the applicability of DOE-STD-3009, the QRA tool is unusable as it produces analysis that fails to conform to quality assurance requirements and is thus of an indeterminate quality.

350. QRA testing performed by Dominion Engineering Inc., who subcontracted to Southwest Research Institute, Exelon Power Labs and potentially others, to determine alternative methods, was not performed in accordance with NQA-1.

351. NQA-1-2000, Part I, consists of 18 requirements; 15 of these contain detailed requirements in addition to a basic initial introductory-level expectation paragraph. Defendants only required Dominion Engineering, Inc. and other QRA potential subcontractors to meet the "basic" conditions for each of the applicable Part I requirements—which they recognized as an issue prior to authorizing testing.

352. In addition, subcontractors failed to comply with even the basic

requirements.  Defendants failed to issue to Dominion Engineering, Inc. required commercial grade dedication requirements and procedures to control suspect/counterfeit items.  Likewise, Dominion Engineering, Inc. failed to maintain required document control, control of calculation analysis used in software design, software traceability and other issues.

353.  Defendants knowingly, or with reckless disregard, developed the QRA tool such that it does not conform to the federal safety requirements and is based on NQA-1 noncompliant tests.  Defendants further misrepresented the purpose of the QRA as a tool to verify ASME weight loads when Defendants intended to use the QRA to remove safety controls in violation of DOE-STD-3009.

354.  To date, Defendants have claimed approximately $140 million in costs related to testing and development of the QRA tool, and Defendants continue to develop the tool and submit claims for QRA costs despite its indeterminate use and contractually-noncompliant purpose.

F.  **FAILURE TO COMPLY WITH SAFETY REQUIREMENTS IN DESIGNING AND FABRICATING THE PVV/PVP SYSTEM**

355.  To prevent the accumulation of hydrogen off-gassed from the pretreatment process, an exhaust system must remove the hydrogen from the headspace of the vessels and filter gas through "scrubbers" and a dedicated filtration system.

356.  This system, known as Process Vessel Vent Process ("PVP") and Process Vessel Vent Exhaust ("PVV") system, is designed to protect the public and the environment.  Compliance with environmental treatment requirements must be achieved prior to any gaseous release from the PVV exhaust stack.

357.  Design verification of the PVP/PVV system occurred in October of 2003; however, at that time, only one item had been completed. An entry was made in the WTP Action Tracking System to complete verification by 2006.  Defendants did not meet the 2006 deadline; instead, Defendants rescheduled the design verification many times with little justification.

358.  Since at least 2002, the Preliminary Documented Safety Analysis Report ("PDSA"), an Authorization Basis document requiring strict compliance, has required that the PVV/PVP system be designed to mitigate potential dangers associated with multiple pressurized releases of hydrogen gas, otherwise known as overblows, in the PT facility.

359.  In or about July of 2010, Greg Ashley misrepresented to ORP officials, including Relator Brunson, that the Environmental & Nuclear Safety ("E&NS") group had actively participated and approved moving forward with a design of the PVV/PVP system that would handle multiple overblows.

360. On July 14, 2010, unaware of Ashley's misrepresentations, Relator Busche, the manager of E&NS, responded to direct questions from Relator Brunson and other ORP employees concerning the E&NS involvement:

> I communicated that ENS had been involved at a cursory level, and reiterated our trend input that realigns the PDSA starting with a hazop. They were under the impression that we had a more active involvement and had concurred/approved of the path forward.  Gary [Brunson] indicated his frustration and indicated he would call.

361. Upon hearing of Relator Busche's statements to Relator Brunson, Frank Russo remarked to Dale Knutson and Greg Ashley that "[w]ith all due respect, fishing for issues (and Donna helping create one) will not help anyone.  Ashley is the voice of the entire Technical organization and if a critical question isn't asked or vetted by him, then it just doesn't count."  Russo then accused Relator Busche of saying "the most inciting thing," and that he would "fix that part."

362. Contrary to Ashley's statements, Defendants ignored reports from E&NS that the PVV/PVP system failed to meet the Authorization Basis and refused to flowdown the requirement to subcontractors designing and fabricating the SSCs of the PVV/PVP system.

363. As a result, major elements of the PVV/PVP system, as designed, fabricated, and installed, are unable to sustain multiple overblows.

364. Defendants knowingly, or with reckless disregard, subcontracted, accepted and falsely certified a PVV/PVP system that does not conform to the Authorization Basis; further, the cost the United States will incur to redesign the PVV/PVP system, and if necessary, uninstall and replace the improperly constructed PVV/PVP will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

## G.    PROCUREMENTS THAT FAILED TO MEET BASIC SAFETY REQUIREMENTS

365. The WTP Contract requires Bechtel to implement specific quality-control provisions.

366. SSCs designated as Safety Class or Safety Significant must be designed and qualified to function as intended in specified environments.

367. Electrical safety equipment must be qualified in accordance with IEEE-323-1983, which requires documentary evidence of suitability and aging consideration based on analysis, experience, testing or a combination of the three methods.

368. Mechanical safety equipment must be qualified by a certificate of conformance to the equipment specifications that includes the environmental conditions and hazards and the effects of aging.

369. Upper level safety systems must be qualified by design as established by documented compliance with the Quality Assurance Manual, an Authorization Basis document for safety in engineering, procurement, and construction. Safety components contained within the system must be qualified in accordance with the applicable electrical and mechanical safety equipment requirements.

370. Prior to procurement or construction, all designs containing Safety Class or Safety Significant SSCs must go through a design verification process to provide assurance that SSCs reflect the safety requirements, are adequately designed, and that all designs are properly integrated.

371. Where time constraints preclude verification of an entire design, Defendants are required to identify and control the unverified design elements. Defendants must complete design verification prior to the SSC performing its function and before installation becomes irreversible, i.e. requires significant rework.

372. Defendants' design control procedures are clear that design media, such as drawings and technical specifications, may not be issued for

procurement or construction until the design is fully compliant with the contractual Authorization Basis.

373. Since as early as 2004, Defendants have knowingly, or with reckless disregard, falsely certified SSCs as compliant with quality requirements.

374. Defendants violated quality requirements in numerous ways, including, among others:

a.      Defendants failed to flowdown quality requirements to subcontractors.

b.      Defendants permitted subcontractors to deviate from quality requirements in order to reduce cost and save time.

c.      Defendants routinely granted submitted supplier deviation disposition requests ("SDDRs") to reduce quality requirements without obtaining the contractually required approval from E&NS.

d.      Defendants failed to implement required quality control measures to ensure that procured Safety Class and Safety Significant SSCs conformed to requirements.

375. Defendants knowingly, or with reckless disregard, accepted and falsely qualified, or permitted the false qualification by a subcontractor or supplier, Safety Class or Safety Significant SSCs that did not meet

quality standards.  This included using false certificates of conformances and other documentation certifying compliance.

376.    Using the above-described PVV/PVP system as an example of non-conformances, Defendants procured and accepted PVP Caustic Scrubbers and PVV/PVP piping that failed to meet quality requirements.

377.    PVP Caustic Scrubbers must maintain a service life of at least 40 years without maintenance.  Defendants procured PVP Caustic Scrubbers from Premier Technology, Inc. that do not have a verified 40-year service life.  Defendants failed to flowdown the requirements to Premier Technology, Inc., who was unable to provide the required assurance, rendering the PVP Caustic Scrubbers quality indeterminate and of no use.

378.  Defendants likewise failed to flowdown to the subcontractor seismic requirements for PVV/PVP piping.  In 2008, Defendants issued a Decision to Deviate document, changing the seismic requirements for piping from Seismic Category III, which denotes no seismic safety function, to Seismic Category I, which denotes top seismic safety function.

379.  This change required the majority of the PVV/PVP piping system to be hardened to withstand an earthquake.

380.  The Defendants design originator and design checker failed to incorporate this design input into the piping and instrument drawings, and

PVV/PVP piping diagrams were not updated to reflect the additional hardening requirement.

381.   Defendants failed to flowdown the seismic requirements to the vendor.

382.   At least 19 piping lines were procured without the requisite hardness to withstand an earthquake.   The non-conforming piping was installed in the PT facility.

383.   In violation of quality requirements, Defendants quality assurance group permitted the acceptance of non-conforming piping and Defendants' engineering group failed to verify the design prior to installation.

384.   Defendants knowingly, or with reckless disregard, accepted and qualified the PVV/PVP piping for use in the PT facility.   Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.

385.   By way of another example, Defendants procured and accepted grout that failed to meet Q Level quality requirements.

386.   Defendants failed to flowdown the environmental conditions to which the grout would be exposed, failed to require the supplier to provide grout that could survive high radiation levels, high temperatures, or other

known hard conditions, and failed to require testing to demonstrate the grout's capability under these conditions.

387.   The grout Defendants accepted and designated as Q Level is made with organic materials that will break down and fail if exposed to high radiation levels, high temperatures, or other hard conditions.   The grout has been used in nuclear safety applications throughout the WTP facility where high radiation levels and other hard conditions could exist.

388.   Defendants accepted and qualified the grout as Q Level. Defendants knowingly, or with reckless disregard, falsely certified this grout as compliant with quality requirements.   This grout is of indeterminate quality, and Defendants' acceptance and installation of it renders every facility where it is installed that is subject to nuclear safety requirements in violation of the WTP Contract.

389.   The procurements identified below are additional examples of the SSCs that Defendants falsely certified as compliant with quality requirements:

a.        Defendants procured from Peterson Inc. hatches, plates, pits, and related components pursuant to material requisition no. 24590-QL-MRA-ADDH-00003.   These procured SSCs failed to meet required bounding environmental conditions for humidity, chemical exposure, temperature and/or a steam-break hazard.

Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

b.     Defendants procured important-to-safety piping from Shaw Naptech, Inc. pursuant to material requisition nos. 25490-QL-POB-PS02-00009 and 24590-POA-PS02-00009, among others. The procured piping failed to meet traceability and pedigree requirements. Defendants accepted and qualified piping as Safety Class or Safety Significant. Defendants knowingly, or with reckless disregard, falsely certified for this piping as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the

corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.

c.      Defendants procured from ABB, Inc. flow-indicator-rotameters and related components for the LAW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-JF16-00001. These procured SSCs failed to meet required bounding environmental conditions for temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW and PTF Facilities at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.   These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.

d.      Defendants procured from ABW Technologies, Inc. instrument racks, inbleed enclosures, clips and related components for the LAB, LAW, HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-JC00-00005.   These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, humidity, temperature, and/or a steam-break hazard.  Defendants accepted and qualified these SSCs as Safety

127

Class or Safety Significant SSCs for use in the LAB, LAW, HLW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.

e.       Defendants procured from ABW Technologies, Inc. magnetic flow transmitters and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-JF08-00003.  These procured SSCs failed to meet required bounding environmental conditions for humidity.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants

have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

f.      Defendants procured from American Crane & Equipment hot cell monorail airlocks, monorail recovery systems, hot cell monorail hoists, and related components for the LAB facility pursuant to material requisition no. 24590-QL-MRA-MJKH-00002. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation and temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAB Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

g.      Defendants procured from Ametek, Inc. transmitters and related components for the LAW facility pursuant to

material requisition no. 24590-QL-MRA-JP02-00003.  These procured SSCs failed to meet required bounding environmental conditions for temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

h.      Defendants procured from Ametek, Inc. speed transmitters, sensors, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-JS01-00001. These procured SSCs failed to meet required bounding environmental conditions for temperature, chemical exposure, and/or humidity.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely

certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

i.      Defendants procured from Beaird Industries, Inc. a plant wash and disposal system breakpot and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MVA0-00009. These procured SSCs failed to meet required bounding environmental conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants

131

have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

j.     Defendants procured from Chromalox, Inc. a HEPA preheater, sacrificial heater element assemblies, and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-MEE0-00003.   These procured SSCs failed to meet required bounding environmental conditions for temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.   These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.   Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

k.     Defendants procured from Flanders/CSC Corporation C5V, C2V, and C3V HEPA filter housings, exhausts, filters, a decontamination booth and glovebox HEPA housing, and

related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MKH0-00001. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, humidity, and temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

l.      Defendants procured from Flanders/CSC Corporation an ultrafiltration feed lag pump b, ultrafiltration feed lag pump a, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MPC0-00009. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the

PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

m.     Defendants procured from Flanders/CSC Corporation pumps and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MPC0-00012. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate

134

quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

n.      Defendants procured from Flanders/CSC Corporation an ion-exchange feed pump, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MPC0-00013. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

135

o.          Defendants    procured    from    Flanders/CSC Corporation vessels, ejectors, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MPE0-00001.    These procured SSCs failed to meet required bounding environmental conditions for humidity.    Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.    Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.    These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.    Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

p.          Defendants procured from Flowserve Corporation control valves and regulators, and related components for the LAW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-JV01-00002.    These procured SSCs failed to meet required bounding environmental conditions for temperature, chemical exposure, a duplicate control tag, and/or humidity.    Defendants

accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

q.      Defendants procured from Fluidic Techniques/FTI Industries venturi tubes and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-JF07-00001. These procured SSCs failed to meet required bounding environmental conditions for temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the

corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

r.        Defendants procured from Harris Thermal Transfer Products a PJV demister, anchor bolt locator templates, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MVA0-00013. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

s.          Defendants procured from Hot Cell Services Corp. shielded window housings, shielded window liner, installation and extraction carts, and related components for the LAB facility pursuant to material requisition no. 24590-QL-MRA-ADDP-00002. These procured SSCs failed to meet required bounding environmental conditions for temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAB Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

t.          Defendants procured from Invensys Systems, Inc. control room and plant components, enclosures and related components for the LAW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-JD03-00001.  These procured SSCs failed to meet required bounding environmental conditions for

environmental classification, steam-break hazards, chemical exposure and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

u.      Defendants procured from Invensys Systems, Inc. a flow element-magnetic, flow transmitter- magnetic, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-JF08-00002. These procured SSCs failed to meet required bounding environmental conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These

140

components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

v. Defendants procured from Ionex Research Corporation fume hoods, partitions, crushers, compactors, shielded transfer imports/exports, and related components for the LAB facility pursuant to material requisition no. 24590-QL-MRA-MJW0-00006. These procured SSCs failed to meet required bounding environmental conditions for temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAB Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants

141

1    have taken affirmative acts to cover up the existence of such issues

2    over protests of employees, such as Robert DeLannoy.

3         w.       Defendants procured from Joseph Oat Corporation

4    HLW acidic waste vessel (RLD-VSL-00007), pulse jet ventilation

5    system demisters, and related components pursuant to material

6    requisition no. 25490-QL-MRA-MVA0-00027.  Defendants' failed to

7    document source verifications for pressure boundary traceability or

8    conformance to specified requirements.  Defendants accepted and

9    qualified these SSCs as Safety Class or Safety Significant SSCs for use

10   at the WTP.  Defendants knowingly, or with reckless disregard,

11   falsely certified these SSCs as compliant with quality requirements.

12   These components are of indeterminate quality, and Defendants'

13   acceptance of these components renders the corresponding system or

14   structure that utilizes these components to be of indeterminate

15   quality in violation of the WTP Contract.

16        x.       Defendants procured from Kyungwon Century

17   America Inc. extraction fans with motors, and related components for

18   the PTF facility pursuant to material requisition no. 24590-QL-MRA-

19   MACS-00004.  These procured SSCs failed to meet required bounding

20   environmental conditions for humidity.  Defendants accepted and

21   qualified these SSCs as Safety Class or Safety Significant SSCs for use

1    in the PTF Facility at the WTP.  Defendants knowingly, or with

2    reckless disregard, falsely certified these SSCs as compliant with

3    quality requirements.   These components are of indeterminate

4    quality, and Defendants' acceptance of these components renders the

5    corresponding system or structure that utilizes these components to

6    be of indeterminate quality in violation of the WTP Contract.  Despite

7    knowing the components are of indeterminate quality, Defendants

8    have taken affirmative acts to cover up the existence of such issues

9    over protests of employees, such as Robert DeLannoy.

10          y.          Defendants procured from Laboratory Impex

11   Systems, Ltd. stack discharge monitoring instruments, and related

12   components for the LAW and HLW facilities pursuant to material

13   requisition no. 24590-QL-MRA-JA03-00001.   These procured SSCs

14   failed to meet required bounding environmental conditions for doses

15   of radiation.  Defendants accepted and qualified these SSCs as Safety

16   Class or Safety Significant SSCs for use in the LAW and HLW

17   Facilities at the WTP.   Defendants knowingly, or with reckless

18   disregard, falsely certified these SSCs as compliant with quality

19   requirements.  These components are of indeterminate quality, and

20   Defendants' acceptance of these components renders the

21   corresponding system or structure that utilizes these components to

1   be of indeterminate quality in violation of the WTP Contract.  Despite

2   knowing the components are of indeterminate quality, Defendants

3   have taken affirmative acts to cover up the existence of such issues

4   over protests of employees, such as Robert DeLannoy.

5          z.          Defendants  procured  from  Mid  Columbia

6   Engineering, Inc. plant service air racks, plant wash racks, and

7   related  components  for  the  PTF  facility  pursuant  to  material

8   requisition no. 24590-QL-MRA-PH02-00011.  These procured SSCs

9   failed  to  meet  required  bounding  environmental  conditions  for

10  chemical exposure.  Defendants accepted and qualified these SSCs as

11  Safety Class or Safety Significant SSCs for use in the PTF Facility at

12  the WTP.  Defendants knowingly, or with reckless disregard, falsely

13  certified these SSCs as compliant with quality requirements.  These

14  components  are  of  indeterminate  quality,  and  Defendants'

15  acceptance of these components renders the corresponding system or

16  structure that utilizes these components to be of indeterminate

17  quality in violation of the WTP Contract.  Despite knowing the

18  components are of indeterminate quality, Defendants have taken

19  affirmative acts to cover up the existence of such issues over protests

20  of employees, such as Robert DeLannoy.

21

144

aa.	Defendants procured from Mid Columbia Engineering, Inc. high pressure steam racks, plant service air racks, fluidics control racks, plant wash racks, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-PH02-00012. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

bb.	Defendants procured from Mott Corp. ultrafilters and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MVEF-00003. These procured SSCs failed to meet required bounding environmental conditions for

chemical exposure and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

cc.      Defendants procured from Northwest Copper Works, Inc. an ultrafiltration feed vessel, ring beam, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRC-MVA0-B0002. These procured SSCs failed to meet required bounding environmental conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants'

146

1   acceptance of these components renders the corresponding system or

2   structure that utilizes these components to be of indeterminate

3   quality in violation of the WTP Contract.  Despite knowing the

4   components are of indeterminate quality, Defendants have taken

5   affirmative acts to cover up the existence of such issues over protests

6   of employees, such as Robert DeLannoy.

7       dd.       Defendants procured from Northwest Copper

8   Works, Inc. ultrafiltration pulse pots, plant wash breakpots, and

9   related components for the PTF facility pursuant to material

10  requisition no. 24590-QL-MRD-MVA0-00003.  These procured SSCs

11  failed to meet required bounding environmental conditions for

12  chemical exposure and/or humidity.  Defendants accepted and

13  qualified these SSCs as Safety Class or Safety Significant SSCs for use

14  in the PTF Facility at the WTP.  Defendants knowingly, or with

15  reckless disregard, falsely certified these SSCs as compliant with

16  quality requirements.  These components are of indeterminate

17  quality, and Defendants' acceptance of these components renders the

18  corresponding system or structure that utilizes these components to

19  be of indeterminate quality in violation of the WTP Contract.  Despite

20  knowing the components are of indeterminate quality, Defendants

21

147

have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ee.       Defendants procured from Nuclear Logistics Inc. transformers, distribution panels and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-EAA0-00001. These procured SSCs failed to meet required bounding environmental conditions for environmental classification. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ff.       Defendants procured from Nuclear Logistics Inc. 480V motor control centers and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-EC00-

00004.    These procured SSCs failed to meet required bounding environmental conditions for chemical exposure.    Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.   These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.   Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

gg.        Defendants procured from Nuclear Logistics Inc. load interrupter switches, dry type transformers, secondary unit substation load centers, and related components for the HLW and PT facilities pursuant to material requisition no. 24590-QL-MRA-EK00-00001.    These procured SSCs failed to meet required bounding environmental conditions for chemical exposure and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PT Facilities at the

WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

hh.      Defendants procured from Nuclear Logistics Inc. wafer check valves and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-PV14-00004. These procured SSCs failed to meet required bounding environmental conditions for environmental classification, steam-break hazards, chemical exposure, and/or temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that

utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ii.      Defendants procured from Nuclear Systems Associates Inc. high-pressure sodium lights, thru-wall lighting fixtures, maintenance shield plugs, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-EL00-00001. These procured SSCs failed to meet required bounding environmental conditions for steam-break hazards, chemical exposure, humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants

1    have taken affirmative acts to cover up the existence of such issues

2    over protests of employees, such as Robert DeLannoy.

3         jj.        Defendants procured from Numet Engineering Ltd.

4    CS ion exchange feed coolers and related components for the PTF

5    facility pursuant to material requisition no. 24590-QL-MRA-MEPS-

6    00001.   These procured SSCs failed to meet required bounding

7    environmental conditions for chemical exposure and/or humidity.

8    Defendants accepted and qualified these SSCs as Safety Class or

9    Safety Significant SSCs for use in the PTF Facility at the WTP.

10   Defendants knowingly, or with reckless disregard, falsely certified

11   these SSCs as compliant with quality requirements.   These

12   components are of indeterminate quality, and Defendants'

13   acceptance of these components renders the corresponding system or

14   structure that utilizes these components to be of indeterminate

15   quality in violation of the WTP Contract.   Despite knowing the

16   components are of indeterminate quality, Defendants have taken

17   affirmative acts to cover up the existence of such issues over protests

18   of employees, such as Robert DeLannoy.

19        kk.        Defendants procured from Nuthem International

20   Inc. jumper valves, plug valves, and related components for the HLW

21   facility pursuant to material requisition no. 24590-QL-MRA-JV09-

00008.   These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, chemical exposure, humidity, and/or temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ll.      Defendants procured from Nutherm International Inc. UPS Systems, 480V AC, by-pass isolating transformers, batteries, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-EU00-00001.  These procured SSCs failed to meet required bounding environmental conditions for chemical exposure.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely

1    certified these SSCs as compliant with quality requirements.  These

2    components are of indeterminate quality, and Defendants'

3    acceptance of these components renders the corresponding system or

4    structure that utilizes these components to be of indeterminate

5    quality in violation of the WTP Contract.  Despite knowing the

6    components are of indeterminate quality, Defendants have taken

7    affirmative acts to cover up the existence of such issues over protests

8    of employees, such as Robert DeLannoy.

9         mm.      Defendants procured from NuVision Engineering

10   Inc. progressive cavity pumps and related components for the PTF

11   facility pursuant to material requisition no. 24590-QL-MRA-MPRP-

12   00001.  These procured SSCs failed to meet required bounding

13   environmental conditions for doses of radiation, humidity, and/or

14   chemical exposure.  Defendants accepted and qualified these SSCs as

15   Safety Class or Safety Significant SSCs for use in the PTF Facility at

16   the WTP.  Defendants knowingly, or with reckless disregard, falsely

17   certified these SSCs as compliant with quality requirements.  These

18   components are of indeterminate quality, and Defendants'

19   acceptance of these components renders the corresponding system or

20   structure that utilizes these components to be of indeterminate

21   quality in violation of the WTP Contract.  Despite knowing the

components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

nn.     Defendants procured from Oregon Iron Works, Inc. shield doors, switch retrofit kits, and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-ADDH-00007. These procured SSCs failed to meet required bounding environmental conditions for humidity, environment classification, temperature, chemical exposure, and steam-break hazards. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

oo.      Defendants procured from Parsons Constructors & Fabricators, Inc. engineering documents the PTF facility pursuant to material requisition no. 24590-QL-MRA-PF00-00044.  These procured SSCs failed to meet required bounding environmental conditions for humidity, and/or chemical exposure.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

pp.      Defendants procured from Petersen Inc. drum transfer hatches, cave export hatches, cave import hatches, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-ADDH-00003.  These procured SSCs failed to meet required bounding environmental conditions for humidity, chemical exposure, temperature and/or a steam-break

1    hazard.   Defendants accepted and qualified these SSCs as Safety

2    Class or Safety Significant SSCs for use in the HLW Facility at the

3    WTP.   Defendants knowingly, or with reckless disregard, falsely

4    certified these SSCs as compliant with quality requirements.   These

5    components   are   of   indeterminate   quality,   and   Defendants'

6    acceptance of these components renders the corresponding system or

7    structure that utilizes these components to be of indeterminate

8    quality in violation of the WTP Contract.   Despite knowing the

9    components are of indeterminate quality, Defendants have taken

10   affirmative acts to cover up the existence of such issues over protests

11   of employees, such as Robert DeLannoy.

12          qq.         Defendants procured from Premier Technology Inc.

13   Pa doors and frames and related components for the HLW and PTF

14   facilities pursuant to material requisition no. 24590-QL-MRA-ADDB-

15   00001.   These procured SSCs failed to meet required bounding

16   environmental conditions for steam-break hazards, humidity, and/or

17   chemical exposure.   Defendants accepted and qualified these SSCs as

18   Safety Class or Safety Significant SSCs for use in the HLW and PTF

19   Facilities at the WTP.   Defendants knowingly, or with reckless

20   disregard, falsely certified these SSCs as compliant with quality

21   requirements.   These components are of indeterminate quality, and

1

2

3

4

5

6

Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

rr. Defendants procured from Premier Technology Inc. waste transfer ports and related components for the LAB facility pursuant to material requisition no. 24590-QL-MRA-HCHH-00003. These procured SSCs failed to meet required bounding environmental conditions for temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAB Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ss.     Defendants procured from Premier Technology Inc. posting ports and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-M000-00002. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PTF Facilities at the WTP.   Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.   These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.   Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

tt.     Defendants procured from Premier Technology Inc. offset assemblies for 36" and 48" thick slabs and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-PY00-00005.   These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, humidity,

and/or temperature.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

uu.    Defendants procured from Premier Technology Inc. vessel vents, heat exchange bulges, removable weirs, scrubbing liquid coolers, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-PY33-00004.    These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.    These

160

1    components are of indeterminate quality, and Defendants'

2    acceptance of these components renders the corresponding system or

3    structure that utilizes these components to be of indeterminate

4    quality in violation of the WTP Contract.  Despite knowing the

5    components are of indeterminate quality, Defendants have taken

6    affirmative acts to cover up the existence of such issues over protests

7    of employees, such as Robert DeLannoy.

8         vv.       Defendants procured from RSCC Wire & Cable LLC

9    power, control and instrumentation cables, and related components

10   for the LAB, LAW, HLW, and PTF facilities pursuant to material

11   requisition no. 24590-QL-MRA-EW00-00001.  These procured SSCs

12   failed to meet required bounding environmental conditions for

13   humidity.  Defendants accepted and qualified these SSCs as Safety

14   Class or Safety Significant SSCs for use in the LAB, LAW, HLW, and

15   PTF Facilities at the WTP.  Defendants knowingly, or with reckless

16   disregard, falsely certified these SSCs as compliant with quality

17   requirements.  These components are of indeterminate quality, and

18   Defendants' acceptance of these components renders the

19   corresponding system or structure that utilizes these components to

20   be of indeterminate quality in violation of the WTP Contract.  Despite

21   knowing the components are of indeterminate quality, Defendants

161

have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ww.    Defendants procured from S.A. Technology, Inc. (formerly Special 7 6,706,278.31 Application Robotics - dba SA Robotics) LVP offgas exhausters and related components for the LAW facility pursuant to material requisition no. 24590-QL-MRA-MACS-00007.  These procured SSCs failed to meet required bounding environmental conditions for doses of radiation.    Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.    These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.    Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

xx.    Defendants procured from S.A. Technology, Inc. racks and related components for the PTF facility pursuant to

material requisition no. 24590-QL-MRA-PH02-00004.  These procured SSCs failed to meet required bounding environmental conditions for chemical exposure.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

yy.      Defendants procured from S.A. Technology, Inc. racks, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-PH02-00008.  These procured SSCs failed to meet required bounding environmental conditions for chemical exposure and/or humidity.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with

quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

zz.        Defendants procured from Special Application Robotics, Inc. DBA S.A. Robotics HDH and RWH turntables, rails, tools, test equipment and assemblies, solid waste baskets, PIH decontamination basket, PFH and HFH filter baskets, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-HDYR-00001.  These procured SSCs failed to meet required bounding environmental conditions for humidity and/or chemical exposure.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate

quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

aaa.        Defendants procured from Special Applications Technology, Inc. C1/C2/C3 supply systems, C2/C3/C5 exhaust systems, and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-SRA-MDHM-00001. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, humidity and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

165

bbb.       Defendants procured from Special Applications Technology, Inc. pressure reducing regulators, pressure gauges, panel nuts, and related components for the PTF facility pursuant to material requisition no. 24590-CD-FMR-JV05-00002.  These procured SSCs failed to meet required bounding environmental conditions for humidity and/or chemical exposure.   Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.   Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.   These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ccc.       Defendants procured from Special Applications Technology, Inc. wash effluent breakpots, acidic waste transfer breakpots, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRC-MVA0-00003.   These procured SSCs failed to meet required bounding environmental

conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ddd.     Defendants procured from SSM Industries, Inc. exhaust fans and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-MACS-00005. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants'

167

acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

eee.     Defendants procured from Standard Calibrations, Inc. technical specifications for the HLW, LAW, and PTF facilities pursuant to material requisition no. 24590-QL-MRA-JP01-00002. These procured SSCs failed to meet required bounding environmental conditions for humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW, LAW, and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken

1    affirmative acts to cover up the existence of such issues over protests

2    of employees, such as Robert DeLannoy.

3         fff.        Defendants procured from Thermo Eberline, Inc. an

4    RMS3 with external HP290, digital area monitors, cables, connectors,

5    software, and related components for the LAB facility pursuant to

6    material requisition no. 24590-CM-FMR-HAHH-00001.   These

7    procured SSCs failed to meet required bounding environmental

8    conditions for temperature.  Defendants accepted and qualified these

9    SSCs as Safety Class or Safety Significant SSCs for use in the LAB

10   Facility at the WTP.   Defendants knowingly, or with reckless

11   disregard, falsely certified these SSCs as compliant with quality

12   requirements.  These components are of indeterminate quality, and

13   Defendants' acceptance of these components renders the

14   corresponding system or structure that utilizes these components to

15   be of indeterminate quality in violation of the WTP Contract.  Despite

16   knowing the components are of indeterminate quality, Defendants

17   have taken affirmative acts to cover up the existence of such issues

18   over protests of employees, such as Robert DeLannoy.

19         ggg.        Defendants procured from Thompson Mechanical

20   Contractors, Inc. wall-to-header fit-up tests, process jumpers, jumper

21   support, jumper headers, jumper horizontal blanks, pneumatic

169

jumpers, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-PF00-00016. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

hhh.      Defendants procured from Vanguard Distributors, Inc. master-slave manipulators and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-MJW0-00003. These procured SSCs failed to meet required bounding environmental conditions for humidity, temperature, chemical exposure, and steam-break hazards. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for

use in the HLW and PTF Facilities at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

iii.     Defendants procured from Vanguard Distributors, Inc. steam injectors, emptying ejectors, transfer ejectors, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-MPE0-00001.  These procured SSCs failed to meet required bounding environmental conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or

structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

jjj.        Defendants procured from Vanguard Distributors, Inc. melters and melter Rails, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-MQR0-00001.    These procured SSCs failed to meet required bounding environmental conditions for humidity, temperature, and chemical exposure, and SSCs fail to meet required seismic bounding conditions.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken

affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

kkk.      Defendants procured from Vanguard Distributors, Inc. bogies and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-MQTS-00001.    These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, humidity, and chemical exposure, and SSCs fail to meet required seismic bounding conditions. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.    These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.   Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

lll.      Defendants procured from Vanguard Distributors, Inc. bogies and related components for the HLW facility pursuant to

material requisition no. 24590-QL-MRA-MQTS-00002. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

mmm. Defendants procured from Vanguard Distributors, Inc. racks and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-PH02-00007. These procured SSCs failed to meet required bounding environmental conditions for environmental classification, humidity, and/or steam-break hazards. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP.

Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

nnn.     Defendants procured from Vanguard Distributors, Inc. ITS in-line air filter-dryers, plant service air in-line particulate filters, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRA-PY02-00003. These procured SSCs failed to meet required bounding environmental conditions for temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate

quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ooo.    Defendants procured from Vanguard Distributors, Inc. wash effluent breakpots, acidic waste transfer breakpots, and related components for the HLW facility pursuant to material requisition no. 24590-QL-MRC-MVA0-00003. These procured SSCs failed to meet required bounding environmental conditions for humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

ppp.        Defendants procured from Vat Incorporated remote operated dampers and related components for the HLW and PTF facilities pursuant to material requisition no. 24590-QL-MRA-MDP0-00002.    These procured SSCs failed to meet required bounding environmental conditions for doses of radiation.    Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and PTF Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.    These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.    Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

qqq.        Defendants procured from Vat Incorporated technical specifications for the HLW facility pursuant to material requisition no. 24590-QL-MRA-MEHX-00001.   These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, chemical exposure, and/or temperature.   Defendants

1   accepted and qualified these SSCs as Safety Class or Safety

2   Significant SSCs for use in the HLW Facility at the WTP. Defendants

3   knowingly, or with reckless disregard, falsely certified these SSCs as

4   compliant with quality requirements.  These components are of

5   indeterminate quality, and Defendants' acceptance of these

6   components renders the corresponding system or structure that

7   utilizes these components to be of indeterminate quality in violation

8   of the WTP Contract.  Despite knowing the components are of

9   indeterminate quality, Defendants have taken affirmative acts to

10  cover up the existence of such issues over protests of employees, such

11  as Robert DeLannoy.

12          rrr.        Defendants procured from Vat Incorporated power

13  manipulators and related components for the HLW facility pursuant

14  to material requisition no. 24590-QL-MRA-MJW0-00002.  These

15  procured SSCs failed to meet required bounding environmental

16  conditions for temperature.  Defendants accepted and qualified these

17  SSCs as Safety Class or Safety Significant SSCs for use in the HLW

18  Facility at the WTP.  Defendants knowingly, or with reckless

19  disregard, falsely certified these SSCs as compliant with quality

20  requirements.  These components are of indeterminate quality, and

21  Defendants' acceptance of these components renders the

corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

sss.        Defendants procured from Velan Valve Corporation jumper valves, ball or plug valves, and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-JV09-00008.  These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, chemical exposure, and/or humidity.  Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

1        ttt.        Defendants purchased and dedicated 22,000 bulk

2    manual valves that are indeterminate as the safety functional

3    requirement of internal isolation function.    The bulk valves were

4    procured Velan Valve Corporation, Bonney Forge, and Nuclear

5    Logistics, Inc.    These components are of indeterminate quality, and

6    Defendants'    acceptance    of    these    components    renders    the

7    corresponding system or structure that utilizes these components to

8    be of indeterminate quality in violation of the WTP Contract.  Despite

9    knowing the components are of indeterminate quality, Defendants

10   have taken affirmative acts to cover up the existence of such issues

11   over protests of employees, such as Robert DeLannoy.

12       uuu.        Defendants procured from Wagstaff, Inc. cask

13   lidding machines, liners, special tools, fixtures, and handling beams,

14   and related components for the HLW facility pursuant to material

15   requisition no. 24590-QL-MRA-HCTH-00002.  These procured SSCs

16   failed to meet required bounding environmental conditions for

17   humidity, temperature, chemical exposure, and steam break, and

18   SSCs fail to meeting requirement bounding conditions for seismic.

19   Defendants accepted and qualified these SSCs as Safety Class or

20   Safety Significant SSCs for use in the HLW Facility at the WTP.

21   Defendants knowingly, or with reckless disregard, falsely certified

these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

vvv.      Defendants procured from Weir Valves & Controls USA valves, heat shields, and related components for the HLW and LAW facilities pursuant to material requisition no. 24590-QL-MRA-JV01-00003. These procured SSCs failed to meet required bounding environmental conditions for chemical exposure, humidity, and/or temperature. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the HLW and LAW Facilities at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite

181

knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

www.     Defendants procured from West Metal Works Inc. breakpots and related components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-MVA0-00015.     These procured SSCs failed to meet required bounding environmental conditions for chemical exposure and/or humidity.     Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP.     Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.     These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.     Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

xxx.     Defendants procured from Wright Industries, Inc. reflective metal insulations for encapsulating lines and related

components for the PTF facility pursuant to material requisition no. 24590-QL-MRA-NNP0-00002. These procured SSCs failed to meet required bounding environmental conditions for duplicate control tags. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the PTF Facility at the WTP. Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements. These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract. Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

yyy.        Defendants procured from Wright Industries, Inc. plugs and related components for the LAB, HLW, and PTF facilities pursuant to material requisition no. 24590-QL-MRA-EMM3-00001. These procured SSCs failed to meet required bounding environmental conditions for doses of radiation, temperature, and/or humidity. Defendants accepted and qualified these SSCs as Safety Class or Safety Significant SSCs for use in the LAB, HLW, and PTF

Facilities at the WTP.  Defendants knowingly, or with reckless disregard, falsely certified these SSCs as compliant with quality requirements.  These components are of indeterminate quality, and Defendants' acceptance of these components renders the corresponding system or structure that utilizes these components to be of indeterminate quality in violation of the WTP Contract.  Despite knowing the components are of indeterminate quality, Defendants have taken affirmative acts to cover up the existence of such issues over protests of employees, such as Robert DeLannoy.

390.  The costs associated with the above SCCs is not precisely known, but is estimated to be at least $200 million; further, the cost the United States will incur to reevaluate SSCs, and if necessary, rework or procure again, will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

## H.   WELDS THAT FAILED TO MEET REQUIREMENTS

391.  Welds located in the black cells and hard to reach places are subject to stringent weld requirements that are repeatedly listed in safety and design documents dictating the construction of vessels, piping, valves, etc.  These stringent weld requirements ensure that the SSCs are designed and fabricated to last for a design life of 40 years without in-service inspection.

392.   In 2010, Defendants performed welding and re-welding on pipe supports without issuance of a work package specifying the requirements. The resulting welds were not subject to any acceptance criteria or inspection requirements and were either not documented or improperly accepted by Field Engineering.

393.   As a result, Defendants knowingly, or with reckless disregard, accepted and falsely qualified, or permitted the false certification of welds that did not meet quality requirements.

394.   Welds in confinement vessels and welds that join primary confinement components are required to undergo non-destructive examination.   Specifically, the welds must be subject to volumetric inspection by radiographic or ultrasonic methods in accordance with ASME requirements.

395.   Defendants procured from Lisega, Inc. HVAC ducting for HLW under material requisition no. 24590-QL-POB-PH01-00003.   Pursuant to requirement, the HLW ducting required the performance of non-destructive examination on all critical welds. Because Defendants failed to flowdown design drawings that required the performance of non-destructive examinations, the examinations were not performed, rendering the HVAC ducts quality indeterminate.   Defendants Supplier Quality Representative and receipt inspection staff failed to recognize that non-

destructive examination had not been performed. The HVAC ducting was accepted, and in some cases installed, without the confirmatory data.

396. Defendants procured from Apollo Mechanical Contractors installation work using autogenous welding in the LAB under subcontract no. 24590-CM-HC1-P00Z-00001. Pursuant to engineering specifications, Apollo Mechanical Contractors was required to inspect all welded joints and maintain consistency in all weld identifications. Apollo Mechanical Contractors inspection reports failed to report on this required inspection attribute, including 1 inch welds, and failed to maintain consistency in identifying welds. Apollo Mechanical Contractors' installation failed to meet welding requirements, including non-destructive examination requirements, but was accepted by Defendants.

397. Defendants procured from Bendalls, Inc. a vessel (RLD-VSL-00008) under material requisition no. 24590-QL-POA-MVA0-00012. The procured vessel failed to meet welding requirements, including non-destructive examination requirements, but was accepted by Defendants' Supplier Representative.

398. Defendants procured from Joseph Oat Corporation HLW acidic waste vessel (RLD-VSL-00007), pulse jet ventilation system demisters, and related components pursuant to material requisition no. 25490-QL-MRA-MVA0-00027. The welds on the procured vessel and components were

certified as complete and accurate in accordance with welding requirements when such welds were unfinished. The welds were nonetheless accepted by Defendants' Supplier Representative.

399. Defendants, or Defendants' subcontractors, used welding techniques that failed to meet basic welding standards for nuclear safety. For example, in welding the tracks for a PT bridge crane, the welder failed to check the temperature of the base metal throughout the welding process to ensure proper heat range. When questioned, the welder stated that thermostatically controlled heating blankets or tape, which would ensure temperature consistency—i.e. weld quality—were "on order." Defendants' failure to ensure proper welding temperature jeopardized metal pedigree and weld quality.

400. Further, Defendants, or Defendants' subcontractors, failed to maintain traceability for NDE and material identification records.

401. Defendants knowingly, or with reckless disregard, accepted and falsely qualified, or permitted their subcontractors or suppliers to falsely qualify, welds that did not meet quality requirements.

402. The costs associated with the above SSCs containing falsely qualified welds is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to reevaluate the welds and if necessary, rework or procure again SSCs

containing welds, will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

## I.   FIRE SAFETY SYSTEM FAILED TO MEET REQUIREMENTS

403.  Defendants are required to install and maintain a Fire Safety System in accordance with standards promulgated by the National Fire Protection Association ("NFPA").

404.  Defendants designed and installed major portions of the Fire Safety System that failed to meet NFPA standards and contractual requirements, including (1) the Sprinkler System; (2) Fire Service Water ("FSW") Protection System; (3) LAW Annex Roof Assembly; and (3) Fire Perimeter Barriers.

405.  Defendants knew these systems violated design requirements and yet misrepresented to DOE that these systems complied with all requirements.

### 1.   *Defendants Failed to Meet Requirements for the WTP Fire Safety Sprinkler Systems*

406.  As reported to Defendants' management by E&NS in 2012, substandard design/installation practices by subcontractors, including Patriot, Inc., and a lack of engineering oversight, resulted in an installed sprinkler system with no uniformity.  Specifically, there was no discernible

logic to hanger placement, branch line configuration, fitting selection, or pipe sizing.  As a result, system branch-line configurations were installed that form a haphazard combination of plugged tees and plugged armovers, reducers, unions, couplings, and random jogs that satisfy no system performance function.

407.  In addition, numerous required hangers were not installed, system installation did not match locations identified in approved design drawings, seismic bracing was not installed in locations designated in design drawings, sprinklers were installed with obstructed spray patterns, hanger and supports were installed with deficiencies, and Defendants failed to provide sprinkler protection in all required areas.

408.  E&NS raised these sprinkler systems deficiencies in multiple facilities at the WTP, but Defendants refused to acknowledge the existence of a problem in order to obtain payment.  Defendants knowingly, or with reckless disregard, accepted and falsely qualified, or permitted a subcontractor or supplier to falsely qualify,  sprinkler systems that did not meet quality requirements.

409.  The costs associated with the Fire Safety Sprinkler Systems is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to rework the Fire Safety Sprinkler Systems will be massive and will have a detrimental impact on

the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

**2.   *Defendants Failed to Meet Requirements for the WTP Fire Service Water Protection System***

410.   Defendants signed off, approved as complete, and turned over to operations the Fire Service Water ("FSW") Protection System in 2008 without a complete design of the interfacing system and with inadequate documentation of safety basis requirements applicable to the FSW.

411.   The FSW requires an uninterruptible power supply to power monitoring instrumentation and control system equipment.

412.   The general PDSA specifically requires that the "[t]he uninterruptible power supply (UPS) provide[] power of acceptable quality, without delay or transients, when the normal power supply is not available."

413.   Prior to being turned over for plant operation, completion of the safety related design of the FSW Protection System was required, including the uninterruptible power system, to ensure the FSW performed its intended safety function in case of interruption in the normal power supply.

414.   The FSW Protection System, which includes two FSW storage tanks with in-service process monitoring instrumentation, control system

equipment, and two diesel drive fire water pumps, was turned over to plant operation in January of 2008 and is currently in-service.

415.   However, as noted in a February 4, 2013 email from Curtis Hall, Defendants signed off on the FSW system, approved it as complete, turned it over to plant operations, and placed it in service when it was not designed according to requirements.  Hall further noted that because the FSW Protection System is not designed pursuant to the PDSA and Basis of Design, the FSW could "degrade at any time to a condition that, if not readily detected and corrected by WTP operations personnel, would not make it capable to perform its required safety related fire protection."

416.   Defendants were aware of these issues both before and after turning over the FSW Protection System for use.  Defendants knowingly, or with reckless disregard, accepted and falsely qualified, or permitted a subcontractor or supplier to falsely qualify, the Fire Service Water Protection System that did not meet quality requirements.

417.  The costs associated with the Fire Service Water Protection System is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to rework the Fire Service Water Protection System will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

### 3.   Defendants Failed to Meet Requirements for the LAW Annex Roof Assembly

418.   The initial design and installed LAW Annex and LAB Roof Assembly contains Styrofoam Deckmate Plus extruded polystyrene insulation, which is combustible.   The design for the installed roof assembly does not meet established safety and fire protection requirements.

419.   Defendants knew, or should have known, of these issues prior to installing a combustible roofing material and knowingly, or with reckless disregard, accepted and falsely qualified, or permitted a subcontractor or supplier to falsely qualify, the LAW Annex and LAB Roof Assembly, neither of which met quality requirements.

420.   The costs associated with the LAW Annex and LAB Roof Assembly is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to rework the LAW Annex Roof Assembly and LAB Roof Assembly will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

1

2

*4.     Defendants Failed to Meet Requirements for the*

*WTP Fire Perimeter Barriers*

3

4

5

421.   NFPA 101, Chapter 6 requires the compartmentialization of buildings by fire barriers to limit the spread of fire and restrict the movement of smoke.

6

7

8

9

10

11

422.   To implement this requirement where a fire-rated floor meets a non-rated wall, the joint must be sealed in order to prevent the spread of fire beyond the floor.  If the void space between the rated floor and non-rated wall is not properly sealed, flames may spread through the walls around the rated floor.  This void space must be sealed with an approved material in accordance with ASTM E 2307-04.

12

13

14

423.   Defendants designed and accepted for installation fire perimeter barriers that use Specified Technologies Inc. slab.  This slab does not comply with NFPA and contract requirements.

15

16

17

18

19

424.   Defendants knew that the used slab did not comply with requirements.  Nonetheless, the Fire Protection Review Board, staffed with engineers employed by Defendants, accepted the slab citing in support the vendor's engineering analysis.  This supporting engineering analysis had been previously cancelled.

20

21

425.   As admitted by the Chairman of the Fire Protection Review Board, Ben Johnson, acceptance of the design was made with full

knowledge that the supporting analysis had been cancelled and was considered deficient.  Acceptance, and citation to the invalid justification, was effectuated to resolve concerns as to the slab material.

426.  Defendants were aware that the Specified Technologies Inc. slab did not comply with NFPA requirements and knowingly, or with reckless disregard, accepted and falsely qualified, or permitted a subcontractor or supplier to falsely qualify the non-compliant  Specified Technologies Inc. slab.  Defendants then attempted to cover-up the slab issues to avoid cost increases and schedule delays.

427.  The costs associated with the slab is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to rework the slab will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

## J. MODIFICATIONS TO CATHODIC PROTECTION SYSTEM WITHOUT DESIGN BASIS

428. The WTP plant employs cathodic protection to minimize corrosion of underground pipes, which will carry mixed waste from the Tank Farm to the WTP for processing and treatment.  Cathodic protection is achieved by transforming the underground piping into a corrosion resistant cathode through the application of an electric current from an

anode located underground near the pipes, through the earth, to the pipeline and back to the positive terminal of the current source.

429.    Defendants are required to procure and install the cathodic protection system in accordance "with documented instructions, procedures, or drawings that include or reference appropriate quantitative or qualitative acceptance criteria for determining that prescribed results have been satisfactorily attained."  In preparing a drawing, the originator is accountable for the "design criteria, SSC functional requirements, design basis documents, quality levels, seismic category, SSC characteristics, acceptance criteria, and engineering in analysis."

430.    Defendants have failed to maintain required acceptance criteria, instructions, procedures, calculations, or drawings documenting the installation configuration.

431.    For example, in May of 2009, Defendants changed the cathodic protection design to allow for the installation of ten additional horizontal anodes.

432.    The design change was based on the interpretation of trouble-shooting testing performed by Rod Snowhite and Doug Gilroy.  They determined that 10 "hot spot" anodes should be installed in the vicitnity of the testing location to increase the potentials.

433.   The addition of the 10 anodes lacked any formal documentation as to installation in violation of requirements.  No calculation or evaluation was completed to address the basis for the design change; the anode current demand and requirements were not evaluated prior to changing the design; the anode spacing, type and length of the anode, and the distance from the protected piping were not evaluated prior to changing the design; and the circuit resistance and required rectified output voltage of the anodes were not evalauted prior to changing the design.

434.   The efficacy of the "hot spot" anodes was to be determined during testing subsequent to installation.  This testing determined that the additional ten anodes did not resolve the problem because the ten anodes lacked the sufficient current to maintain potentials as required under NACE.

435.   In March of 2012, it was discovered that Defendants installed an anode cabled in PVC conduit.  This violated design requirements and additionally weakend the ability of the anode to pass current and protect buried piping.

436.  In evaluating its basis for using PVC conduit, Defendants determined that no details or specification provisions existed that allowed the installation configuration cited.  There existed no information in which to address to the work previously performed.

437. Because the cathodic protection system was installed and modified without any foundation or documentation, the entire system lacks traceability, is quality indeterminate, and cannot be relied upon without a verification process.

438. Defendants knowingly, or with reckless disregard, falsely certified that the modifications were within the required design basis when they were not.

439. The costs associated with the cathodic protection system is not precisely known, but is estimated to be in the millions of dollars; further, the cost the United States will incur to rework the cathodic protection system will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

## K.   GOVERNMENT DOLLARS SPENT TO DEVELOP A TOOL FOR PRIVATE GAIN

440. In April of 2001, BNI completed its due diligence of the WTP conceptual design and identified pulse-jet mixing as a technology risk but also one that was "not new."  To resolve mixing issues, the best industry practices would be to conduct additional tests.

441. Following the recommendation of Bechtel's San Francisco-based Advanced Simulation and Analysis Group, Defendants decided to use Computational Fluid Dynamics ("CFD") to analyze the behavior of

slurry waste in the various vessels and verify that the vessels could indeed process all of the waste.

442. CFD is a modeling program that uses complex calculations and coding to determine the behaviour of a specified substance under selected parameters. The Advanced Simulation and Analysis Group is part of Bechtel Research and Development and operates to benefit Bechtel Corporation and its subsidaries.

443. At the time of its decision, Defendants knew that CFD was not the well-established method to resolve mixing issues especially given the complexity of the mixing system and the slurry to be processed. Indeed, members of the Bechtel Advanced Simulation and Analysis Group published articles stating that it was "universally" known that use of CFD was not appropriate for many complex flows and that CFD is prone to error in assessing boundary and initial conditions.

444. Under the guise that CFD modeling would avoid costs related to additional testing, Bechtel elected to use CFD modeling to develop the technology for future commercialization and improve its corporate status as a leader in advanced technology.

445. Lead by the Advanced Simulation and Analysis Group, CFD modeling began in 2002 and evaluated the mixing capabilities of

homogenous Newtonian and non-Newtonian wastes in vessels with pulse jet mixers.

446.   Regarding both Newtonian and non-Netwonian wastes, the CFD modeling did not take into account the requirements for resuspension of solids particles of varying sizes and densities contained in the wastes; in other words, CFD did not bound to the actual waste to be processed.  CFD failed to correlate non-Newtonian mixing to experimental results and additional testing was required.

447.   In 2006, the External Flowsheet Review Team ("EFRT") noted this issue, concluding that insufficient analysis existed with respect to the resuspension of solids in vessels with Newtonian and non-Newtonian slurries:

A critical parameter in the design of PJMs [pulse jet mixers] for solids suspension and re-suspension is the zone of influence (ZOI), which establishes the number of pulsed jets needed for different size vessels.  According to the PJM guidelines, the ZOI should decrease for large, dense, rapidly settling particles; this has not been reflected in the vessel designs. . . . **The computational fluid dynamics model of the system, which has been based on continuous jet flow of two-phase systems, may not be sufficiently validated for the dynamics of PJM**

**operation and needs to be matched to relevant experimental results.**

448.   In responding to the EFRT's concerns, Defendants have, since approximately 2008, made material misrepresentations to ORP with regard to the abilities of CFD, including that (1) CFD is a valid method to confirm pulse jet mixing vessel designs; (2) initial CFD modeling confirmed vessel designs; and (3) CFD has been developed in compliance with quality assurance requirements.

449.   Defendants made such misrepresentations to obtain government funding for CFD for the purpose of developing an advanced technology that will "differentiate [Bechtel] from competitors on bids"—i.e. give Bechtel the competitive edge.

### 1.   *Defendants Misrepresented to DOE the Utility of CFD Modeling*

450.   Following the EFRT Report, Defendants, lead by John Berkoe of Bechtel's Advanced Simulations and Analysis Group, insisted to DOE that CFD was the best choice and could be used to confirm pulse jet mixing vessel designs.

451.   In reality, however, CFD modeling of a complex mixing system involving fluids and solids of varying rheological properties had never been successfully achieved nor could CFD modeling be used for such

1    without significant investment and development—all of which Defendants

2    hid from DOE.

3        452.    Defendants' mixing consultants, Art Etchells and David Dickey,

4    objected to the use of CFD.  In an email Dickey asserted that "[t]he question

5    about CFD is not whether it is a design tool or not.  The question is whether

6    CFD is ever accurate for PJM systems.  The accuracy and predictability of

7    CFD is impossible to judge without conducting extensive research into

8    velocity and concentration measurements of a dynamic PJM system."

9        453.    Relator Tamosaitis agreed with Dickey's assessment; as did

10    John Truax, a Bechtel lead engineer.  Truax noted in an email to Dickey and

11    other Bechtel and URS engineers that while there may be agreement

12    between experimental data and CFD, such agreement was based more on

13    timing than accuracy or certainty:

14        From my knothole participating in previous discussions

15        between the CFD leads and the test leads it was obvious to me

16        that our test methods could not support corellation [sic] of CFD

17        because our sample and data collection methods don't have the

18        accuracy and uncertainty tolerances to meet the rapidly

19        changing variations (and magnitude of those variations in a

20        short time span) of the CFD model.  I should clarify. We could

21        get an answer and it would be correct (one to 20 percent solids)

and you could say it matched CFD because it showed that this number could be correct because it changed greater than this amount in the window where the sample probably was snagged.

454.  Dickey responded to Truax's email, further elaborating on the issues with CFD:

What the Bechtel CFD people are trying to do is state-of-the-art, theoretically possible, but totally unproven.  If pulse-jet mixers are new for solids suspension, CFD for solids suspension is newer.  I am unaware of any significant work that has been done to demonstrate that solids suspension can be modeled with CFD.  Even the attempts to model the vertical distribution of solids in suspension have met with limited success, even for conventional mixers.

Very few people actually use CFD to design mixers.  CFD is used to explore aspects of mixing, such as local velocities, turbulence intensity, and other fluid flow that cannot be easily measured.  However, I have often contended that I could develop a more reliable mixer design using power per volume, torque per volume, or even tip speed than most CFD analysis.

CFD can provide detailed estimates of local velocities, of which we do not know what is necessary for process success.

The advocates for designing PJMs with CFD, obviously do not understand the limits of CFD. To say that CFD is not used to design conventional mixers is probably an overstatement, but it is much closer to the truth than saying CFD can be used to a design mixers.

455.    Dickey continued to share his concern with the use of CFD and conducted an informal survey among independent CFD experts asking them:

1.    Has CFD been successfully used as the primary or only design method for sizing a mixer?

2.    Are CFD velocities or turbulence intensities sufficient to predict successful process results?

3.    Has CFD been used to predict off-bottom suspension for a mixer application?

4.    Can a validated CFD model be used for scale-up with or without geometry changes?

456.    The result of Dickey's informal survey clearly indicated that CFD was not a proven technology for mixing design:

1.   CFD is rarely used as a primary design tool, because other more reliable, empirically derived methods are available.

2.   Most CFD is used for comparison or evaluation of design options.

3.   No one uses CFD to predict solids suspension.

4.   Use of CFD for scale-up goes both ways. Some use it, others do not.

…

As expected, for conventional mixers, with almost 20 years of CFD experience and many models with research validation., the use of CFD as a design tool is extremely limited. Some use it as part of equipment design and scale-up.  Most use CFD as a tool to understand or support mixer design, but not as the primary design tool.  I think that those people recommending the use of CFD for PJM design are uninformed about the actual use and success of CFD in mixer design. I would like to see CFD used as we have discussed to enhance and supplement analysis and evaluation of PJMs. CFD is a tremendously useful tool for comparing and evaluating mixers, it is just not a design tool.

457.   The concerns with CFD were known to Defendants, including then-WTP Project Director, Ted Feigenbaum, and other core members of Defendants' management of the WTP, such as Robert Voke, the functional WTP Manager of Mechanical Engineering.   In a recent conversation involving Relator Busche and Susan Homber, Voke admitted that he, along with other engineers, knew that CFD could never be used for its cited purpose and that Defendants had known for years.

458.   Yet, Defendants did not communicate these concerns to DOE. Instead, Defendants falsely touted CFD as the tool that could and would be used to confirm the design of the PJM vessels, knowing that CFD could not bound the design to average mixing situations.   For instance, Bechtel told ORP that CFD was a "proven analytical technique in the industry;" and that "WTP ha[d] 8 years of successful application for mixing and thermal analysis."   In actuality, CFD had never been used to predict the behaviour of slurry, and analysis as early as 2006 had shown that CFD could not bound the mixing design.

## 2.   *Defendants Misrepresented to DOE the Results of CFD Analysis*

459.   Defendants misrepresented to DOE that there is "good" agreement between experimental data and CFD analysis.

460. Factually, the correlation between CFD modeling and experimental data was (1) not predictable nor consistent; (2) too simplified as to be beyond a usable margin; and (3) not truly in agreement.

461. Defendants misrepresented the results of CFD modeling to DOE in order to falsely portray CFD as valid and falsely verify PJM vessel designs.

### 3. Defendants Failed to Implement Quality Assurance Requirements in CFD Testing

462. In developing CFD models to resolve the M3 issue, Bechtel failed to use NQA-1 quality data, rendering analytical results indeterminate. Bechtel then claimed closure of the M3 issues, relying on data from quality indeterminate CFD modeling.

463. In anticipation of testing to "verify and validate" CFD, Defendants failed to take basic quality assurance steps necessary to ensure useful, applicable testing. Defendants failed to establish: (1) a design guide for CFD; (2) a "plan that clearly laid out the steps for systematic V&V of the CFD model," and instead lacked procedures or analysis to compare experimental and model predictions; and (3) basic feasiability analysis—all of which violate NQA-1.

464. Defendants made these and other misrepresentations in order to convince DOE to continue CFD development using taxpayer dollars

with the goal of using the technology in other private, commercial applications. For example, Bechtel had previously used CFD technology for Conoco, Chevron, BHP-Biliton (Cerro Matoso Ferronickel Smelter), and many others.

465. As a result of Defendants' false claims to DOE concerning CFD, Defendants have received over approximately $16,000,000 from the United States and continuing and unwarranted support for Defendants in their dual role as design authority and design agent.

## L.   FAILURE TO IMPLEMENT SAFETY REQUIREMENTS

466. The WTP is a DOE capital project governed by DOE Order 413.3B. All DOE capital projects require the integration of safety at the outset, including design development, for all functions and processes of the project. Safety integration must be maintained throughout the life of the project.

467. As mandated by DOE Order 413.B, DOE capital project safety documents are governed by nuclear safety requirements defined in 10 C.F.R. 830, and safety documents must follow the format and content requirements of DOE-STD-3009.

468. The WTP Safety Requirements Document, Volume II, implements 10 C.F.R. 830 and identifies the safety criteria that Defendants are required to comply with when designing, procuring, and constructing

the WTP.  This criteria includes ensuring that the WTP can withstand hazards, natural and unnatural.

469.  To assess the necessary safety protections for the WTP, DOE Order 413.B, 10 C.F.R. 830, and the WTP Contract each require that the analysis of potential hazards be documented in a Preliminary Documented Safety Analysis ("PDSA").  The PDSA identifies hazards and corresponding impacts to SSCs, including whether a SSC serves a safety function such as active or passive confinement.  The PDSA likewise provides the safety requirements—e.g., the safety controls that a SSC must have—that must be met in designing, procuring, and constructing the WTP.

470.  The PDSA hazards analysis is an integral fixture of the design process and must be flowed down to ensure the inclusion of all necessary safety controls.  As such, Defendants are required to maintain PDSAs with respect to new safety information, design changes, and updates to administrative controls.

471.  In 2002, Defendants developed separate PDSAs for the PT, LAW, HLW, and LAB facilities.  Defendants have modified the PDSAs to account for changes to hazards analysis and the design.

472. Defendants, however, have knowingly failed to incorporate known hazards and certain design changes into the PDSAs.  Because

incorporation of such hazards and design changes would render the current design unsatisfactory, Defendants have decided not to maintain the PDSAs.

473.   As a result, Defendants have knowingly continued to design, procure, and construct the WTP using, or flowing down to subcontractors, safety requirements that do not account for all hazards or design changes and are noncompliant with DOE Order 413.B, 10 C.F.R. 830, and other regulations pertaining to the Dangerous Waste Permit.

474.   A recent Investigation Report issued by the Office of Health, Safety and Security's Office of Enforcement and Oversight noted that in maintaining PDSAs, "it is incumbent upon BNI to identify safety SSC functional requirements and performance criteria through a formal comprehensive and accident analysis and to flow down those requirements and criteria to the engineering designers for incorpoation into the design."

475.   The following are examples of Defendants' systemic failure to integrate safety requirements into the design:

### 1.   *The PT PDSA Failed to Identify Known Safety Hazards in the Ultrafiltration Process System*

476.   In 2008, Defendants identified hazards associated with the design of the Ultrafiltration Process System steam spargers—namely, if the temperature of the fluid in the pulse jet mixer charge vessels exceeded 130°

F, the liquid would flash to water vapor.

477.   Defendants determined that this flashing could cause a more rapid than expected accumulation of particulate matter on filters in the Pulse Jet Ventilation System.  The build up on these filters, known as high efficiency particulate air filters ("HEPA"), could result in an overblow.

478.   An overblow would render the HEPA filters unable to fulfill their safety function.

479.   Despite formal recognition by Defendants of the overblow potential, past and current versions of the PT PDSA neither addressed or proposed a resolution of the hazard.  The PT PDSA did not recognize the overblow potential in the Ultrafiltration Process System as an unresolved hazard.

480.   As a result, Defendants or Defendants' subcontractor, designed, fabricated, tested and installed SSCs related to the Ultrafiltration Process System that failed to address mandatory safety measures pursuant to 10 C.F.R. 830.

481.   The cost the United States will incur to reevaluate, rework, redesign, refabricate, retest and reinstall SSCs related to the Ultrafiltration Process System will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

**2.**    *The PT PDSA Failed to Identify Safety Functions and Changes to the PVV/PVP System*

482.    Defendants are required to obtain DOE approval of nuclear safety design criteria to be used in preparing the PDSA unless Defendants have used the design criteria identified in DOE Order 420.1.

483.    DOE Order 420.1B and DOE-STD-3009 require that safety analyses be used to establish the safety controls and determine the functional requirements for Safety Class and Safety Significant SSCs.

484.    The Safety Requirements Document Volume II likewise defines Safety Class SSCs as those systems required to protect the public, which include those SSCs that could inhibit other Safety Class SSCs from performing their intended function.  In other words, if the failure of "SSC-1" could prevent "Safety Class SSC-2" from completing its safety function, "SSC-1" must also be designated as "Safety Class."

485.    In the PT PDSA, Defendants failed to apply this designation to hot air in-bleeds in the PVV/PVP system.

486.    Since 2006, Defendants knew that the hot air in-bleeds protected the HEPA, but refused, even after notification from ORP, to update its PDSA.

487.    As a result, Defendants or Defendants' subcontractor, designed, fabricated, tested, and installed SSCs related to the PVV/PVP System that

failed to address mandatory safety measures pursuant to 10 C.F.R. 830.

488.   In addition, in 2010 Defendants changed WTP functional requirements by increasing the aerosol entrainment coefficient.   This change significantly impacted the designed PVV/PVP filtration system with regard to aerosol loading during normal operations and a seismic event.

489.   Defendants failed to update the PT PDSA to reflect this change to the PVV/PVP system.

490.   As a result, Defendants or Defendants' subcontractor, failed to re-design the impacted portions of the PVV/PVP system, continued to design the entire PVV/PVP system without considering the changed requirements, and tested and/or installed SSCs related to the PVV/PVP system that failed to address mandatory safety measures pursuant to 10 C.F.R. 830.

491.   The cost the United States will incur to reevaluate, rework, redesign, refabricate, retest and reinstall the PVV/PVP system will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

### 3. The PDSA Safety Classifications Related to the PT Facility Fire Barrier Design Were Not Based on Required Hazard Analyses

492. WTP PDSAs must document safety analysis. The PDSA safety evaluation includes the identification of hazards, identification of potential/event sequences, identification of potential control strategies, and documentation of the hazard evaluation.

493. In the PT PDSA, Defendants defined the safety criteria for the fire barrier design without performing safety or fire hazards analyses.

494. Defendants issued for procurement and construction most of the fire barrier design without having performed safety or fire hazards analyses.

495. Because Defendants failed to perform safety or fire hazards analyses for the fire barrier design, Defendants could not determine whether the PDSA requirements had been properly implemented in the design, and specifically, where the fire barrier design had proper safety class designations.

496. The cost the United States will incur to reevaluate, rework, redesign, refabricate, retest and reinstall SSCs related to the fire barrier design will be massive and will have a detrimental impact on the ability of DOE to meet its obligations under the Tri-Party Consent Decree.

### 4. Defendants Failed to Account for Known Volcanic Ashfall Hazards in Designing Safety Class and Safety Significant SSCs

497.   Safety Class and Safety Significant SSCs must be designed to withstand the effects of natural phenomena hazards, such as volcanic ashfall, earthquakes, wind, and floods, without the SSCs losing their capability to perform intended safety functions.

498.   Defendants' strategy for controlling hazards during a volcanic ashfall event relies on the change-out of filters.

499.   In February 2009, DOE questioned the approach, noting that it would be infeasible to exchange over 7000 filters in less than 24 hours.

500.   Defendants did not update the PDSA of any facility to correct the infeasible approach nor did Bechtel indicate in the PDSAs that a problem existed.  Defendants continued to design, fabricate, test and install Safety Class and Safety Significant SSCs without knowing whether the SCCs would perform intended safety functions following a volcanic ashfall event.

501.   The cost the United States will incur to reevaluate, rework, redesign, refabricate, retest and reinstall SCCs related to the ability of Safety Class and Safety Significant SSCs to withstand volcanic ashfall will be massive and will have a detrimental impact on the ability of DOE to

meet its obligations under the Tri-Party Consent Decree.

## M.    A NONCOMPLIANT QUALITY ASSURANCE SYSTEM

502.  Quality Assurance requirements for DOE contractors are mandated by 10 C.F.R. 830, Subpart A.  To comply with this subpart, Bechtel selected the NQA as the quality assurance standard; accordingly, the WTP must conform to the requirements of NQA-1.

503.  Accordingly, the WTP Contract likewise requires Defendants to comply with NQA-1.  Yet, Defendants represented that they applied these quality standards when they have not.

504.  At all material times, Defendants did not have an effective quality assurance system.   Rather, with the full knowledge and participation of its senior managers, Defendants have for many years used its quality apparatus to create the superficial appearance of maintaining a functional quality system while in fact taking actions with the purpose and intent of hiding systemic flaws in order to expedite the design and construction of WTP.

505.  To avoid the application of safety requirements by E&NS, Defendants' Design Engineering group, ignoring quality assurance procedures, purposefully failed to include E&NS in design approvals. Relator Busche, despite being the manager of E&NS and responsible for the

Safety Basis, was excluded from meetings or prevented from reviewing designs important to safety on multiple occassions.

506.  Defendants concealed SSC quality control issues by not tracking the issues as required or by closing out the issues without resolving them.

507.  Upon the identification of non-conforming SSCs, Defendants are required to issue a non-conformance report ("NCR"), which documents Defendants' approach to resolving the deficiency. A NCR may only be closed upon the determination of whether to accept the SSC "as-is", "re-work" or "repair" the SSC, or reject the SSC, and justification of the determination must be documented.

508.  All outstanding NCRs must be reported to ORP monthly.

509.  In 2006, Defendants reported that they had procured Safety Class and Safety Significant SSCs that failed to meet quality requirements for seismic and environmental conditions.  Instead of entering separate NCRs for each non-conforming SSC, Defendants issued two NCRs; one for all SSCs that fail to meet seismic requirements and the other for all SSCs that fail to meet environmental requirements.

510.  Since 2006, upon the identification of new non-conforming Safety Class or Safety Significant SSCs, Defendants have added the newly

identified SSC to the NCR established in 2006 instead of creating a new NCR for each non-conformity.

511.  Upon information and belief, Defendants stopped creating NCRs to mask the number of non-conforming Safety Class and Safety Significant SSCs that would otherwise be reported to DOE on a monthly basis.

512.  In the few instances where NCR reports have been issued for non-conforming Safety Class and Safety Significant SSCs, Defendants have accepted the product for use "as-is" without providing justification sufficient to meet quality requirements.

513.  By way of example, in November of 2010, a series of NCRs were entered to document the receipt of piping of an indeterminate quality procured from Shaw Naptech.  This piping was designated as Safety Class or Safety Significant and thus was required to meet stringent pedigree requirements—Shaw disputed that it had provided the requirements in its purchase order.  Defendants determined the pipe could be used "as-is" in safety applications, justifying its decision through samples tested from "similar" piping spools.  This justification did not resolve the traceability or pedigree problems of the specific piping spool at issue.

514. In addition, WTP employees may anonymously submit concerns to the Project Issues Evaluation Report ("PIER") system.

Concerns are evaluated by a group that assesses whether the concern is valid and worth investigating.

515. Since as early as 2004, and likely earlier, PIERs have been submitted by WTP employees regarding the failure to flowdown requirements to subcontractors and the acceptance of safety class and safety significant SSCs that are of an indeterminate quality.

516. Defendants closed PIERs without addressing or resolving the non-conforming Safety Class or Safety Significant SSC.

517. In addition, Defendants maintained multiple lists of issues instead of a singular overall list to create confusion and avoid detection of all WTP issues that could otherwise be discovered were they centralized. The various lists include, among others, the managers list, the "empty the drawers list," and the list of reliablity validation project issues—the majority of issues contained on this latter list have been excluded from the PIER system at the direction of Ward Sproat and Joe St. Julian, both Defendants' management.

518. To avoid formal reporting, Bill Gay of URS instructed Jennifer Meehan to develop the VCT list, also known as the Meehan list, to track technical issues related to vessel, piping, mixing and other unresolved issues. Defendants instructed Meehan to destroy the spreadsheet in

November of 2012 in order to end tracking of the issues.  Meehan archived the spreadsheet.

519.  In the Fall of 2012, the DOE Office of Enforcement and Oversight identified deficiencies in the corrective action processes stemming from management problems and lack of identification and reporting of issues.

520.  The cost of a government contractor's quality system is factored into the cost to the United States, and a properly-functioning quality system is part of the consideration a contractor provides the United States in exchange for contract payments.

521.  Defendants were not only required to maintain a fully-functioning quality system, but based on Defendants' false certifications, were given taxpayer dollars to do so.

### N.    FALSE CLAIM FOR MONEY FOR DESCOPED WORK

522.  Capital line item projects are governed by DOE Order 413.3.

523.  DOE Order 413.3 and the WTP Contract required the contractor to achieve 4 "Critical Decisions," which are deliverables that must be met prior to transferring the WTP to another contractor, presumably URS, for operations.

524.    In 2011, Bechtel realized that it could not meet the deliverables required by DOE Order 413.3 and the WTP Contract without spending approximately $310,000,000.

525.    To avoid the expenditure, Bechtel strategized to obtain a phased Critical Decision-4 ("CD-4"), which would descope many elements of the deliverable and transfer the work to operations.

526.    In a 2011 "Opportunity Assessment Sheet," Bechtel noted that "IF DOE directs a phased Critical Decision 4 (DOE O 413.3), THEN current WTP Contract scope that is beyond CD-4 could be performed using funding from DOE Operations budget thus reducing line item cost."

527.    Bechtel proposed that these descoped portions, most of which pertained to nuclear safety, be completed by the operations contractor out of non-capital line item funds.

528.    URS, as the presumed contracter for WTP operations, pushed for this as well because it would provide additional sources of money for operations.

529.    Bechtel submitted a baseline cost proposal in 2012, requesting the descope of work but not the descope of funding as required by law. Bechtel disguised this request by including it in a baseline change proposal for additional funds to complete requested changes to LAW, LAB, and BOF.

530.   Bechtel and URS, utilizing Thomas Brown, a Deputy Federal Project Director and former 20 year Bechtel executive, pushed the Federal Project Director and the Contracting Officer to approve the baseline cost proposal.

531.   Bechtel and URS, having had prior experience with the process of descoping work subject to DOE Order 413.3, knew, or should have known, that the descope could only be approved by a Secretarial Acquisition Executive.   Namely, in 2006, prior to a baseline change affecting DOE Order 413.3 work, Bechtel requested authorization from Secretarial Acquisition Executive.

532.   Following ORP approval of the 2012 baseline cost propsal, Jack Surash of DOE-HQ questioned the validity of ORP and Bechtel's actions.

533.   Bechtel ignored DOE-HQ and dedicated the money for engineering tasks as if the money was not tied to the CD-4 deliverable.

534.   Despite descoping much of the CD-4 deliverable, Bechtel kept the money that would have been spent on the CD-4 deliverable and used that money elsewhere, including on engineering tasks.   As a result, Bechtel knowingly submitted a false claim for payment of funds for descoped work, costing the United States millions of dollars.

**O. FALSE CLAIM FOR MILESTONE AWARD: LAB CONSTRUCTION SUBSTANTIALLY COMPLETE**

535. The WTP Contract provides incentive awards for the completion of facility and activity milestones. For example, Defendants earn an additional fee when construction of a facility is completed by a certain date.

536. To earn a milestone award of $4,000,000, Defendants were required to complete the construction of LAB by December 31, 2012. The criteria to achieve this milestone were finalized in February of 2012 and included, among others, installation of the fire protection system.

537. In December of 2012, Bechtel submitted a claim to ORP for the milestone fee award, misrepresenting to ORP that it had substantially completed construction of LAB.

538. Bechtel falsely claimed that it had completed construction of the fire protection system: "The design, procurement, installation of piping and inline components, and testing of the fire protection sprinkler systems required to meet the milestone are completed."

539. Substandard design/installation practices by subcontractors, including Patriot, Inc., and a lack of engineering oversight, resulted in an installed sprinkler system that failed to meet fire standards and safety requirements. Specifically, the fire sprinkler system failed to properly

place hangers within required distance, and the system lacked discernible logic for branch line configuration, fitting selection, or pipe sizing. As a result, system branch-line configurations were installed that form a haphazard combination of plugged tees and plugged armovers, reducers, unions, couplings, and random jogs that failed to meet safety and system performance requirements.

540. Defendants knew that the fire sprinkler system, as designed and installed, failed to meet requirements prior to claiming payment for LAB Substantially Complete. In requesting award payment, Defendants certified completion of the sprinkler system and omitted all facts concerning the system's failure to meet requirements. The completion of the fire sprinkler system was material to DOE's decision to pay Defendants award payment of $4,000,000 associated with the LAB Substantially Complete milestone.

## P. FALSE CERTIFICATION OF TRI-PARTY AGREEMENT MILESTONE M-062-49

541. In addition to incentive awards, Defendants earn awards under a Performance Evaluation Measurement Plan ("PEMP"). Under the PEMP, Defendants are evaluated bi-annually for awards amounting to millions of dollars.

542.  For the 2011-B PEMP award of $6,300,000.00, DOE placed primary emphasis on the completion of Tri-Party Agreement milestone M-062-49.  To complete this milestone, Defendants were required to certify the WTP's ability to treat 100% of the waste.

543.  In July of 2011, Frank Russo certified to DOE and the State of Washington in a document entitled "WTP Design Capability Study" the ability of the WTP to treat 100% of waste that:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

544. Predicating this certification were "assumptions" that Defendants asserted would be met, including among others:

a)    The remaining open and to-be-identified issues (e.g.,

pulse jet mixer mixing) are resolved without impact to WTP throughput;

b)     A Supplemental Low-Activity Waste (LAW) Facility is modeled as a black box with no constraints on the WTP and is available upon WTP start-up.

c)     The WTP manages all internal recycles and no recycles are returned from the Supplemental LAW Facility; and

d)     The minimum WTP operating efficiency of 70% is applied throughout the treatment duration.

e)     Criticality is not a credible event at the WTP for all waste received and processed.

545.   These assumptions are unachievable, and Defendants, at the time of Russo's July 2011 certification, knew the assumptions to be unattainable; for example:

a)     Resolving "open and to-be-identified issues (e.g., pulse jet mixer mixing)," according to Defendants' own data, results in reduced throughput because (1) the scale-up factor used by Defendants to assess the vessels reduced overall waste throughput and (2) vessels and related internals could not be enlarged as they had already been purchased and installed by Defendants.

b)      Designing, building, and constructing a Supplemental Low-Activity Waste (LAW) Facility cannot be completed by the commissioning date—given constraints with funding, contracting, and pattern and practice—unless Defendants knew commissioning would be delayed—a fact Defendants would be legally required to disclose to the State of Washington and did not.

c)      Processing a recycle feed from a Supplemental LAW Facility cannot be realistically achieved in a black box with no constraints.  LAW has similar recycle streams that feed back to PT. The Supplemental LAW Facility would have no such treatment center and incapable, as a black box with no constraints, to treat the recycled stream.

d)      Maintaining a minimum operating efficiency of 70% requires Defendants to increase their current predicted performance, which does not consider all operational issues, such as those identified within CLIN 3.2, that will affect efficiency and lower true values for downtime.

e)      Ensuring that criticality is not a credible event requires Defendants to apply a deterministic approach and assess all potential criticality events, regardless of its probability of occurrence. Defendants have, in violation of DOE-STD-3009, sought to apply a

226

1   probabilistic approach to remove safety controls for events deemed

2   "unlikely" which leaves criticality a possible event.

3   546. Defendants knew, or should have known, that these

4   "assumptions" could not be "assumed," and yet misrepresented to the

5   United States that these assumptions were reasonable and the assumptions

6   could and would be met.

7   547.  As a result of Defendants' false claims to DOE concerning the

8   WTP's ability to treat 100% of the waste, Defendants received $3,877,000 of

9   the 2011-B PEMP award fee from the United States.

10   **Q.   MANIPULATION OF PERFORMANCE METRICS**

11   548. Defendants submit monthly reports to DOE that contain

12   performance metrics derived from budget and schedule tracking programs,

13   including the WTP Earned Value Management System ("EVMS").   The

14   EVMS is a system that integrates a government contractor's work scope,

15   cost, and schedule into a performance measurement baseline ("PMB") in

16   order to more easily track the contractor's progress.

17   549. Performance Measurement Baselines include information

18   comparing scheduling data, for example budgeted cost of work scheduled

19   ("BCWS") and actual cost of work scheduled ("ACWS"), and cost data, for

20   example budgeted cost of work performed ("BCWP") and actual cost of

21   work performed ("ACWP").

550. The collection of this data allows Defendants to identify performance trends. For example, the BCWS may be compared with the ACWS to measure whether the completion of a task or project is behind or ahead of schedule—an index known as the Schedule Performance Index ("SPI"). Likewise, after comparing the BCWP with the ACWP, an index known as the Cost Performance Index ("CPI") measures whether a task or project is above or below costs.

551. Defendants are required to submit the Schedule Performance Indexes and Cost Performance Indexes pertaining to all phases of WTP design and construction to ORP in monthly reports, and DOE relies on these metrics in paying Defendants under the WTP Contract.

552. DOE also relies on these monthly reports and a bi-annual Self-Assessment to determine the incentive fees earned by Defendants under the Performance Evaluation and Measurement Plan ("PEMP"). The WTP Contract ties approximately $6.0 million in fees to the PEMP incentives.

553. To maximize potential fees, Defendants have manipulated performance metrics to minimize cost and schedule delays and falsely lower SPI and CPI measurements, including (1) moving scope and budget to the future; (2) authorizing and performing work without an associated budget; and (3) manipulating the PMB and misusing Management Reserve.

### 1.    *Defendants Moved Scope and Budget to the Future to Alter SPI Indexes*

554.   Defendants moved scope and budget in then-current performance periods to future periods.   As noted in a 2011 DOE surveillance of the issue, Defendants acknowledged that "they would wait until the end of the current reporting period to shift work not completed to future months."

555.   For example, Judy Aman, a Project Controls lead for E&NS, knowingly offset bad performance by adding dummy lines into the EVMS schedule.

556.   Moving current work scope to the future "is a clear example of current period changes that eliminate what would otherwise be negative schedule variances and would result in a lower schedule performance index (SPI).  This may explain why the WTP SPI remains near 1.0 after five years."

557.   Defendants, prior to and after 2011, abused the scheduling process by moving current work scope to the future to falsely project to DOE that Defendants had achieved positive scheduling performance in order to obtain payment under the WTP Contract, including payment for PEMP incentive fees.

1

2

3

**2.**    *Defendants Authorized and Performed Work Without a Budget To Delay Reporting of Costs and Schedule*

4

5

6

7

558.  Defendants' Advanced Work Authorization ("AWA") process provides that in limited situations, such as where insufficient time exists to prepare and process a baseline cost proposal ("BCP"), work may be performed prior to receiving formal government authorization.

8

9

10

11

12

13

14

15

559.  Defendants abused this process by using AWAs to perform work without government authorization in situations where it was not necessary or justified and then failing to allocate the cost associated with the work to the Performance Measurement Baseline once the work was authorized, thereby misrepresenting project costs that would otherwise be included in the PMB.  "The implementation of scope without budget skews both schedule and cost performance because there is no BCWS established; there, no BCWP can be claimed."

16

17

18

19

20

21

560.  Defendants delayed the discovery of schedule delays and cost overruns that affect the determination of SPI and CPI by abusing the AWA system, thereby manipulating their reported cost and scheduling data to falsely project to DOE positive performance at the WTP in order to obtain payment under the WTP contract, including payment for PEMP incentive fees.

### 3. *Defendants Manipulated the PMB and Misused Funds from Management Reserve*

561. Defendants have purposefully employed a scheduling and budget strategy that disguises variances by adjusting the recorded schedule and budget to minimize the appearance of cost overruns or delays.

562. Defendants adjust the schedule by modifying BCPs for future work so they include work that is to be completed presently, and Defendants adjust the budget by using funds from Management Reserve ("MR") to cover cost overruns. MR funds are a set of funds budgeted to Defendants that cover costs due to unforeseen circumstances as they arise Pursuant to WTP procedures, MR is not to be allocated to specific work, is not to be used to cover cost overruns, and is not considered part of the Performance Measurement Baseline. Defendants misappropriated MR funds by using them to cover cost variances, thereby reducing the funds available for costs resulting from unforeseen circumstances, the intended purpose of MR funds, and causing an overall increase in project costs.

563. Through such replanning, Defendants knowingly gave the false appearance to DOE that the WTP was on schedule (SPI) and near budget (CPI) in order to obtain payment under the WTP contract, including payment for PEMP incentive fees.

### 4.    *Defendants Broke EVMS Scheduling Ties and Modified Rules of Credit to Maintain Performance*

564.   Designing and constructing the WTP involves coordinated and interrelated efforts by multiple groups, such as Engineering, E&NS, R&T, and Project Management, among others.  EVMS traces the parallel efforts of different groups on a given work scope by linking groups who are performing interrelated work and tracking their performance as a whole.

565.   This EVMS function allows evaluation of whether a scope of work is on schedule by providing a central database of all individual groups connected to the project and their schedule status.  This system is relevant to promote WTP project efficiency because if an individual group is behind schedule, the performance of the overall work scope is adversely affected.

566.   To avoid such adverse affects, Defendants knowingly broke scheduling ties among groups to maintain performance measures.

567.   Defendants likewise adjusted the rules of credit, or criteria, that define whether a work scope may be deemed complete in EVMS. Defendants modified the rules of credit so that Defendants could claim completion of discrete tasks and maintain positive performance measures.

568.   By breaking scheduling ties and modifying rules of credit, Defendants knowingly gave the false appearance to DOE that the WTP was

on schedule (SPI) and near budget (CPI) in order to obtain payment under the WTP contract, including payment for PEMP incentive fees.

569.  DOE relied upon the representations made by Defendants in their status reports and project meetings to authorize payments to Defendants under the WTP Contract, including the payment of PEMP incentive fees.  As a result, DOE has overpaid Defendants for their services. Additionally, the implementation of the WTP has been delayed, adversely impacting DOE's goal of commissioning the WTP and treating the dangerous mixed waste located at the Hanford Site.

## COUNT I

**False Claims Act – Hanford Waste Treatment Plant**

570.  The allegations of paragraphs 1 through 570 are realleged as if fully set forth herein.

571.  Defendants, acting with actual knowledge or reckless disregard, submitted or caused to be submitted, false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1).

572.  The claims were false because Defendants claimed or certified to the United States or another contractor, within the terms of 31 U.S.C. § 3729(c), that a product was being delivered to the United States which conformed to all contract requirements when that statement was false.

233

573. Defendants, acting with actual knowledge or reckless disregard, made, used, or caused to be made or used, false records or statements to obtain payment from the United States for false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(2).

574. Every request for payment submitted by Bechtel to the United States under the WTP Contract, which was fraudulently secured by a bid that Bechtel knew, or should have known, to be insufficient to complete contractual requirements, constitutes a violation of the False Claims Act.

575. Every request for payment submitted by Defendants to the United States with respect to testing, which actually or impliedly certified that Defendants performed such testing in accordance with contractual requirements when Defendants knowingly, or with reckless disregard, failed to do so constitutes a violation of the False Claims Act.

576. Every request for payment submitted by Defendants to the United States with respect to the design, procurement, and construction of SSCs, which actually or impliedly certified that Defendants procured, constructed, and/or installed such SSCs to contractual requirements when Defendants knowingly, or with reckless disregard, failed to do so constitutes a violation of the False Claims Act.

577. Every request for payment submitted by Defendants to the United States for activities related directly or indirectly to lobbying

constitutes a violation of the False Claims Act.

578.  Every request for accelerated payment submitted by Defendants to the United States where Defendants falsely claimed that such payment would be used to accelerate certain activities when Defendants knew, or should have known, that the accelerated payment would not be used for such activities or that such activities would be completed irrespective of the accelerated payment constitutes a violation of the False Claims Act.

579.  Every BCP submitted by Defendants to the United States where Defendants falsely claimed that the funds associated with that BCP would be used to complete certain work when Defendants knew, or should have known, that the funds associated with that BCP would be used elsewhere constitutes a violation of the False Claims Act.

580.  Every request for payment submitted by Defendants to the United States for incentive or milestones that Defendants falsely claimed or certified had been met constitutes a violation of the False Claim Act.

581.  Every request for payment submitted by Defendants to the United States related to the activities identified in paragraphs 1 to 570, which actually or impliedly certified that Defendants performed such activities in accordance with contractual requirements when Defendants knowingly, or with reckless disregard, failed to do so constitutes a

1    violation of the False Claims Act.

2        582.   Each of the false statements made in each false claim to the

3    United States or to another contractor had the potential to influence the

4    United States' decision whether to pay the claim.

5        583.   The amounts of the false or fraudulent claims to the United

6    States were material, and the United States has been damaged as result of

7    Defendants' violations of the False Claims Act.

8                                    **COUNT II**

9        **False Claims Act Conspiracy – Hanford Waste Treatment Plant**

10        584.   The allegations of paragraphs 1 through 570 are realleged as if

11    fully set forth herein.

12        585.   Defendants entered into tacit and explicit agreements pursuant

13    to which Defendants conspired to defraud the United States in violation of

14    the False Claims Act, 31 U.S.C. § 3729(c).

15        586.   Acting in a conspiracy, Defendants, acting with actual

16    knowledge or reckless disregard, submitted or caused to be submitted to

17    the United States, false or fraudulent claims for payment in violation of 31

18    U.S.C. § 3729(a)(1), and made, used, or caused to be made or used, false

19    records or statements to obtain United States' payment of false or

20    fraudulent claims in violation of 31 U.S.C. § 3729 (a)(2) as identified in

21    Count I, paragraphs 571 through 584 and incorporated herein.

## V.       DAMAGES

587.   The allegations of paragraphs 1 through 570 are realleged as if fully set forth herein.

588.   Defendants knowingly made false statements and submitted false records to secure approvals of its false claims and monies to which it is not entitled, and their violations warrant restitution of monies they fraudulently obtained or monies to repair problems resulting from Defendants' falsities.

589.   Upon information and belief, the amount of monies fraudulently obtained is in excess of a billion dollars and the amount to repair is multiple billions of dollars.

590.   The United States is likewise entitled to recover treble damages.

591.   Additionally, Defendants are liable for civil penalties prescribed by 43 U.S.C. § 1350.

## VI.      JURY REQUEST

592.   Relators request a trial by jury.

## VII.     PRAYER FOR RELIEF

593.   WHEREFORE, Plaintiff, United States, through Relators, request the Court enter the following relief:

a.        That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

b.          That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.          That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

d.          That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

e.          That Relators recover such other relief as the Court deems just and proper.

All of which is respectfully submitted,


/s/ Richard C. Eymann
Richard C. Eymann, WSBA #7470
EYMANN ALLISON HUNTER JONES P.S.
2208 W. Second Avenue
Spokane, Washington 99201
Telephone:  (509) 747-0101
Facsimile:    (509) 458-5977
E-mail:  eymann@eahjlaw.com


Hugh P. Lambert
Emily C. Jeffcott
Cayce C. Peterson
THE LAMBERT FIRM, PLC
701 Magazine Street

New Orleans, Louisiana 70130
Telephone:  (504) 581-1750
Facsimile:   (504) 529-2931
E-mail:       hlambert@thelambertfirm.com
                   ejeffcott@thelambertfirm.com
                   cpeterson@thelambertfirm.com


*Attorneys for Relators*